CIENEGA GARDENS, et al., Plaintiffs,

v.

UNITED STATES, Defendant.

Chancellor Manor, et al., Plaintiffs,

v.

United States, Defendant.

Nos. 94–1C, 94–10004C, 94–10009C, 94–10013C, 94–10029C, 98–39C, 98–3911C, 98–3912C.

United States Court of Federal Claims.

Aug. 29, 2005.

Everett C. Johnson, Jr., Latham & Watkins, Washington D.C., for Cienega Gardens-related plaintiffs. With him were Susan S. Azad, Latham & Watkins, Los Angeles, CA, and Heather McPhee and Laura Perkins, Latham & Watkins, Washington D.C. With him on the briefs were Richard P. Bress and Leonard A. Zax, Latham & Watkins, Washington D.C.

Jeff H. Eckland, Eckland & Blando LLP, Minneapolis, MN, for Chancellor Manor-related plaintiffs. With him was Mark J. Blando, Eckland & Blando, Minneapolis, MN.

Kenneth M. Dintzer, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, and Kenneth D. Woodrow, David A. Harrington, Timothy P. McIlmail, Sean Dunn, Cristina C. Ashworth, and Michael Austin, Trial Attorneys, Department of Justice, Washington, D.C.

## *OPINION AND ORDER*

LETTOW, Judge.

A 22-day trial was conducted in these two sets of consolidated low-income housing cases after the Court of Appeals for the Federal Circuit remanded them for trial of temporary takings claims. *See Chancellor Manor v. United States,* 331 F.3d 891 (Fed.Cir.2003); *Cienega Gardens v. United States,* 331 F.3d 1319 (Fed.Cir.2003) ("*Cienega VIII*"). The Court of Appeals issued its closely related decisions in *Chancellor Manor* and *Cienega VIII* on the same day. In *Chancellor Manor,* the Court of Appeals reversed a trial court's grant of summary judgment in favor of the government on temporary takings claims of three plaintiffs, and in its order of remand it directed that a "searching factual inquiry" be conducted at trial. 331 F.3d at 906. In *Cienega VIII,* the Court of Appeals also held that a trial court had erred in granting summary judgment to the government on temporary takings claims put forward by 42 plaintiffs. 331 F.3d at 1353. In that case, however, a trial had previously been held on contract-damages claims of four model plaintiffs, and the Court of Appeals concluded that the resulting evidentiary record was sufficient to determine that a temporary regulatory taking had occurred and that the original damages judgment should be reinstated as to those four plaintiffs, subject to adjustment as necessary to provide just compensation. *Id.* at 1353–54.[1] As to the remaining thirty-eight plaintiffs, the Court of

1. This court previously held a trial on adjustments to the just-compensation award for the four model plaintiffs in *Cienega Gardens. See Independence Park Apts. v. United States,* 61 Fed.

Appeals remanded "for the trial court to allow the parties to develop an appropriate record and to rule on liability, and if liability is found, also on damages." 331 F.3d at 1354.

Because of the common elements in these cases, for purposes of trial the court consolidated the suits of the three *Chancellor Manor*-related plaintiffs and five of the 38 *Cienega Gardens*-related cases remaining after retrial and resolution of the claims of the first four model plaintiffs. *Cienega Gardens v. United States,* 62 Fed.Cl. 28 (2004).[2]

Trial was held from November 8, 2004 through December 17, 2004, including one week in Minneapolis, Minnesota. Site visits were made to all eight of the properties at issue. Following post-trial briefing and closing argument, the cases are ready for disposition. For the reasons set forth below, the court finds that the government's actions constituted a temporary taking respecting each of the eight properties, and that the owner of each property is entitled to just compensation in the amount specified.

## TABLE OF CONTENTS

FACTS .......... 439

Low–Income Housing Programs Under Sections 221(d)(3) and 236 .......... 439
Emergency Low Income Housing Preservation Act of 1987 .......... 440
Low–Income Housing Preservation and Resident Homeownership Act of 1990 .......... 442
H.R.2099 .......... 444
Housing Opportunity Program Extension Act of 1996 .......... 444
Properties Owned by *Cienega Gardens*-related Plaintiffs .......... 446
1. Cienega Gardens partnership .......... 446
2. Del Amo Gardens partnership .......... 448
3. Las Lomas Gardens partnership .......... 449
4. Blossom Hill Apartments partnership .......... 450
5. Skyline View Gardens partnership .......... 451
Properties Owned by *Chancellor Manor*-related Plaintiffs .......... 452
1. Chancellor Manor partnership .......... 453
2. Oak Grove Towers partnership .......... 454
3. Gateway Investors, Ltd .......... 456
Procedural History .......... 457

ANALYSIS .......... 459

A. Threshold Issues .......... 459
1. Ripeness .......... 459
2. Accord and satisfaction .......... 462
3. Assignment of Claims Act .......... 464
B. Takings Analysis .......... 465
1. Character of governmental action .......... 466
a. The basis and purpose of ELIHPA and LIHPHRA .......... 466
b. HUD's application of the statutes .......... 468
c. The governmental interest .......... 469
d. Inapposite permitting analogy .......... 469
e. Value of extrinsic statutory options .......... 470

Cl. 692 (Fed.Cl.2004). The judgment entered after the trial on adjustments is now on appeal. *See* Nos. 05–5034 and 05–5035 (Fed. Cir., filed Dec. 27, 2004).

2. The five *Cienega Gardens*-related plaintiffs are California partnerships, each named for a California property it owns or owned. They include Cienega Gardens, No. 94–1–C, Del Amo Gardens, No. 94–10004–C, Las Lomas Gardens, No. 94–10009–C, Blossom Hill Apartments, No. 94–10013–C, and Skyline View Gardens, No. 94–10029–C. The three *Chancellor Manor*-related plaintiffs are Minnesota partnerships. Two of the plaintiffs, Chancellor Manor, No. 98–39–C, and Oak Grove Towers Associates, No. 98–3912–C, are named for the Minnesota properties they own. The third plaintiff, Gateway Investors, Ltd., No. 98–3911–C, owns Rivergate Apartments.

 2. Reasonable investment-backed expectations of the property owners.....471
3. Economic Impact.....474
4. Takings synopsis.....479
5. Duration of the temporary takings.....479

C. Just Compensation.....483
1. Net rental value.....483
a. Net rents for *Cienega Gardens*-related plaintiffs.....484
b. Net rents for *Chancellor Manor*-related plaintiffs.....487
c. Discounting.....490
2. Interest.....492
a. Interest rate.....492
b. Compounding.....492

CONCLUSION.....493

## FACTS[3]

During the 1930s, the federal government undertook a program to support low-income housing. *See* National Housing Act, Pub.L. No. 73–479, § 1, 48 Stat. 1246 (1934) (authorizing the creation of the Federal Housing Administration); § 207, 48 Stat. at 1252 (authorizing the insurance of mortgages for property owned by federal or state instrumentalities or non-profits formed for the provision of low-income housing). Until the 1960s, this program primarily subsidized projects of local public housing authorities. *Chancellor Manor* Stip. of Facts ¶¶ 1, 2 (*"Chancellor Manor* Stip."). One such subsidy was provided via Section 221(d)(3) of the Housing Act of 1954, Pub.L. No. 83–560, 68 Stat. 590, 601 (1954) (codified as amended at 12 U.S.C. § 1715*l*), which, as originally enacted, authorized mortgage insurance to non-profit organizations and public housing authorities. In 1961, in an effort to "enable private enterprise to participate to the maximum extent in meeting the housing needs of moderate-income families," Congress amended the National Housing Act to open the Section 221(d)(3) program to private investors. S.Rep. No. 87–281, at 4 (1961), *reprinted in* 1961 U.S.C.C.A.N. 1923, 1926; Housing Act of 1961, Pub.L. No. 87–70, tit. I, § 101(a)(6), 75 Stat. 149, 150–51 (1961) (codified as amended at 12 U.S.C. § 1715*l*). In 1968, amendments made to the National Housing Act by the Housing and Urban Development Act of 1968, Pub.L. No. 90–448, tit. II, § 201, 82 Stat. 476, 498–501 (1968), added "Section 236" programs, which provided a combination of mortgage insurance and interest-rate subsidies to public and private owners. Congress reiterated that it sought "the fullest practicable utilization of the resources and capabilities of private enterprise" in housing low-income and moderate-income families. § 2, 82 Stat. at 476.

### *Low–Income Housing Programs Under Sections 221(d)(3) and 236*

Participation in the programs provided under either Section 221(d)(3) or Section 236 required owners to encumber their property in several ways. Property owners were required to construct and maintain housing in accord with specifications of the Department of Housing and Urban Development ("HUD"), to rent only to tenants at a HUD-approved income level, to charge only HUD-approved rents, and to maintain cash reserves to self-insure against mortgage default. PCM 387, ¶¶ 2, 4 (Regulatory Agreement for Chancellor Manor, under the Section 236 program); JX–CG 136, ¶¶ 2, 4 (Regulatory Agreement for Del Amo Gardens, under the Section 221(d)(3) program).[4] In addition, the programs restricted the investment return such that owners could not earn more than an annual return of six per-

3. This recitation of facts constitutes the court's primary findings of fact in accord with Rule 52(a) of the Rules of the Court of Federal Claims ("RCFC"). Other findings of fact and rulings on questions of mixed fact and law are set out in the analysis.

4. This opinion will refer to the exhibits of *Cienega Gardens*-related plaintiffs as "PCG," exhibits of *Chancellor Manor*-related plaintiffs as "PCM," government exhibits as "DX," joint exhibits in the *Cienega Gardens*-related cases as "JX–CG," and joint exhibits in the *Chancellor Manor*-related cases as "JX–CM."

cent on their *initial equity* investment. PCM 387, ¶ 6(e)(1); JX–CG 136, ¶ 6(e)(1). This amount did not change throughout the term of the encumbrance, regardless of the amount of equity built up in the properties, and even that return was not guaranteed to be payable on an annual basis because owners could not draw out funds unless project finances permitted it. PCM 387, ¶ 6(e)(2); JX–CG 136, ¶ 6(e)(2).

Both programs sought to offset these restrictions by providing incentives for private developers to enter the programs. Among the incentives were the ability to borrow 90 percent of the overall cost of the project in a HUD-insured loan, Tr. 1106:13 to 1107:14 (Test. of J. Goldrich),[5] 2639:5–11, 2640:7–25 (Test. of K. Malek),[6] and entitlement to a Builder's and Sponsor's Profit and Risk Allowance ("BSPRA"), which combined with the loan reduced the developer's initial cash investment to 1.8 to 3 percent. Tr. 2644:6 to 2646:18, 2647:13 to 2648:19 (Test. of Malek). The low level of required investment was a double-edged sword, because the lower the initial investment, the lower the six-percent annual return an owner was permitted to receive.

Another incentive provided owners with the ability to leave the programs and convert the properties to ordinary rental projects. More specifically, an owner had the ability to prepay the mortgage after 20 years without HUD approval. Tr. 1203:15 to 1204:6 (Test. of W. Dockser) ("a reason why people would invest in the programs ... was the ability to discuss an exit strategy in 20 years.").[7] This incentive enabled property owners to provide low-income housing for twenty years, and then terminate the low-income housing restrictions and make a long-term profit by charging market rates for rentals at the properties. Tr. 1067:19 to 1068:10 (Test. of J. Goldrich). This prepayment right was made explicit in the mortgage notes executed for properties. *See, e.g.,* JX–CG 132A, at CGII–000003 (Deed of Trust Note for Del Amo Gardens). Correlatively, the governing regulations provided that "[a] mortgage indebtedness may be prepaid in full and the Commissioner's controls terminated without the prior consent of the Commissioner where ... the prepayment occurs after the expiration of 20 years from the date of final insurance endorsement of the mortgage ...." 24 C.F.R. § 236.30 (1970); *see also id.* § 221.524(a). *Cf. id.* § 207.14 (requiring certain mortgages to contain a prepayment clause).

*Emergency Low Income Housing Preservation Act of 1987*

By the mid–1980s, Congress realized that "in the next 15 years, more than 330,000 low income housing units insured or assisted under sections 221(d)(3) and 236 of the National Housing Act could be lost as a result of the termination of low income affordability restrictions." Emergency Low Income Housing Preservation Act of 1987, Pub.L. No. 100–242, § 202(a)(1), 101 Stat. 1877 (1988) (codified as amended at 12 U.S.C. § 1715*l* note) ("ELIHPA" or "Title II"). In response to this impending low-income housing shortage, Congress in effect temporarily barred owners from prepaying their mortgages and freeing themselves from restrictions on their properties, by requiring private owners in the Section 221(d)(3) and 236 programs to obtain HUD approval prior to prepayment and setting draconian criteria for HUD's approval of prepayment. *Id.* § 221(a). ELIHPA also placed additional restrictions on owners, such as requiring owners to provide tenants at least one year's advance notice of any termination of a Housing Assistance Payment ("HAP") contract. *Id.* § 262 (codified at 42 U.S.C. § 1437f(c)(8)). HUD issued its regulations implementing ELIHPA in September 1990, 31 months after the statute was passed. 24 C.F.R. §§ 248.101 to 248.261 (1991).

5. Jona Goldrich was a general partner in each of the Cienega Gardens-related properties. Tr. 1044:11 to 1045:6 (Test. of Goldrich).

6. Mr. Malek was an expert retained by the government, who testified in two areas, accounting and tax accounting, with a specialty in tax-advantaged transactions. Tr. 2626:4 to 2626:7.

7. W. Dockser was a Deputy Assistant Secretary of HUD and Federal Housing Administration ("FHA") Commissioner from 1969 to 1972, and he later became involved in private-sector development of multi-family subsidized housing. Tr. 1188:14 to 1191:6 (Test. of W. Dockser).

Under ELIHPA, owners that sought to eliminate or change the new or old restrictions on their properties were required to file a notice of intent with the Secretary of HUD describing their intended action. ELIHPA, § 222, 12 U.S.C. § 1715*l* note. Upon receipt of a notice of intent, HUD would send the owner information about the relevant market area and a description of the federal options authorized. The available options for owners included prepaying under the new criteria set out in ELIHPA, agreeing to extend the affordability restrictions in exchange for certain financial incentives, selling the property to a qualified purchaser, or maintaining the status quo. *Id.* §§ 224, 225, 12 U.S.C. § 1715*l* note.

The owner would then file a more detailed document called a plan of action, describing the proposed changes, the assistance available from state or local authorities, the proposed changes in the low-income affordability restrictions, any change in ownership, the anticipated effect of the proposed changes on existing tenants, and the anticipated effect on the availability of housing in the relevant area. ELIHPA, § 223(b), 12 U.S.C. § 1715*l* note. HUD was required to notify the owner in writing within 60 days if any deficiencies were found in a plan of action, and to describe alternative ways in which the plan could be revised appropriately. *Id.* § 227(a), 12 U.S.C. 1715*l* note. Within 180 days of the submission of a plan of action, or longer if the owner so requested, HUD was required to notify the owner of whether the plan of action was approved. If approval was withheld, HUD was to describe its reasons for not approving the plan, and what the owner could do to secure approval; it was also required to provide a reasonable opportunity to revise the plan. *Id.* § 227(b)(1)-(2).

HUD's approval for prepayment was obtainable only if the Secretary of HUD made a written finding that such payment would not have a detrimental effect on the supply of affordable housing in the relevant market:

> The Secretary may approve a plan of action that involves termination of the low income affordability restrictions [through prepayment of the mortgage or other means] only upon a written finding that—
>
> (1) implementation of the plan of action will not materially increase economic hardship for current tenants (and will not in any event result in (A) a monthly rental payment by a current tenant that exceeds 30 percent of the monthly adjusted income of the tenant or an increase in the monthly rental payment in any year that exceeds 10 percent (whichever is lower), or (B) in the case of a current tenant who already pays more than such percentage, an increase in the monthly rental payment in any year that exceeds the increase in the Consumer Price Index or 10 percent (whichever is lower)) or involuntarily displace current tenants (except for good cause) where comparable and affordable housing is not readily available, determined without regard to the availability of Federal housing assistance that would address any such hardship or involuntary displacement; and
>
> (2) (A) the supply of vacant, comparable housing is sufficient to ensure that such prepayment will not materially affect—
>
> (i) the availability of decent, safe, and sanitary housing affordable to lower income and very low-income families or persons in the area that the housing could reasonably be expected to serve;
>
> (ii) the ability of lower income and very low-income families or persons to find affordable, decent, safe, and sanitary housing near employment opportunities; or
>
> (iii) the housing opportunities of minorities in the community within which the housing is located; or
>
> (B) the plan has been approved by the appropriate State agency and any appropriate local government agency for the jurisdiction within which the housing is located as being in accordance with a State strategy approved by the Secretary under section 226.

ELIHPA, § 225(a), as amended by Pub.L. No. 101–402, § 1, 104 Stat. 866 (Oct. 1, 1990), and Pub.L. No. 101–494, 104 Stat. 1185 (Oct. 31, 1990), 12 U.S.C. § 1715*l* note.[8] At trial, a

8. Section 226 of ELIHPA permitted the Secretary of HUD to approve a state strategy only if

financial analyst for HUD, Thomas Vitek, testified that "prepaying the mortgage was very difficult to achieve [under Title II] because it was [ ] very hard to prove that a prepayment would not negatively affect the supply of affordable housing." Tr. 2888:24 to 2889:2 (Test. of T. Vitek).

As noted previously, a property owner could also agree to extend the restrictions for the remainder of the mortgage in exchange for certain incentives. To receive such incentives, owners needed to agree to (1) retain the housing as low-income, very low-income, and moderate-income housing for the remaining term of the mortgage, (2) ensure that adequate expenditures were made for maintenance and operation of the properties, (3) not displace current tenants except for good cause, (4) not increase rent higher than 30 percent of a tenant's adjusted income, or market rate, whichever might be lower, (5) phase in rent increases, and (6) charge rents for newly available apartments at HUD-approved rates and to HUD-approved tenants. ELIHPA, § 225(b), 12 U.S.C. § 1715*l* note. In exchange, the Secretary was authorized to agree to provide owners one or more of the following benefits: an increase in the permissible distribution or other measures to increase the rate of return on the investment, a change in the method for calculating equity, increased access to residual receipts accounts or excess replacement reserves, insurance for a second mortgage, a limited increase in the rents, financing of capital improvements, or other measures. *Id.* § 224(b).

Finally, owners could also sell the property to a HUD-approved purchaser at a price determined through a statutory process. Neither ELIHPA nor the regulations implementing it describes the sale process in depth. *See* ELIHPA, §§ 223(b)(4) and 224(b)(7), 12 U.S.C. § 1715*l* note (referencing sale of properties to qualified nonprofit organizations or other "acceptable" entities); 24 C.F.R. §§ 248.213(b)(4), 248.231(g) (1991). Nonetheless, such a sale was possible on HUD's terms. Tr. 2898:23 to 2899:19 (Test. of Vitek); 3159:1–3 (Test. of R. Mandel).

*Low–Income Housing Preservation and Resident Homeownership Act of 1990*

In 1990, Congress passed a further response to the looming low-income housing shortage, the Low–Income Housing Preservation and Resident Homeownership Act of 1990, Pub.L. No. 101–625, tit. VI, 104 Stat. 4249 (1990) (codified in scattered sections of Title 12 of the U.S.Code, including 12 U.S.C. §§ 4101 to 4124) ("LIHPHRA" or "Title VI"). LIHPHRA made permanent ELIHPA's temporary ban on prepayment without HUD approval. Congress determined that requiring existing low-income housing providers to bear the majority of the burden of low-income housing by preserving existing inventory for such use was "the most cost-effective strategy available to the government" to resolve the housing problem. S.Rep. No. 101–316, at 107 (1990), *reprinted in* 1990 U.S.C.C.A.N. 5763, 5869. HUD issued regulations implementing LIHPHRA in April 1992, 16 months after the statute was passed. 24 C.F.R. §§ 248.1 to 248.319 (1993).

LIHPHRA was generally similar in effect to ELIHPA, but differed in several important respects. Generally, the incentives and accompanying restrictions were less favorable to owners under Title VI than those provided under Title II. Tr. 1367:13–14, 1368:4–19 (Test. of C. Glodney) (explaining why the *Cienega*-related owners deemed Title II to be more favorable). First, the prepayment provisions varied slightly. As with Title II, before HUD would approve a request to prepay, a property owner would need to show that prepayment would not materially increase economic hardship for current tenants and that the supply of vacant, comparable housing in the area was sufficient. 12 U.S.C. § 4108(a). Title VI, however, did not permit prepayment under a plan approved by a state agency. *Compare* ELIHPA §§ 225(a) and 226, 12 U.S.C. § 1715*l* note, *with* 12 U.S.C. §§ 4108(a), 4117(c). In addition, LIHPHRA permitted

the strategy met several criteria, including the requirement that a tenant's monthly rent payment not exceed 30 percent of his or her income, except in certain limited circumstances, and that "not less than 60 percent of the units in any one project" would remain affordable for low-income and very low-income tenants. *Id.* § 226, 12 U.S.C. § 1715*l* note.

prepayment of mortgages if (1) the Secretary of HUD approved a plan of action to accept incentives, but (2) the incentives remained unfunded during the 15-month period beginning on the date of approval. 12 U.S.C. § 4114(a)(1)(A). Similarly, a property owner could prepay if the Secretary approved a plan of action to sell, but there were no bids from qualified purchasers or HUD failed to provide the necessary assistance. *Id.* § 4114(a)(1)(B)-(2).

Second, the options other than prepayment became even more onerous than they were under Title II. Instead of agreeing to extend the restrictions for the remainder of the mortgage, as was the case under Title II, owners were required to agree to retain affordable housing "for the remaining useful life of such housing." 12 U.S.C. § 4112(a)(2)(A). Petitions for the Secretary of HUD to determine that the useful life of a property had expired were not permitted until 50 years after the approval of a plan of action. *Id.* § 4112(c)(3). *See also* Tr. 1374:16 to 1375:2 (Test. of C. Glodney) (stating that Title VI properties were generally restricted until 30 years past the original 40-year mortgage date, which would be approximately 50 years after many of the properties' 20-year prepayment dates). Among the incentives, the biggest differences were the removal of the provision for an increase in the allowable distribution and removal of the provision for revisions to the method of calculating equity. *Compare* ELIHPA § 224(b), *with* 12 U.S.C. § 4109(b); *but cf.* 12 U.S.C. § 4104. Owners could gain access to a portion of the preservation equity through provision of insurance for a second mortgage loan. 12 U.S.C. § 4109(b)(7).

Those owners who sought either the incentives or the sale option under Title VI underwent a process to determine the "preservation" value of the property. Both HUD and the owner chose appraisers, and if those appraisers did not agree and the owners and HUD could not reach an agreement, they would jointly select a third, binding appraiser. 12 U.S.C. § 4103(a)(1). For the purposes of incentives, the guidelines to appraisers required that they assume conversion of the housing to market-rate, and determine the costs of such conversion. *Id.* § 4103(c)(1). For the purposes of sale, appraisers were to "assume conversion of the housing to highest and best use for the property" and deduct costs of conversion. *Id.* § 4103(c)(2).

Third, owners that chose to sell the properties to a qualified purchaser had to follow a highly regulated process. LIHPHRA set out a much more developed procedure for selling properties than did ELIHPA. *See* Tr. 3159:15–20 (Test. of R. Mandel). After an appraisal was conducted, the Secretary of HUD determined the aggregate preservation rents, and if those rents were too costly, owners were required to sell the property to priority or qualified purchasers. 12 U.S.C. § 4111(a). Under either a forced or voluntary sale, owners could only receive bids from qualified purchasers in the first year, meaning that the only bidders could be a resident homeownership group under LIHPHRA or a non-profit or state or local government agency that agreed to retain the restrictions on the property. 12 U.S.C. § 4110(b)(1); *id.* § 4121(a). The sale price was prohibited from exceeding the preservation value determined by the appraisal process. 12 U.S.C. § 4110(b)(1). If no bona fide offer was made during the first year, owners could then sell to any entity that agreed to retain the restrictions on the property, but the sale value could not exceed the value determined by the appraisers. *Id.* § 4110(c).

Regarding the implementation of ELIHPA and LIHPHRA, the court heard testimony by two specialists who were familiar with the aspects of those two statutes related to sale of low-income housing properties to qualified non-profit purchasers. Thomas M. Vitek had initially worked with the National Housing Law Project affiliated with the University of California at Berkeley and then with Berkeley Planning Associates, a private firm specializing in evaluations of governmental programs. Tr. 2876:24 to 2878:14 (Test. of Vitek). In 1978, Mr. Vitek obtained employment with the HUD regional office in San Francisco. Tr. 2878:18 to 2879:5 (Test. of Vitek). By 1995, Mr. Vitek had become the preservation coordinator for HUD's San

Francisco regional office. Tr. 2884:20 to 2885:18. He testified that a number of non-profit organizations were interested in purchasing low-income housing properties and that HUD provided assistance for such purchases through Section 8 contracts entailing subsidies to low-income renters, governmentally-insured financing, and a flexible subsidy program. Tr. 2897:2 to 2898:8. Mr. Vitek indicated that sales to qualified non-profits took longer to be completed than extensions of participation through Use Agreements and that about 20 to 25% of owners going through the process sold their properties. Tr. 3009:6 to 3010:12. The second specialist, Mr. Richard Mandel had initially worked for the Mid–Peninsula Housing Coalition in Palo Alto and then went to the California Housing Partnership Corporation in 1990. Tr. 3150:13 to 3153:6 (Test. of Mandel). At that corporation, he provided assistance to non-profit organizations in negotiating the purchase of the properties, acquiring financing, and closing the purchase. Tr. 3154:23–3155:3. The corporation served as an information clearinghouse to identify properties that might be available for sale and to provide that information to prospective purchasers. Tr. 3155:24 to 3156:12. Mr. Mandel testified that he worked on 37 sales, two of which were under Title II and 35 of which were under Title VI. Tr. 3161:6 to 3162:4. Those sales had to occur at the transfer preservation value; there was no ability to negotiate the sales price. Tr. 3168:8 to 3169:9. Mr. Mandel had kept a database listing roughly 205 to 210 total projects that had filed notices of intent under Title VI, and approximately 37% of the owners initially filed to sell. DX 428 (Chart of Owners' Stated Intent in California (undated)); Tr. 3183:2 to 3185:7.

LIHPHRA's transition provisions permitted those owners whose properties would become "eligible low-income housing" before January 1, 1991, and who filed a notice of intent prior to that date, to elect between proceeding under Title II or Title VI. Pub.L. No. 101–625, § 604 (codified as amended at 12 U.S.C. § 4101 note (Transition Provisions)). "Eligible low-income housing" included certain properties prior to the preservation statutes were eligible for prepayment without HUD approval within 24 months. 12 U.S.C. § 4119. Thus, properties previously eligible for prepayment prior to January 1, 1993 could be eligible to choose between the procedures of Title II and Title VI. *See* Tr. 1371:18 to 1372:11 (Test. of C. Glodney).

*H.R.2099*

The prepayment rights of owners of low-income housing continued to be a contentious issue in Congress after the enactment of LIHPHRA in 1990. Almost five years later, on December 7, 1995, Congress passed H.R. 2099, a bill detailing various appropriations for the Departments of Veterans Affairs and HUD. In that bill, Congress conditioned the appropriated funding on, among other things, the ability of "an owner of eligible low-income housing [to] prepay the mortgage or request voluntary termination of a mortgage insurance contract, so long as said owner agrees not to raise rents for sixty days after such prepayment." H.R.2099, 104th Cong. (1995) (second undesignated paragraph of Title II).[9] President Clinton vetoed H.R.2099, and it did not become law. *See* 141 Cong. Rec. 37,409–10 (1995).

*Housing Opportunity Program Extension Act of 1996*

The controversy over prepayment rights persisted. Roughly three months after President Clinton vetoed H.R.2099, on March 28, 1996, the Housing Opportunity Program Extension Act of 1996, Pub.L. No. 104–120, 110 Stat. 834 (1996) ("HOPE"), was enacted. Among other things, HOPE extended the authorization for low-income housing programs, and in that connection Congress incorporated by reference the paragraph of H.R.2099 that included the restoration of prepayment rights. Pub.L. No. 104–120, § 2(b), 110 Stat. 834–35.[10] HOPE condi-

9. At trial, the court took judicial notice of H.R. 2099, which was marked DX 447. Tr. 2870:19 to 2871:24.

10. In pertinent part, the statutory text provided:
(b) Low Income Housing Preservation.—

(1) Use of Amounts—*Notwithstanding* any provision of the Balanced Budget Downpayment Act, I (Public Law 104–99; 110 Stat. 26) or *any other law, the Secretary shall use the amounts described in paragraph (2) of this sub-*

tioned HUD's use of funds on, among other things, permitting eligible owners to prepay their mortgages, provided they agreed to wait 60 days before raising rents. *Id.* Courts have interpreted HOPE to have superseded ELIHPA and LIHPHRA as relating to prepayment. *Cienega VIII,* 331 F.3d at 1326–27 ("The restrictions imposed by ELIHPA and LIHPHRA were essentially lifted by [HOPE]"). The appropriation statute for HUD for fiscal year 1996 was enacted about a month later on April 26, 1996, as part of the Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub.L. No. 104–134, tit. II, 110 Stat. 1321–265 to 1321–293 (1996), and it included a proviso allowing an owner to prepay:

> *Provided further,* That an owner of eligible low-income housing may prepay the mortgage or request voluntary termination of a mortgage insurance contract, so long as said owner agrees not to raise rents for sixty days after such prepayment; ....

Pub.L. 104–134, tit. II, 110 Stat. 1321–267 (second paragraph, fourth proviso). Later funding statutes reiterated the prepayment right. *See, e.g.,* Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, Pub.L. No. 104–204, tit. II, 110 Stat. 2874, 2884 (Sept. 26, 1996) (codified at 12 U.S.C. § 4101 note); Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, Pub.L. No. 105–276, § 219, 112 Stat. 2461, 2487–88 (Oct. 21, 1998) (clarifying the conditions to prepayment and adding a 150–day waiting period for prepayment with certain exceptions).[11]

Even though the only stated requirement of prepayment under HOPE and the ensuing appropriations statute was a 60–day waiting period, some regional offices of HUD continued to impose some of ELIHPA's and LIHPHRA's restrictions. HUD sent out a series of "Preservation Letters," in which it claimed that owners in low-vacancy areas would be required to allow tenants to remain in the housing for three years at the rent levels existing prior to prepayment, and to pay 50% of the relocation expenses of any tenant. *See, e.g.,* DX 266, at DOJ 0033 (Mem. from N. Retsinas, Ass't Sec'y for Housing, to Dirs. of Housing (May 3, 1996)) ("Preservation Letter No. 4"). Manifestly, HUD was endeavoring to keep the pre-HOPE programmatic restrictions intact notwithstanding the enactment of HOPE. Non-statutory conditions on prepayment evolved over the series of preservation letters. For example, later letters only required owners to pay relocation expenses to another unit in the same area. PCG 1169, at DOJ 16123 (Mem. from N. Retsinas to Dirs. of Housing (July 1, 1996)) ("Preservation Letter No. 6"). The preservation letters also advised that HUD would continue to enforce the requirement in ELIHPA that owners provide tenants with one year's notice of termination, *id.* at DOJ 16117, and emphasized that owners would not be permitted to opt out of existing Sec-

*section under the authority and conditions provided in the second undesignated paragraph of the item relating to "Housing Programs–Annual Contributions for Assisted Housing" in title II of the bill, H.R.2099 (104th Congress), as passed* [by] *the House of Representatives on December 7, 1995;* except that for purposes of this subsection, any reference in such undesignated paragraph to March 1, 1996, shall be construed to refer to April 15, 1996, any reference in such paragraph to July 1, 1996, shall be construed to refer to August 15, 1996, and any reference in such paragraph to August 1, 1996, shall be construed to refer to September 15, 1996.

(2) Description of Amounts.—Except as otherwise provided in any future appropriation Act, the amounts described under this paragraph are any amounts that—

(A) are—

(i) unreserved, unobligated amounts provided in an appropriation Act enacted before the date of the enactment of this Act;

(ii) provided under the Balanced Budget Downpayment Act, I; or

*(iii) provided in any appropriation Act* enacted after the date of the enactment of this Act; and

(B) are provided for use in conjunction with properties that are eligible for assistance under the Low–Income Housing Preservation and Resident Homeownership Act of 1990 or the Emergency Low Income Housing Preservation Act of 1987.

110 Stat. at 834–35 (emphasis added).

11. LIHPHRA's prepayment limitation is still treated as the primary law in the United States Code. *See* 12 U.S.C. § 4101. HOPE is relegated to the Historical and Statutory Notes. *See* 12 U.S.C. § 4101 note.

tion 8 HAP contracts. PCG 1163, at DOJ 28540 (Mem. from C. Greer, Acting Deputy Ass't Sec'y for Multifamily Housing Programs, to Dirs. of Housing (Apr. 12, 1996)) ("Preservation Letter No. 2"). As a result, it was not feasible for some owners who wished to prepay promptly after HOPE's passage to do so.

Properties Owned by *Cienega Gardens*-related Plaintiffs

The five *Cienega Gardens*-related plaintiffs at issue—Cienega Gardens, Del Amo Gardens, Las Lomas Gardens, Blossom Hill Apartments, and Skyline View Gardens—are California real estate partnerships named for the principal property owned by the entity. *See* PCG 1186 (Limited Partnership Agreement for Blossom Hill Apartments (May 1, 1973)); PCG 1187 (Amended and Restated Agreement of Limited Partnership for Skyline View Gardens (Dec. 14, 1972)); PCG 1188 (Partnership Agreement for Las Lomas Gardens (June 1, 1970)); PCG 1193 (Partnership Agreement for Cienega Gardens (Nov. 2, 1970)); PCG 1194 (Partnership Agreement for Del Amo Gardens (Nov. 15, 1970)). Jona Goldrich, Sol Kest, and Robert Stern were partners in all five partnerships, and Goldrich & Kest, Inc. was a partner in four of the partnerships (excluding Blossom Hill Apartments). Robert Hirsch was a partner in four of the partnerships, and he had an interest in Goldrich & Kest, Inc., which was a partner in the fifth, Las Lomas Gardens. This opinion refers to Messrs. Goldrich, Kest, Stern, and Hirsch, along with Goldrich & Kest, Inc., collectively as the "general partners." The general partners employed a "buy and hold" approach to real estate, whereby they would purchase property and hold the property for future appreciation. Tr. 1042:4–10, 1074:11–18, 1141:9 to 1142:11 (Test. of J. Goldrich). The general partners' ownership of such properties placed them among the largest providers of assisted-living units in California. Tr. 1043:18–21 (Test. of Goldrich). The partnerships were each created to purchase a particular property with a high square footage in a middle-class area where the potential for appreciation after prepayment was high. Tr. 1070:8 to 1071:7 (Test. of Goldrich). The general partners also owned G & K Management Company, Inc. ("G & K Management"), which managed the properties to obtain a management fee and to achieve a high standard of maintenance and aesthetic appeal (among other things, to ensure that no major repairs would be necessary to be competitive in the market after prepayment). Tr. 1074:20 to 1076:17 (Test. of Goldrich); 1243:6 to 1244:11, 1914:9 to 1916:18 (Test. of C. Glodney).[12] The owners intended to prepay the properties in question after 20 years and convert them to market-rate properties. Tr. 1093:18 to 1094:9 (Test. of Goldrich).[13]

1. Cienega Gardens partnership.

Cienega Gardens Apartments, located in an attractive middle-class residential area in Covina, California, is composed of one-, two-, and three-bedroom units. Tr. 4925:3–6 (Test. of Glodney). For the 180 units, it features 180 covered parking spots, between 130 and 150 uncovered parking spots, playgrounds, recreation rooms, and basketball courts; it is within walking distance from elementary, middle, and high schools, and within a short drive of shopping centers and restaurants. Tr. 4925:6–15 (Test. of Glodney). The site inspection showed that the property is maintained in excellent condition and that it appears to be much newer than it is. A fairly expensive privately owned condominium complex is adjacent to the property. Mr. Goldrich represented that

12. Carole Glodney is the president of G & K Management and served at trial as the party representative for the *Cienega Gardens*-related plaintiffs. Tr. 1241:19 to 1242:7 (Test. of Glodney).

13. The plan of the general partners was to prepay the properties the partnerships owned in middle-class neighborhoods where they could charge higher market rents after prepayment. Tr. 1093:18 to 1094:9 (Test. of Goldrich). The general partners had interests in a handful of properties in very low-income communities, at least some of which Mr. Goldrich claims he built or purchased at the request of HUD in exchange for favorable treatment on other properties. Tr. 1143:11–19 (Test. of Goldrich). The general partners did not necessarily intend to prepay such properties. Tr. 1093:1–9 (Test. of Goldrich). Nonetheless, all of the properties at issue in this case were in middle-class communities, and the general partners of each relevant partnership intended to prepay. Tr. 1093:18 to 1094:9, 1103:20 to 1104:3 (Test. of Goldrich).

land values in Covina have increased by approximately 500% in the last 20 years. Tr. 1081:20 to 1082:1 (Test. of J. Goldrich).

On December 1, 1970, the Cienega Gardens partnership entered into a Regulatory Agreement with HUD, whereby it agreed to charge HUD-approved rents in exchange for mortgage insurance and interest subsidies under Section 236. JX-CG 51 (Regulatory Agreement for Cienega Gardens).[14] The agreement limited Cienega Gardens's maximum dividend to six percent of the owners' initial equity investment. *Id.* ¶ 6(e)(1). Such equity originally totaled approximately $304,300, meaning that the maximum annual dividend for the Cienega Gardens partnership was limited to $18,258. *See, e.g.*, JX-CG 63 (Independent Auditor's Report for Cienega Gardens (Nov. 30, 1990)). On the same day the Regulatory Agreement was signed, Cienega Gardens signed a Deed of Trust Note with Union Bank. HUD initially endorsed the note on December 23, 1970, and gave its final endorsement on December 8, 1971. JX-CG 48A, at CGII 015998 (Deed of Trust Note for Cienega Gardens). Rider "A" to the Deed of Trust note permitted Cienega Gardens to prepay its mortgage without HUD approval after 20 years. *Id.* at CGII 015395. Specifically, the note permitted prepayment if

> the Maker is a limited distribution mortgagor which is not receiving payments from the Commissioner under a rent supplement contract pursuant to Section 101 of the Housing and Urban Development Act of 1965, and the prepayment occurs after the expiration of twenty (20) years from the date of final endorsement of this Deed of Trust Note by the Commissioner.

*Id.* Thus, Cienega Gardens's initial prepayment eligibility date was December 8, 1991.

As the prepayment date approached, ELIHPA and LIHPHRA had both been passed, and the Cienega Gardens partnership no longer had the option to prepay without HUD approval. On February 8, 1990, Cienega Gardens filed its notice of intent to prepay its mortgage, seeking prepayment "twenty years from final endorsement or as soon as reasonably possible thereafter" and stating its reason for prepayment as its "[c]ontractual right to prepay mortgage." PCG 1078, at CGII 010445 (Letter from C. Glodney to M. Findley, HUD) (attaching Intent to Prepay Mortgage for Cienega Gardens). After the passage of LIHPHRA, Cienega Gardens refiled its notice of intent to prepay its mortgage. PCG 1079 (Letter from C. Glodney to M. Findley (Dec. 26, 1990)) (attaching Intent to Prepay Mortgage for Cienega Gardens). This correspondence reflected the partnership's continued intent to prepay. Tr. 1346:25 to 1347:3 (Test. of Glodney). Nonetheless, it was virtually impossible for properties in California to meet LIHPHRA's stringent requirements for prepayment. Tr. 1351:23 to 1352:20 (Test. of Glodney); 2917:21 to 2918:7 (Test. of T. Vitek). Thereafter, to avoid wasting time on an application for prepayment that would have been rejected, Cienega Gardens filed a Notice of Election to Proceed, seeking incentives under Title II. PCG 1101 (Letter from C. Glodney to J. Lagerbauer, Dir., Housing Mgmt. Div., HUD (June 3, 1992)).[15]

On May 26, 1995, Cienega Gardens signed a Use Agreement under Title II to extend its affordability restrictions until the maturity date of the mortgage note, thus binding Cienega Gardens until February 1, 2012.

14. Two pages of JX-CG 51, consisting of an amendment to the regulatory agreement, were not admitted as part of the exhibit at trial. Tr. 1055:11-24. In its findings of fact and conclusions of law, the court does not rely on those pages.

15. On behalf of Cienega Gardens, as with each of the other *Cienega Gardens*-related properties, G & K Management sought to receive the Title II and Title VI incentives retroactive to the prepayment eligibility dates. However, HUD stated that it found no provision in Title II, Title VI, or the implementing regulations for either statute that would allow incentives to be provided retroactive to the prepayment date of the project. PCG 1171A (Letter from C. Ming, Manager, Los Angeles Office, HUD to C. Glodney (Jan. 27, 1994)); PCG 1171D (Letter from C. Glodney to K. Ragan, San Francisco Office, HUD (Nov. 9, 1993)) (regarding Title VI properties); PCG 1171E (Letter from C. Glodney to C. Ming (Nov. 9, 1993)) (regarding Title II properties). Accordingly, Cienega Gardens and the other partnerships that entered into Use Agreements were unable to receive incentives until the date of the Use Agreement.

JX–CG 52, ¶ 2 (Use Agreement for Cienega Gardens). One incentive Cienega Gardens received was the removal of the limitation on the owners' annual dividend. *Id.* ¶ 13(1) ("There shall be no limitation on the distribution of surplus cash."). Although G & K Management tried to negotiate a monthly limited dividend, HUD only agreed to an annual or semi-annual distribution. Tr. 1921:4–14 (Test. of Glodney). Among the other incentives Cienega Gardens received as a result of its Use Agreement were phased-in increases in rents, access to its reserve-for-replacements account (provided it maintained a minimum balance equivalent to one month's maximum gross rent potential), and Section 8 assistance for 147 of the 180 units. JX–CG 52, ¶¶ 9, 11–12.

Eight years and nine months after the *Cienega Gardens* suit was brought, the Cienega Gardens partnership sold Cienega Gardens Apartments to a HUD-approved purchaser on October 10, 2002. Tr.1909:24 to 1910:4, 2017:20–22 (Test. of Glodney), 2166:17–22 (Test of Peiser). G & K Management continues to manage the property. Tr. 4928:9–13 (Test. of Glodney).

2. Del Amo Gardens partnership.

The Del Amo Gardens property is a 230–unit complex consisting entirely of one-bedroom apartments. It is located in a residential area in Long Beach, California. Tr. 4906:14–16, 19 (Test. of Glodney). A facility for seniors and disabled residents, it features a gazebo, recreation room, laundry facilities, uncovered parking, and easy access to bus stops on Del Amo Boulevard and to the freeway. Tr. 4906:17 to 4907:19 (Test. of Glodney). The site inspection showed that the property is very well maintained. Approximately ten years ago, Del Amo Gardens installed a perimeter security system to provide its residents with the advantage of living in a gated community. Tr. 4907:12 to 4908:10 (Test. of Glodney). The community was designed to attract seniors, as demonstrated by the single bedrooms and the location in a climate with relatively moderate temperatures. Tr. 1084:1–8 (Test. of Goldrich), 4911:12–21 (Test. of Glodney).

The Del Amo Gardens partnership entered into its Regulatory Agreement with HUD on December 1, 1970, whereby it agreed to charge HUD-approved rents in exchange for mortgage insurance and rent subsidies under Section 221(d)(3). JX–CG 136 (Regulatory Agreement for Del Amo Gardens). The owners could not receive an annual limited dividend higher than six percent of their initial equity investment. *Id.* ¶ 6(e)(1). This equity amounted to approximately $304,805, so the maximum annual dividend was limited to $18,288. *See, e.g.,* JX–CG 153 (Independent Auditor's Report for Del Amo Gardens (Nov. 30, 1990)). Also on December 1, 1970, Del Amo Gardens entered into a deed of trust note with Union Bank. JX–CG 132A (Deed of Trust Note for Del Amo Gardens). HUD initially endorsed the note on December 10, 1970, and gave its final approval on March 27, 1972. *Id.* at CGII–015999. Rider "A" to this deed of trust note required HUD approval for prepayment except "a maker which is a limited distribution mortgagor may prepay without such approval after twenty (20) years from the date of final endorsement of this Deed of Trust Note by the Federal Housing Commissioner." *Id.* at CGII–000003. Thus, Del Amo Gardens's initial prepayment eligibility date was March 27, 1992.

Del Amo Gardens's subsequent steps were similar to those of Cienega Gardens. On February 8, 1990, it filed an initial notice of intent to prepay on the twentieth anniversary of the endorsement of the Deed of Trust note or "as soon as reasonably possible thereafter." PCG 1179 (Letter from C. Glodney to M. Findley (Feb. 8, 1990)) (attaching Intent to Prepay Mortgage for Del Amo Gardens). After the passage of LIHPHRA, it filed a second notice of intent to prepay the mortgage for Del Amo Gardens. PCG 1097 (Letter from C. Glodney to M. Findley (Dec. 27, 1990)). This filing is consistent with Del Amo Gardens's assertion that it intended to prepay as soon as possible. Tr. 1347:4–25 (Test. of Glodney). Although it still preferred prepayment, Tr. 1352:3–20 (Test. of Glodney), Del Amo Gardens opted to submit a Notice of Election to Proceed under Title II, seeking incentives. PCG 1101 (Letter from C. Glodney to J. Lagerbauer (June 3, 1992)).

On May 26, 1995, Del Amo Gardens entered into a Use Agreement under Title II. JX–CG 137. This agreement required Del Amo Gardens to continue charging restricted rents through February 1, 2012. *Id.* ¶ 2. The Use Agreement, among other things, removed the limitation on Del Amo Gardens's annual limited dividend. *Id.* ¶ 13(1) ("There shall be no limitation on the distribution of surplus cash.").

3. Las Lomas Gardens partnership.

Las Lomas Gardens is a 112–unit family complex located in La Habra, California, a community in Orange County. Tr. 4921:7–8, 15–16 (Test. of Glodney). It consists of one-bedroom, two-bedroom, and three-bedroom apartments, as well as three- and four-bedroom townhouses. Tr. 4921:8–11 (Test. of Glodney). The property is surrounded by fairly expensive single-family homes and condominiums. The site inspection showed that the buildings are very well maintained and the landscaping is very attractive with large trees and meticulously kept annual and perennial plantings. The complex features covered parking for every unit, additional uncovered parking, a gazebo, and easy access to schools and shopping centers. Tr. 4921:14–25, 4930:20–24 (Test. of Glodney). Mr. Goldrich testified that the property value has increased considerably, and that he would pay as much as ten times the amount per unit to purchase the property today. Tr. 1088:10 to 1090:2.

On July 1, 1970, the Las Lomas Gardens partnership entered into its Regulatory Agreement with HUD under Section 236. JX–CG 218 (Regulatory Agreement for Las Lomas Gardens). As with the other properties, this agreement restricted the owners' return to six percent of their initial equity investment. *Id.* ¶ 6(e)(1). The original equity on Las Lomas was approximately $201,887, meaning that the maximum annual limited dividend was $12,113. *See, e.g.,* JX–CG 225 (Independent Auditor's Report for Las Lomas Gardens (Sept. 30, 1990)). Las Lomas Gardens entered into its deed of trust note with Security Pacific National Bank on the same day. JX–CG 212A. HUD initially endorsed the note on July 22, 1970, and gave its final endorsement on July 15, 1971. *Id.* at CGII–016000. Rider "A" to this note authorized prepayment without HUD approval twenty years after HUD's final endorsement. *Id.* at CGII–000246.[16] Thus, Las Lomas Gardens's initial prepayment eligibility date was July 15, 1991.

On July 27, 1990, Las Lomas Gardens submitted its initial notice of intent to prepay its mortgage. PCG 1121A (Letter from C. Glodney to S. Adame, San Diego Office, HUD (July 27, 1990)).[17] After the passage of LIHPHRA, Las Lomas sent HUD additional correspondence, advising that it submitted its notice of intent to prepay under Section 222 of Title II. PCG 1123 (Letter from C. Glodney to S. Adame (Dec. 27, 1990) (first page)). This correspondence supports Las Lomas's testimony that the owners intended to prepay at that point. Tr. 1349:17–23 (Test. of Glodney). Later, although the owners still preferred prepayment, they opted not to file for prepayment under LIHPHRA because they believed they would not meet the requirements. Tr. 1352:3–20 (Test. of Glodney). Accordingly, they filed a notice of election to proceed under Title II, seeking incentives. PCG 1172 (Letter from C. Glodney to J. Lagerbauer (June 3, 1992)).

On May 16, 1995, Las Lomas entered into a Use Agreement with HUD under Title IL JX–CG 220 (Use Agreement for Las Lomas Gardens). This agreement required Las Lomas to maintain rent restrictions through December 1, 2011. *Id.* ¶ 2. In exchange for maintaining these restrictions, Las Lomas received an increased possible return on equity to 7.9% of the equity investment defined

16. It appears that the language in the prepayment rider in Cienega Gardens's deed of trust note was common for agreements entered under Section 236. The only plaintiff whose prepayment language differed was Del Amo Gardens, the only plaintiff in this case under the 221(d)(3) program.

17. Las Lomas sent a notice of intent on July 16, 1990, but it was returned to the owners unfiled for failure to sign the correspondence or the notice. PCG 1121B (Letter from S. Adame to C. Glodney (July 23, 1990)); PCG 1121C (Letter from C. Glodney to S. Adame (July 16, 1990)); Tr. 1336:23 to 1339:6 (Test. of Glodney). The endorsed copy was sent on July 27, 1990. PCG 1121A.

in the plan of action, with such right being cumulative. The plan of action defined the equity investment as $5,117,184. JX–CG 239, ¶ VI(A) (Plan of Action for Las Lomas (June 7, 1994)). It also permitted certain limited rent adjustments, JX–CG 220, ¶ 9, and provided Section 8 assistance to 93 of the 112 units in the project. *Id.* ¶ 11.

4. Blossom Hill Apartments partnership.

Blossom Hill Apartments in San Jose, California, consists of 200 garden-style units, including one– and two-bedroom apartments, and three-bedroom townhouses. Tr. 4893:16–22 (Test. of Glodney). It is located in a middle-class residential neighborhood, close to shopping malls and schools. Tr. 4894:12–20 (Test. of Glodney). It includes uncovered parking facilities for its residents. Tr. 4894:6–9 (Test. of Glodney). The site inspection showed that the property is attractive and well landscaped, featuring a number of trees exceeding 100 years of age that were preserved with the development, as well as other attractive plantings. The buildings and facilities reflected a high level of maintenance. According to Mr. Goldrich, San Jose has experienced considerable population growth over the last twenty years. Tr. 1091:24–25 (Test. of Goldrich).

Blossom Hill partnership entered into its Regulatory Agreement with HUD on August 1, 1973 under Section 236, limiting the owners' maximum annual dividend to six percent of their initial equity investment. JX–CG 5, ¶ 6(e)(1) (Regulatory Agreement for Blossom Hill). The initial equity investment was $436,601, allowing for a maximum limited dividend of $26,196. *See, e.g.,* JX–CG 12 (Independent Auditor's Report for Blossom Hill Apartments (June 30, 1990)). On that same day, Blossom Hill entered into a deed of trust note with Union Bank. JX–CG 1A (Deed of Trust Note for Blossom Hill). HUD initially endorsed the note on August 24, 1973, and gave its final endorsement on October 31, 1974. *Id.* at CGII–015997. Rider "A" to the Deed of Trust note gave Blossom Hill the right to prepay its mortgage without HUD approval after 20 years. *Id.* at CGII–000636. Thus, its initial prepayment eligibility date was October 31, 1994.

After Blossom Hill entered into the regulatory agreement, and after HUD gave its initial approval of the deed of trust note, but prior to HUD's final endorsement, the general partners sold limited partnership interests in Blossom Hill through a syndicator, selling 95% of their equity. PCG 1186, at CG11–015636 (Amended Limited Partnership Agreement for Blossom Hill (Dec. 27, 1973)); Tr. 1112:4–8 (Test. of Goldrich). The general partners maintained control of the partnership, subject to the rights of the holders of the limited partnership interests, as well as a 35% residual (post 20–year) ownership in the property. PCG 1186, at CG11–015636, 39–40; Tr. 1101:7–15 (Test. of Goldrich).[18] Throughout this time, however, the entity owning Blossom Hill Apartments complex has remained the Blossom Hill Apartments partnership.

Because Blossom Hill's prepayment eligibility post-dated the Title II cutoff, it filed its notice of intent to receive incentives under Title VI on October 21, 1993. PCG 1049F (Initial Notice of Intent for Blossom Hill Apartments). At some point in late January or early February 1995, Blossom Hill filed its plan of action. Tr. 1484:8–13 (Test. of Glodney); PCG 1041, at CGII–013745 (Mem. to File regarding Goldrich & Kest's Title VI Plans of Action Status (undated)); PCG 1053 (Letter from C. Glodney to K. Ragan (Jan. 27, 1995)). That plan of action was approved on May 19, 1995. PCG 1056 (Letter from J. Browder to J. Goldrich); Tr. 1484:17–18 (Test. of Glodney). However, Blossom Hill did not sign a Use Agreement because Title VI was not then funded. PCG 1028 (Letter from J. Browder to J. Goldrich (June 15, 1995)); Tr. 1484:19 to 1486:25 (Test. of Glodney). Accordingly, were the program to remain unfunded for 15 months—*i.e.,* through August 19, 1996—Blossom Hill would have been permitted to prepay under LIHPHRA. PCG 1028. Had Blossom Hill prepaid under

18. On December 17, 1996, the limited partners sold their partnership interests to the general partners and entities associated with them. DX 85A, at 10–11 (Set II Plaintiffs' Third Supplemental Objections and Responses to Interrogatory No. 9 (Nov. 15, 2004)); Tr. 1854:25 to 1857:20 (Test. of Glodney).

LIHPHRA on that date, it would have been responsible for paying fifty percent of relocation expenses for certain displaced tenants, and required to allow certain tenants to remain on the property for three years after the date of prepayment. *Id.;* Tr. 1487:15 to 1490:9 (Test. of Glodney). During this 15–month period, HOPE was enacted.

Blossom Hill attempted to prepay its mortgage under HOPE. In early April 1996, it submitted to HUD its notice of intent to prepay. Tr. 1513:3–13 (Test. of Glodney). Blossom Hill sought to prepay as early as feasible, but initially, prepayment was delayed because the regional HUD office had "not yet received instructions from [its] Headquarters on how to proceed with the prepayments." DX 244 (Letter from K. Axtell to J. Goldrich (Apr. 18, 1996)). Subsequently, Blossom Hill faced a number of obstacles to prepayment, mainly through HUD's issuance of preservation letters. *See supra,* at 445; PCG 1163 (Preservation Letter No. 2); DX 266 (Preservation Letter No. 4). For example, HUD notified Blossom Hill's representatives that rents could not be increased for three years because the property was in a low-vacancy area. PCG 1035 (Letter from K. Loman to C. Glodney (July 30, 1996)). Ultimately, Blossom Hill was able to prepay the mortgage on December 19, 1996. Tr. 1611:5–9 (Test. of Glodney); DX 251 (Letter from K. Loman to C. Glodney (Jan. 29, 1997)). When Blossom Hill did prepay, it remained unable to increase rents on those units subject to Section 8 contracts. One such contract covered 99 units through October 31, 1997, and a second Section 8 contract involved 20 units through June 30, 1998. DX 251; Tr. 1612:23 to 1613:25 (Test. of Glodney). Blossom Hill had entered such Section 8 contracts under the assumptions that LIHPHRA would remain in effect and that the partnership would not be eligible to prepay. Tr. 1612:23 to 1613:25 (Test. of Glodney). At the time of the site visit, on December 16, 2004, approximately 60–70% of the units were rented to conventional tenants. Tr. 4897:19–23 (Test. of Glodney).

5. Skyline View Gardens partnership.

The Skyline View Gardens properties consist of two sites, about a mile apart, in South San Francisco, California. Skyline View Terrace comprises 104 units, while Bay View Terrace includes 56 units, both including one–, two–, and three-bedroom multi-family units. Tr. 4888:2–8 (Test. of Glodney). The properties are located on or near a ridge line between the Pacific Ocean and the Bay, just south of San Francisco, close to the airport, shopping areas, and schools, and feature recreation rooms, playgrounds, gyms, and covered parking. Tr. 4888:9 to 4892:10 (Test. of Glodney). The site inspection showed that these properties are well maintained and aesthetically attractive. According to Mr. Goldrich, because property in San Francisco is so expensive, property close to the city generally can charge relatively high rents. Tr. 1090:23 to 1091:5 (Test. of Goldrich).

On July 1, 1972, the Skyline View partnership entered into its regulatory agreement with HUD under Section 236, limiting the partnership to a maximum annual dividend of six percent of the owners' initial equity investment. JX–CG 293, ¶ 6(e)(1) (Regulatory Agreement for Skyline View Gardens). The partnership owners' initial equity investment was $339,200, limiting the maximum annual dividend for Skyline View to $20,388. *See, e.g.,* JX–CG 300 (Independent Auditor's Report for Skyline View Gardens (June 30, 1991)). Also on July 1, 1972, Skyline View entered into a deed of trust note with Union Bank. JX–CG 289A (Deed of Trust Note for Skyline View Gardens). HUD initially endorsed this note on July 20, 1972, and gave its final endorsement on March 15, 1974. *Id.* Rider "A" to the Deed of Trust note permitted Skyline View to prepay its mortgage without HUD approval after twenty years—*i.e.,* March 15, 1994. *Id.* As with Blossom Hill, the general partners sold limited partnership interests through a syndicator, selling 95% of the equity interest, but maintaining control subject to the rights of limited partners and retaining a 35% residual (post 20–year) ownership. PCG 1187, at CGII–015766 (Amended Partnership Agreement for Skyline View Gardens (Dec. 14, 1972)); Tr. 1101:7–15 (Test. of Goldrich).[19] Throughout,

19. On December 16, 1996, the limited partners sold their partnership interests to the general

the partnership has owned the Skyline View Gardens properties.

Because Skyline View's initial prepayment eligibility date was after the cutoff for participation in the options provided under Title II (ELIHPA), Skyline View submitted its notice of intent to seek incentives under Title VI (LIHPHRA). PCG 1131 (Letter from C. Glodney to K. Ragan (Oct. 21, 1993)); Tr. 1388:24 to 1389:1 (Test. of Glodney). It submitted its plan of action on January 31, 1995, and HUD approved its plan of action on May 8, 1995. PCG 1041, at CGII–013752; Tr. 1499:24 to 1500:20 (Test. of Glodney). Although its plan of action was approved, Skyline View's plan was not funded. PCG 1174 (Letter from J. Browder to J. Goldrich (June 15, 1995)). If HUD had been unable to provide incentives by August 8, 1996, Skyline View would have been permitted to prepay, although it would have been required to pay for tenant relocation expenses and maintain rents for three years. *Id.;* Tr. 1500:21 to 1502:9 (Test. of Glodney). During this period, HOPE was enacted.

Skyline View prepaid under HOPE. Tr. 1502:2–4 (Test. of Glodney). Soon after HOPE was enacted, Skyline View notified HUD of its intent to prepay under HOPE. Tr. 1516:2–5 (Test. of Glodney). As with Blossom Hill, HUD had not yet determined how to proceed in implementing HUD, so Skyline View's prepayment was delayed. DX 244. The delay in part was caused by HUD's decision to implement Preservation Letter No. 2. DX 197 (Letter from K. Loman to J. Goldrich (Apr. 24, 1996)). Skyline View eventually prepaid on December 19, 1996. DX 242 (Letter from C. Glodney to K. Loman (Jan. 7, 1997)); Tr. 1614:24 to 1615:2 (Test. of Glodney). Prior to prepayment, the owners had renewed their Section 8 HAP contract for an additional year through September 30, 1997. DX 196 (Letter from K. Loman to C. Glodney (July 24, 1996)); DX 200 (Letter from C. Glodney to K. Loman (July 29, 1996)); Tr. 1591:4 to 1593:22 (Test. of Glodney).

At the time of the site visit, December 16, 2004, Skyline View Gardens averaged about 60–65% conventional tenants. Tr. 4897:24 to 4898:4 (Test. of Glodney).

Properties Owned by *Chancellor Manor*-related Plaintiffs

The *Chancellor Manor*-related plaintiffs—Chancellor Manor, Oak Grove Towers Associates, and Gateway Investors, Ltd.—are Minnesota partnerships in which Sentinel Management Company is a general partner and manager. Tr. 93:8–19, 102:20 to 103:21 (Test. of Antonio Bernardi), 185:7–17 (Test. of Alessandro Bernardi).[20]

Antonio Bernardi established Landtech Corporation around 1972 and served as its president. Tr. 72:16–23, 126:10 to 127:24 (Test. of A. Bernardi).[21] Landtech later changed its name to Sentinel Management, although the nature of its business did not change. Tr. 91:7–16, 126:19 to 127:8 (Test. of A. Bernardi), 4503:7–17 (Test. of D. Weinberger).[22] In its real estate investments, Landtech uses a "buy and hold" strategy, whereby it buys properties with the intention of holding them to secure long-term appreciation. Tr. 200:1–23 (Test. of S. Bernardi), 345:2 to 346:2, 4495:24 to 4496:6 (Test. of Weinberger). Given their mode of operation, the prepayment right was particularly important to the owners. Tr. 102:5–8 (Test. of A. Bernardi) ("If you didn't have that, that possibility to ... prepay the mortgage after 20 years ... [n]obody in town will accept to b[u]y something."); *see also* Tr. 101:16 to 102:8, 105:10 to 106:12, 163:12–18 (Test. of A. Bernardi). The owners thus kept careful track of the prepayment dates. Tr. 302:20 to 304:2 (Test. of Weinberger). None of the Minnesota properties were eligible for incen-

partners and entities associated with them. DX 85A, at 15; Tr. 1854:2–24 (Test. of Glodney).

20. Both Antonio Bernardi and Alessandro Bernardi testified at trial. Further references to Antonio Bernardi shall be abbreviated as "A. Bernardi," and to Alessandro Bernardi shall be shortened to "S. Bernardi."

21. Landtech's co-founder, Tom Barrett, has also served as its president. Tr. 4503:3–13 (Test. of Weinberger).

22. David Weinberger is currently a vice president of Sentinel Management Company, and served as the *Chancellor Manor*-related plaintiffs' representative at trial. Tr. 289:23 to 290:1 (Test. of Weinberger).

tives under Title II, so they all operated under the auspices of Title VI. *See supra,* at 444 (describing LIHPHRA's transition provisions and the deadline of January 1, 1993 for Title II applications).

1. Chancellor Manor partnership.

The Chancellor Manor property is a 200-unit garden-style apartment complex located on approximately five acres of land in Burnsville, Minnesota, a suburb sixteen miles south of Minneapolis. Tr. 820:2–16 (Test. of D. Weinberger), 872:5 to 873:17 (Test. of E. Herman); DX 1192, at 10 (Appraisal Report of D. Mueller for Chancellor Manor (Sept. 9, 2004)).[23] The complex includes one, two, and three-bedroom apartments, as well as three-bedroom townhouses. Tr. 820:17–21 (Test. of Weinberger); DX 1192, at 27. It is close to a shopping center, as well as to the intersection of a major road with Interstate 35, which leads into the core of Minneapolis and St. Paul. Tr. 820:22 to 821:1 (Test. of Weinberger), Tr. 872:7 to 873:7 (Test. of Herman). The property is also near the Buckhill ski area. Tr. 821 (Test. of Weinberger). The property features surface and enclosed garage parking, and amenities such as playground areas. Tr. 912:5–22 (Test. of Herman). The site inspection showed that the property has been well maintained. The city of Burnsville expanded considerably between 1970 and 1990, with 157.2% increase in population and 292% household growth, and, according to the government's real-estate appraisal expert, has become one of the more affluent communities in the state and in the nation. DX 1192, at 10–11.

Chancellor Manor entered into its Regulatory Agreement with HUD on November 1, 1971, whereby it agreed to charge HUD-approved rents in exchange for mortgage insurance and interest subsidies pursuant to Section 236. PCM 387 (Regulatory Agreement for Chancellor Manor). These regulatory agreements also limited the owners' annual limited dividend to six percent of their initial equity investment. *Id.* ¶ 6(e)(1). A deed of trust note permitted prepayment without HUD's approval any time beginning twenty years after HUD's final endorsement of the deed of trust note. *Chancellor Manor* Stip. ¶ 13 (stipulating to such provision in the mortgage note for Chancellor Manor). HUD gave its final endorsement on August 14, 1973. *Id.* ¶ 18. Thus, its initial prepayment eligibility date was August 14, 1993. *Id.* The Chancellor Manor partnership was the entity that entered into these agreements, and it remains the owner of the Chancellor Manor property to this day. The general partner of the Chancellor Manor partnership at the time of the regulatory agreement and deed of trust note was Shelter Development Corporation. PCM 387. Landtech was added as an "Additional General Partner" of Chancellor Manor on August 7, 1974 "to ensure the long-term profitability and effectiveness and operation" of the partnership. Tr. 4511:3–13, 4524:15 to 4525:13 (Test. of Weinberger); DX 1064 (Third Amended Limited Partnership Agreement for Chancellor Manor). Landtech and Shelter served as general partners until 1980, when Landtech became the sole general partner of Chancellor Manor. DX 1063 (Fourth Amendment to Limited Partnership Agreement (Feb. 26, 1980)).

At the time of Chancellor Manor's *initial* prepayment eligibility date, LIHPHRA was in effect. After receiving guidance that HUD would not permit the partnership to prepay, Tr. 196:4 to 197:24 (Test. of S. Bernardi), 301:9 to 302:19 (Test. of D. Weinberger), the partnership filed a notice of intent to seek incentives. PCM 6 (Notice of Intent (Jan. 14, 1993)). Thereafter, Chancellor Manor continued to follow LIHPHRA's procedures by filing a plan of action to seek incentives. PCM 7 (Plan of Action for Chancellor Manor (Apr. 13, 1994)). Ultimately, it signed a Use Agreement, binding the property to HUD-approved rents for the "remaining useful life of the Project." DX 721 (Use Agreement for Chancellor Manor (Feb. 14, 1995)). The agreement defines "remaining useful life" as "the period during which the physical characteristics of the Project remain in a condition suitable for occupancy, assuming normal maintenance and repairs are

23. Ellen Herman is an appraiser who testified for the plaintiffs, and Dan Mueller is an appraiser who testified from the government.

made and major systems and capital components are replaced as becomes necessary." *Id.* ¶ 1(g). The owner may petition HUD to determine whether the remaining useful life of the project has expired no less than fifty years after HUD's approval of the project's Plan of Action. *Id.* ¶ 2. Because HUD approved Chancellor Manor's plan of action on December 13, 1994, *Chancellor Manor* Stip. ¶ 58, the earliest that Chancellor Manor can exit the HUD program is December 13, 2044, and then only if HUD determines that the property is no longer useful.[24] In exchange for maintaining the restrictions, Chancellor Manor received a HUD-insured loan and an authorized annual distribution of $281,064, which, after debt service, amounted to $29,879. *Chancellor Manor* Stip. ¶ 63.

Chancellor Manor's HAP contract was set to expire in 1991, but the partnership claims it was prepared to permit the contract to expire in 1991, and obtain, with HUD's assistance, vouchers for tenants until its prepayment date in 1993. *Chancellor Manor* Pls.' Post-Trial Br. at 42; Tr. 195:9–20 (Test. of S. Bernardi). Upon realizing that LIHPHRA would prohibit prepayment, Chancellor Manor renewed its HAP contract for another five-year period through 1996. PCM 5 (Letter from E. Montermini, Vice President, Sentinel to H. Goldman, HUD (1991)).

In January 2001, the Chancellor Manor partnership negotiated a purchase and sale agreement with a non-profit entity, Community Development Housing Corporation, for the property, but the agreement was never executed because the non-profit could not fund the transaction. Tr. 424:8 to 426:17 (Test. of Weinberger).[25]

2. Oak Grove Towers partnership.

Oak Grove Towers is a 228-unit high-rise apartment building located in the Loring Park neighborhood of Minneapolis. Tr. 822:8–24 (Test. of Weinberger), 870:7–10 (Test. of Herman). It features one-bedroom and two-bedroom apartments. Tr. 822:8–9 (Test. of Weinberger). The building has 220 parking spaces, a patio area, an exercise room, and laundry facilities. DX 1191, at 35, 37, 39 (Appraisal Report of D. Mueller for Oak Grove Towers (Sept. 9, 2004)). The site inspection showed that the property is well maintained, to the effect that it appears to be a much newer property than it actually is. Other high-rise apartment buildings and condominiums are located nearby. The Loring Park neighborhood has been a very well established and desirable residential area throughout the city's history. Tr. 870:9–21 (Test. of Herman). The property is very near Loring Park, a large park with paths, ponds, and horticultural plantings at the southwestern end of downtown Minneapolis, and is also within several blocks of a cathedral, a basilica, other large churches, the Woman's Club, the Walker Art Center, the Guthrie Theater, several historic buildings, and educational institutions. It is within walking distance of Nicollet Mall in downtown Minneapolis, offers many restaurants, and provides tenants with easy access to the interstate highway system. Tr. 823:3–13 (Test. of Weinberger), Tr. 870:11 to 872:4 (Test. of Herman).

The owners agreed to charge HUD-approved rents in exchange for mortgage insurance and interest subsidies pursuant to Section 236. PCM 400 (Regulatory Agreement (Mar. 13, 1972)). This regulatory agreement also limited the owners' annual limited dividend to six percent of their initial equity investment. *Id.* ¶ 6(e)(1). The deed of trust note permitted prepayment without HUD approval twenty years after HUD's final approval, which approval was given on January 31, 1974. PCM 399 (Mortgage Note for Oak Grove Towers Associates (Mar. 13, 1972)). Thus, Oak Grove was initially eligible for prepayment without HUD approval as of

24. In its approval letter, HUD apparently advised Chancellor Manor that the restrictions "would remain in effect throughout the remaining useful life of the project, which was estimated to be 50 years or until January 31, 2045." *Chancellor Manor* Stip. ¶ 60. The January 31, 2045 date, however, does not appear in the Use Agreement.

25. Mr. Weinberger testified that Community Development Housing Corporation was seeking "some [S]tate of Minnesota bond financing. And there is an allocation of moneys made available on a first come, first serve basis. And they were not able to obtain the financing." Tr. 425:15–19. The purported purchase price was $12,500,000. *Id.* at 426:2.

January 31, 1994. Oak Grove was the entity that entered into these agreements, and remains the controlling entity to date. At the time the partnership entered into these agreements, its general partner was Shelter Development Corporation. PCM 399. Landtech became an additional general partner in approximately August 1974, and Landtech and Shelter were partners until Landtech bought out Shelter's interest in the partnership around 1980. Tr. 4530:22 to 4531:9 (Test. of Weinberger).

Oak Grove could not prepay without HUD approval on its eligible prepayment date, January 31, 1994, because LIHPHRA was in effect. Oak Grove submitted its notice of intent on May 21, 1993, choosing the Use Agreement option. PCM 148 (Oak Grove Notice of Intent (May 21, 1993)). Subsequently, Oak Grove submitted a plan of action on April 5, 1995. PCM 143 (Oak Grove Plan of Action (Apr. 5, 1995)). Upon the enactment of HOPE, the owners began planning for prepayment, foregoing any incentives available under LIHPHRA. Tr. 236:21 to 237:7 (Test. of S. Bernardi). Oak Grove pursued a private $2.5 million mortgage loan on June 30, 1997, and prepaid on July 30, 1997. PCM 158 (Mortgage Application (June 30, 1997)); Tr. 413:6 to 415:14 (Test. of Weinberger). The partnership sought to have as little debt as possible, borrowing only what was needed to "buy down the [original] mortgage and to accomplish any upgrades we needed to convert to a market property at that time." Tr. 428:1–18. (Test. of Weinberger). The partnership also wished to borrow for as short a time as possible. *Id.* To those ends, the partnership obtained a very low loan-to-value seven-year fully amortizing mortgage. Tr. 428:1 to 429:19 (Test. of Weinberger).

Oak Grove had in place two HAP contracts. Under these contracts, tenants paid rent equal to 30% of their adjusted income, and HUD subsidized the remainder of the rent. 42 U.S.C. § 1437f. The larger of the two HAP contracts covered 91 units, and was renewed for a five-year period effective November 1, 1992 through October 31, 1997. DX 738 (Oak Grove HAP Renewal Contract (Dec. 31, 1991)); Tr. 4536:14–25 (Test. of Weinberger). The smaller HAP contract included 75 units, and was set to expire on September 30, 1996. DX 786 (Oak Grove HAP Renewal Contract (June 11, 1996)); Tr. 4536:8–11 (Test. of Weinberger). However, the one-year notice requirement of ELIHPA was still in effect at the time. 42 U.S.C. § 1437f(c)(8); *see also* PCG 1169, at DOJ 16117 (Preservation Letter No. 6). Oak Grove had given tenants notice as of March 21, 1996. Tr. 401:16–20 (Test. of Weinberger). Thus, the owners agreed to extend the HAP contract for one year from October 1, 1996 to September 30, 1997. DX 786. At the time, HUD was only authorized to renew HAP contracts for one-year increments. *Id.* HUD determined that the notice Oak Grove provided to its tenants was satisfactory. DX 775 (Letter from H. Goldman to S. Bernardi (Sept. 12, 1997)).

After Oak Grove prepaid, a tenants' association filed a lawsuit against the partnership alleging violations of the one-year notice requirement, as well as federal and state fair housing laws. DX 979A (Settlement Agreement (May 4, 1998)); Tr. 418:8 to 419:1, 420:12 to 421:17 (Test. of Weinberger). *Cf.* PCM 280 (Draft Complaint against Gateway Investors (undated)). Oak Grove settled this litigation on May 4, 1998. DX 979A; Tr. 421:18–23 (Test. of Weinberger). The settlement obligated Oak Grove to accept "enhanced vouchers" from holdover tenants whose rent was previously subsidized by HUD, for as long as HUD offered such enhanced vouchers. DX 979A; Tr. 421:24 to 422:9 (Test. of Weinberger). At the time of the settlement, 166 of the 228 tenants at Oak Grove qualified for this status. Tr. 422:14–24 (Test. of Weinberger). The settlement also provided for free parking for voucher-holding tenants through September 30, 1999, at the latest, and a subsequent amendment permitted parking fees to be included in the rent in certain situations. DX 979A; DX 979B (Supp. Settlement Agreement for Oak Grove (Dec.2000)). As of July 2004, approximately 30% of the tenants received assistance under Section 8. Tr. 477:15 to 479:20 (Test. of Weinberger).

3. Gateway Investors, Ltd.

Gateway Investors, Ltd. owns and operates Rivergate Apartments, a 269-unit high-rise apartment building at the northeastern edge of downtown Minneapolis overlooking the Mississippi River. Tr. 816:15 to 817:7 (Test. of Weinberger); Tr. 864:11 to 870:6 (Test. of Herman). The property consists of 255 one-bedroom units and 14 two-bedroom units. DX 1190, at 35 (Appraisal Report of D. Mueller for Rivergate Apartments (Sept. 9, 2004)). It features an exercise room, a laundry facility, and a patio. *Id.* at 35, 37, 39. The site inspection showed that the property is well maintained and has an attractive appearance fully in keeping with its urban setting. Located in the heart of the historic riverfront district, it overlooks the Falls of St. Anthony and the "stone arch" bridge and is immediately adjacent to the Minneapolis Public Library, a high-rise condominium, and other high-rise apartment buildings, and it is within a block or two of museums, federal buildings, and a modern, well known hotel located in an extensively renovated historic structure. It also is within walking distance of the business district in Minneapolis and the skyway system, a second-story network of enclosed pedestrian bridges that connects 53 blocks of the city. Tr. 817:2 to 819:5 (Test. of Weinberger); Tr. 866:7 to 869:11 (Test. of Herman); DX 1190, at 19.

On June 7, 1973, Gateway entered into its Regulatory Agreement under Section 236. PCM 417 (Regulatory Agreement for Gateway Investors (June 7, 1973)). As with the other properties, this regulatory agreement limited the owners' annual dividend to six percent of their initial equity investment. *Id.* ¶ 6(e)(1). Gateway also entered into its deed of trust note on June 7, 1973, which note permitted prepayment without HUD approval after twenty years. PCM 415 (Mortgage Note for Gateway Investors, Ltd. (June 7, 1973)). HUD's final endorsement date was June 6, 1975, and thus, Gateway's initial prepayment eligibility date was June 6, 1995. *Id.* Gateway entered into these agreements and has been the owner of Rivergate to date. At the time it entered these agreements, its general partner was the Knutson Companies, Inc. PCM 417, at HUD 00452 (signature page). Landtech was added as an "Additional General Partner and Managing General Partner" after Gateway signed the documents but prior to HUD's final endorsement. DX 842 (Third Amended Limited Partnership Agreement (Jan. 1, 1975)). Knutson brought in Landtech to manage the property effectively "to and through the prepayments of these mortgages." Tr. 4511:1–2 (Test. of Weinberger); *see also* Tr. 4510:17 to 4511:2 (Test. of Weinberger). Knutson and Landtech served as general partners until 1989, when Knutson exited the partnership. Tr. 4510:9–16 (Test. of Weinberger).

On its initial prepayment eligibility date, LIHPHRA was still in effect. Accordingly, Gateway filed a Notice of Intent to seek incentives on May 9, 1994. PCM 421 (Notice of Intent for Gateway Investors, Ltd.). Subsequently, it filed a plan of action on May 25, 1995. PLM 273 (Plan of Action for Rivergate Apartments (May 25, 1995)). After HOPE was enacted, Gateway changed course and prepared for prepayment. Gateway applied for a $2.8 million mortgage loan on June 20, 1997, and prepaid on July 30, 1997. PCM 278 (Mortgage Application (June 20, 1997)); Tr. 416:3 to 417:21 (Test. of Weinberger).

As with Oak Grove, Rivergate rents were covered by two HAP contracts. The larger contract covered 107 units, and was renewed effective October 1, 1992 through September 30, 1997. DX 822 (Rivergate HAP Renewal Contract (Dec. 31, 1991)). The smaller contract covered 50 units, and was set to expire on September 30, 1996. DX 854 (Rivergate HAP Renewal Contract (June 11, 1996)). The owners renewed the smaller HAP contract for one year to receive HAP subsidies while satisfying ELIHPA's one-year notice requirement. *Id.*

Rivergate also faced potential tenant litigation after prepayment. PCM 280 (Draft Complaint). The draft complaint argued that a letter dated March 21, 1996 informing tenants of the renewal of Rivergate's smaller HAP contract for one year was inadequate notice under ELIHPA. *Id.* ¶¶ 16–19. Tenants were prepared to sue HUD, the Secretary of HUD, and Rivergate, claiming that

the owners failed to satisfy the one-year notice requirement, state laws, and federal fair housing laws. Rivergate settled this potential litigation by agreeing to accept enhanced vouchers for qualified tenants through May 1, 2015. DX 985 (Rivergate Settlement Agreement (Dec. 20, 2000)). At the time of the agreement, approximately 157 of the 269 tenants were qualified voucher tenants. Tr. 422:14–25 (Test. of Weinberger). As of July 2004, approximately 30% of the tenants were receiving assistance under Section 8. Tr. 477:15 to 479:20 (Test. of Weinberger).

Rivergate built a parking garage adjacent to the property in 2001. Tr. 817:14–17 (Test. of Weinberger). Prior to the newly built parking facility, Rivergate featured 64 surface stalls for the 269 units. DX 1190, at 37. As of November 2004, the parking garage accommodated 270 parkers, 121 of whom were tenants of Rivergate, and 174 of whom were outside parkers who pay on a monthly basis. Tr. 817:14–22 (Test. of Weinberger). Mr. Weinberger testified that the garage ramp is viewed as a separate revenue-generating activity designed to take advantage of the general lack of parking in the downtown area. Tr. 453:6 to 454:9.

*Procedural History*

These two sets of cases have been vigorously litigated since their inception. The *Cienega Gardens*-related plaintiffs initially sued in 1994 on both contract and takings grounds. *Cienega VIII,* 331 F.3d at 1324.[26] The parties designated four of the forty-two plaintiffs to be model plaintiffs, and Judge Robinson of this court conducted a trial in 1996 on those plaintiffs' breach-of-contract claims. *Cienega Gardens v. United States,* 38 Fed.Cl. 64 (1997) ("*Cienega III*"). The court found the government liable for breach of contract, and awarded the model plaintiffs $3,061,107 in damages. *Id.* at 89. The Court of Appeals reversed, holding that all forty-two plaintiffs lacked the requisite contractual privity with the government. *Cienega Gardens v. United States,* 194 F.3d 1231, 1238–39 n. 11, 1246 (Fed.Cir.1998) ("*Cienega IV*"). On remand, Judge Hodges of this court dismissed the plaintiffs' takings claims, ruling that the plaintiffs' failure to apply for prepayment under LIHPHRA resulted in the claims not being ripe for review. *Cienega Gardens v. United States,* 46 Fed.Cl. 506 (2000) ("*Cienega V*"). The Federal Circuit reversed, holding that the model plaintiffs' regulatory takings claims were ripe for adjudication, and stating that "[i]f the factual circumstances of any or all of the remaining Owners present a similarly compelling case of administrative futility, then the trial court should adjudicate their takings claims, as well." *Cienega Gardens v. United States,* 265 F.3d 1237, 1249 (Fed.Cir.2001) ("*Cienega VI*"). The Court of Appeals' remand focused on plaintiff's regulatory takings claims; the Court of Appeals affirmed the trial court's dismissal of the model plaintiffs' *per se* takings claims. *Id.* at 1248–49. On remand, Judge Hodges acting *sua sponte* granted the government a summary judgment on plaintiffs' takings claim, drawing an analogy between this case and *Alexander Investment v. United States,* 51 Fed.Cl. 102 (2001), and holding that the owners did not have vested property rights, and that if they did, the taking would not be compensable. *Cienega Gardens v. United States,* No. 94–1C (Fed. Cl. Jan. 8, 2002) ("*Cienega VII*"). The Federal Circuit again reversed, abrogating the decision in *Alexander Investment,* and holding that ELIHPA and LIHPHRA had engendered a regulatory taking of the model plaintiffs' property rights, reinstating for the model plaintiffs the contract-based judgment originally entered in *Cienega III,* and remanding the model plaintiffs' claims to this court to adjust that reinstated judgment to provide just compensation. As to the other thirty-eight plaintiffs, the Court of Appeals held that it lacked a sufficient record to conduct a regulatory takings analysis and remanded the claims of those plaintiffs to this court to determine liability and, if necessary, just compensation. *Cienega VIII,* 331 F.3d at 1353–54. This court held a trial on possible adjustments to the reinstated judgment for the four model plaintiffs and en-

26. Administrative law claims were dismissed for lack of jurisdiction and not appealed. *Cienega Gardens v. United States,* 33 Fed.Cl. 196 (1995) ("*Cienega I*"). *See also Cienega VIII,* 331 F.3d at 1324 n. 3.

tered an adjusted judgment providing just compensation *sub nom. Independence Park*, 62 Fed.Cl. at 685.[27]

The *Chancellor Manor*-related plaintiffs also filed both contract and takings claims. Senior Judge Lydon of this court granted a motion by the government for summary judgment on both counts. *Chancellor Manor v. United States*, 51 Fed.Cl. 137 (2001). The Court of Appeals affirmed the summary judgment on the contract claim, holding that plaintiffs were not in privity of contract with the government. *Chancellor Manor*, 331 F.3d at 900–01. The Court of Appeals, however, reversed the judgment for the government on the takings claim, and remanded the case to this court to determine whether plaintiffs' claims satisfy the requirements of *Penn Central Transportation Company v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), to constitute a regulatory taking.[28] *Chancellor Manor*, 331 F.3d at 906–07.

The mandates issued under *Cienega VIII* and *Chancellor Manor* are largely similar, but they differ in three potentially significant respects. First, the decisions diverge respecting the baseline used to determine whether the action frustrated the plaintiffs' reasonable investment-backed expectations, one of the three considerations identified in *Penn Central* as being pertinent to a regulatory takings analysis. *Chancellor Manor* requires a wholly objective baseline for analysis of reasonable investment-backed expectations, while *Cienega* requires a determination of the plaintiffs' actual expectations and then an objective evaluation of those expectations. *Compare Cienega VIII*, 331 F.3d at 1346, *with Chancellor Manor*, 331 F.3d at 904. Second, *Chancellor Manor* holds that the property interest at issue is the real property right to exclusive possession, but that no separate and distinct contractual rights were at issue. *Cienega* holds that the property rights at issue are both real property rights and a property interest in the contracts themselves. *Compare Cienega VIII*, 331 F.3d at 1330, *with Chancellor Manor*, 331 F.3d at 903. Third, *Chancellor* allows the government to show that plaintiffs helped create the housing problem, and includes that possibility among the alleged facts that might illuminate the nature of the governmental action, also a *Penn Central* consideration in the regulatory takings analysis. *Cienega* rejects this potential position by the government as being "unsound as a matter of logic." *Compare Cienega VIII*, 331 F.3d at 1339, *with Chancellor Manor*, 331 F.3d at 905.

Given the similarities of the facts and circumstances in these cases, and to apply both mandates consistently, the court consolidated the three *Chancellor Manor*-related cases with five *Cienega Gardens*-related plaintiffs for purposes of trial. *Cienega Gardens*, 62 Fed.Cl. at 28. One week of the trial was held in Minneapolis, Minnesota, on November 8–12, 2004. While in Minneapolis, the court visited the three Minnesota properties at issue. The remainder of the trial was held in Washington, D.C. between November 15 and December 13, 2004, and in California on December 16 and 17, 2004, at which latter

27. Minor revisions to that judgment were made via a decision granting a motion for reconsideration in part. *See Independence Park Apts. v. United States*, 62 Fed.Cl. 684 (2004).

28. In *Penn Central*, the Supreme Court set out three principles or guideposts to aid in making the "essentially ad hoc, factual inquiries" necessary for determining whether a regulation goes too far and constitutes a taking. *Penn Central*, 438 U.S. at 124, 98 S.Ct. 2646. Those three factors or guideposts are (1) the character of the governmental action, (2) the economic impact of the action, and (3) the degree of interference with the reasonable investment-backed expectations of the property owner. *Id. See also Cienega VIII*, 331 F.3d at 1337 (listing the three *Penn Central* factors and citing *Loveladies Harbor v. United States*, 28 F.3d 1171, 1176–77 (Fed.Cir. 1994), a decision explaining those factors).

The Supreme Court has emphasized time and again that "*Penn Central* does not supply mathematically precise variables, but instead provides important guideposts that lead to the ultimate determination whether just compensation is required." *Palazzolo v. Rhode Island*, 533 U.S. 606, 634[, 121 S.Ct. 2448, 150 L.Ed.2d 592] (2001) (O'Connor, J., concurring). "The Takings Clause requires careful examination and weighing of all the relevant circumstances in this context." *Id.* at 636[, 121 S.Ct. 2448]. *See also Tahoe–Sierra Pres. Council v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 325–328 & nn. 20–23[, 122 S.Ct. 1465, 152 L.Ed.2d 517] (2002).

time the court visited the five California properties. The parties submitted post-trial briefing, and the court heard closing arguments on March 23, 2005. The case is now ready for decision.

## ANALYSIS

Three threshold issues must be addressed before proceeding with the temporary takings analysis. First, the government claims that the claims of four of the plaintiffs are not ripe. Second, the government argues that the plaintiffs who signed Use Agreements have waived their takings claims under the doctrine of accord and satisfaction. Third, it argues that the plaintiff-partnerships whose partners have changed are barred from pursuing their claims by the Assignment of Claims Act, 31 U.S.C. § 3727.[29] After addressing these threshold inquiries, the court turns to the temporary takings analysis for each property. Because the court finds that each plaintiff has suffered a temporary taking, the court as a final step analyzes and determines the just compensation due the partnerships that own each property.

### A. Threshold Issues

#### 1. *Ripeness.*

A takings claim may not be brought unless it is ripe for review. *Cienega VI,* 265 F.3d at 1244 (citing *Palazzolo,* 533 U.S. at 620, 121 S.Ct. 2448; *Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City,* 473 U.S. 172, 186, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985)). Generally, "a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson County,* 473 U.S. at 186, 105 S.Ct. 3108; *see also United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 127, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985); *Stearns Co. v. United States,* 396 F.3d 1354, 1358 (Fed.Cir.2005). However, "once it becomes clear that the agency lacks the discretion to permit any development, or the permissible uses of the property are known to a reasonable degree of certainty, a takings claim is likely to have ripened." *Palazzolo,* 533 U.S. at 620, 121 S.Ct. 2448; *see also Whitney Benefits, Inc. v. United States,* 926 F.2d 1169, 1172 (Fed.Cir.1991). Thus, a claimant generally must obtain an agency decision establishing the applicability of a statute or regulation to its property prior to claiming that its property has been taken. However, when "the agency has no discretion to exercise over [the landowner's] right to use her land, no occasion exists for applying *Williamson County's* requirement that a landowner take steps to obtain a final decision about the use that will be permitted on a particular parcel." *Suitum v. Tahoe Reg'l Planning Agency,* 520 U.S. 725, 739, 117 S.Ct. 1659, 137 L.Ed.2d 980 (1997).

The government challenges the ripeness of four plaintiffs' claims—Blossom Hill Apartments, Skyline View Gardens, Oak Grove Apartments, and Gateway Investors. *See Chancellor Manor* Def.'s Post-Trial Br. at 27–30; *Cienega* Def.'s Post-Trial Br. at 20–22. The ripeness challenge rests on two different grounds. The government's first argument rests on the fact that the plaintiffs did not seek prepayment under LIHPHRA, but instead, filed plans of action seeking incentives.[30] According to this argument, because 12 U.S.C. § 4108 as a conceptual matter permitted property owners to prepay if stringent conditions were satisfied, *Williamson County* requires *all* property owners to obtain a final agency decision barring prepayment before bringing a takings claim.[31]

29. These threshold issues were the subject of three motions *in limine* argued by the *Cienega Gardens*-related plaintiffs and the government at the outset of the second week of trial. Tr. 1021:20 to 1034:2. At that time, the court noted that decisions on these threshold issues likely would be rendered post trial. Tr. 1033:15 to 1034:2.

30. ELIHPA did not apply to the four plaintiffs whose claims have been challenged on ripeness grounds because their initial prepayment eligibility dates occurred after January 1, 1993. *See supra,* at 444 (discussing LIHPHRA's transition provisions).

31. The government in the *Cienega Gardens*-related cases apparently concedes that plans of action by Blossom Hill and Skyline View for prepay-

The government's second argument is closely related but begins with the premise that the plaintiffs failed to qualify for prepayment under 12 U.S.C. § 4114(a)(1)(A), which permits prepayment if a plan of action seeking incentives is unfunded for fifteen months. During the relevant fifteen-month periods for each of the four plaintiffs at issue, HOPE was enacted, and each plaintiff abandoned its plan of action seeking incentives and endeavored instead to prepay under HOPE.[32] As the legal grounds for its second ripeness argument, the government would draw an analogy between this case and *Boise Cascade Corporation v. United States,* 296 F.3d 1339 (Fed.Cir.2002), in which a plaintiff brought a regulatory takings claim challenging an injunction prohibiting its logging on its property without a permit because an endangered spotted owl was located there. Before the United States Fish and Wildlife Service decided whether to grant a permit, the owl no longer inhabited the area. *Id.* at 1342. The Court of Appeals held that the regulatory takings claim was not ripe, and could never ripen, absent a denial of a permit or extraordinary delay. *Id.* at 1352. The government argues that the plaintiffs never received a final agency decision before HOPE permitted prepayment, so it is impossible to know how LIHPHRA would have applied to the plaintiffs. Tr. 5060:17 to 5061:20.

■ The first argument is quickly resolved based on Federal Circuit precedent and the record in this case. *Cienega VI,* in holding that the claims of the four model plaintiffs were ripe, found that under LIHPHRA, "HUD lacks the 'high degree of discretion characteristically possessed by land-use boards in softening the strictures of the general regulations they administer.'" *Cienega VI,* 265 F.3d at 1246 (quoting *Palazzolo,* 533 U.S. at 620, 121 S.Ct. 2448).[33] Based on the factual record, the Federal Circuit then distinguished *Greenbrier v. United States,* 193 F.3d 1348 (Fed.Cir.1999), which held that the claims of 249 owners of low-income housing projects were not ripe because they had failed to show that their applications for prepayment would have been rejected. *Cienega VI,* 265 F.3d at 1248. The record in *Cienega VI* showed that HUD lacked discretion under LIHPHRA to permit the four model plaintiffs in *Cienega* to prepay. The Court of Appeals ordered that "[o]n remand, the trial court will have to determine, under the applicable facts, whether each [of the remaining thirty-eight plaintiffs] has demonstrated that it would have been futile to apply to HUD for prepayment." *Id.*

The record before this court is similar to that in *Cienega VI.* Prepayment under Section 4108 was only permissible if HUD made a written finding that prepayment would not (1) result in an increase of more than 10% in tenants' monthly rent, (2) result in involuntary displacement of current tenants without comparable affordable housing, or (3) materially affect the supply of vacant, comparable housing for low-income and very low-income families. 12 U.S.C. § 4108. Regarding the California properties, government's counsel conceded that in California, "prepayment [under Section 4108] was unlikely." Tr. 38:1–4. The government's own expert admitted that "prepaying the mortgage was very difficult to achieve [under Title VI] because it was so hard to prove in Region 9 [(California's region)]. It was so hard to prove that the lifting of the affordability restrictions would not adversely affect the supply of affordable housing." Tr. 2918:2–7 (Test. of T. Vitek). HUD officials also told G & K Management that plans of action seeking prepayment for properties in California would not

ment under 12 U.S.C. § 4108 would have been rejected given the market in California. Tr. 38:17–18 ("We are not asserting ripeness based on their failure to seek to prepay."). However, the government does not appear to make the same concession regarding Oak Grove and Gateway. *See Chancellor Manor* Def.'s Post-Trial Reply Br. at 3–5.

32. HOPE's enactment superseded LIHPHRA's provision permitting prepayment if approved plans of action regarding incentives were unfunded for fifteen months. PCG 1169, at DOJ 16126 (Preservation Letter No. 6).

33. The legal analysis of this issue in *Cienega VI* is not only binding precedent, but it also constitutes the law of the case for Blossom Hill Apartments and Skyline View Gardens. *See Independence Park,* 61 Fed.Cl. at 699.

meet the statutory criteria for prepayment under Section 4108, and would be rejected. Tr. 1351:7 to 1352:20 (Test. of Glodney). Not only would plaintiffs seek to increase rents by more than 10%, but prepayment of their properties would adversely affect the supply of housing for low-income tenants. In short, HUD lacked the discretion to approve the *Cienega Gardens*-related properties' plans of actions seeking prepayment.

Similarly, HUD lacked discretion under Section 4108 to approve the *Chancellor Manor*-related properties' prepayment. Sentinel Management's properties only filed notices of intent and plans of action for incentives after receiving assurances from HUD that they would not be eligible under LIHPHRA for prepayment. Tr. 196:14 to 197:24 (Test. of S. Bernardi), 300:9 to 302:19 (Test. of Weinberger). The government provided no evidence to the contrary. In fact, one government witness who worked extensively in the field could not recall a single example of a property owner from anywhere in the country who had prepaid under Section 4108. Tr. 3008:3–5 (Test. of T. Vitek). Another acknowledged that very few owners had requested prepayment because a grant of such a request was known to be so unlikely under the statute. Tr. 3266:1–9 (Test. of R. Mandel). The overwhelming evidence produced at trial revealed that the plaintiffs could not have prepaid under Section 4108.

■ The government's second argument would superimpose a secondary permitting scheme over the statute's primary *raison d'etre,* placing the burden of providing low-income housing on a small segment of the population whose contractual and property rights dictated otherwise. However, rather than enacting a generally applicable permitting scheme, LIHPHRA targeted the property owners who had previously entered the low-income housing program. *See Cienega VIII,* 331 F.3d at 1335 ("ELIHPA and LIHPHRA directly and intentionally abrogated the contracts. The effects on the contracts is, therefore, not merely consequential."). *See* also S.Rep. No. 101–316, at 107 (quoted *supra,* at 442). *Cf. Centex Corp. v. United States,* 395 F.3d 1283, 1306 (Fed.Cir.2005) (treating legislation as targeted when it "was directed at a small and specifically identified group of taxpayers having contracts with the government, and it was designed to reduce the cost of those contracts to the government"). "[R]egulatory takings cases based on contracts containing key guarantees later negated by Congress may be fundamentally different from those involving only the generalized 'regulatory environment' seen in earlier statutes, regulations, agency policies and practices, and industry understandings." *Cienega VIII,* 331 F.3d at 1354. Under LIHPHRA, a property owner could only prepay when, directly or indirectly, the property was no longer deemed necessary for the provision of low-income housing: either HUD determined that prepayment of that property would not materially affect the low-income housing market, 12 U.S.C. § 4108, Congress determined that plans of action should not be funded, 12 U.S.C. § 4114(a)(1)(A), or nonprofit purchasers decided not to purchase that property. 12 U.S.C. § 4114(a)(1)(B)-(C), (2). Thus, the fifteen-month period cited by the government as a reasonable waiting period during which the government might decide to fund a plan of action is not at all a necessary prerequisite for a ripe takings claim, but rather is merely a relevant factor in determining the end date of a temporary taking.[34] Viewed in context, the government's analogy to the permitting analysis in *Boise Cascade* is sophistic and wholly unavailing.

In addition, the government's position was implicitly rejected by *Cienega VI,* which held the plaintiffs' claims were ripe to challenge these very statutes on the basis that a plan of action seeking prepayment could not be ap-

34. Under LIHPHRA, the end of the fifteen-month period, even were it prior to HOPE, would not necessarily be the end of the temporary takings period because property owners in low-vacancy areas would be required not to raise rents on certain tenants for three years and to pay a portion of tenants' relocation expenses. 12 U.S.C. § 4113; PCG 1028 (Letter from J. Browder to J. Goldrich (June 15, 1995)) (stating requirements of prepayment under Section 4114). Whether a property owner would prepay after fifteen months or be locked into a Use Agreement for the remaining useful life of the property is nonetheless relevant in determining the appropriate end date of a temporary taking. *See infra,* at 480–81.

proved. 265 F.3d at 1248. The Court of Appeals did not require that the model plaintiffs also separately seek incentives and receive a determination of whether those incentives would be funded.[35]

Accordingly, the temporary taking claims of Blossom Hill, Skyline View Gardens, Oak Grove Apartments, and Gateway Investors are ripe for consideration.

In the alternative, the government argues that if plaintiffs' claims are ripe, then the *Chancellor Manor*-related plaintiffs' claims were filed after the statute of limitations had expired. *Chancellor Manor* Def.'s Post-Trial Br. at 30 n.2. LIHPHRA was enacted in 1990, and the *Chancellor Manor*-related plaintiffs' claims were filed in 1998, supposedly in violation of this court's six-year statute of limitations. 28 U.S.C. § 2501. The government argues that if the plaintiffs already knew that prepayment would be futile, they had adequate knowledge in 1990 to know a taking had occurred and to file suit. Tr. 5112:6 to 5113:6. The statute of limitations for temporary takings, however, is measured at the end of the takings period. *Creppel v. United States,* 41 F.3d 627, 631-32 (Fed.Cir.1994); *Reed Island-MLC v. United States,* 67 Fed.Cl. 27, 34-36, 2005 WL 1712462, at *6-8 (2005). This rule operates much like the doctrine applicable to suits upon repudiation of a contract—a plaintiff may file a claim on a temporary takings theory once the taking begins or wait and determine the duration of the taking before filing suit. *See Reed Island,* 67 Fed.Cl. at 36, 2005 WL 1712462, at *8 (discussing *Franconia Assocs. v. United States,* 536 U.S. 129, 144, 122 S.Ct. 1993, 153 L.Ed.2d 132 (2002)). *See also Bass Enters. Prod. Co. v. United States,* 133 F.3d 893, 896 (Fed.Cir.1998). In this case, the temporary taking of each Minnesota property ended less than six years before plaintiffs filed suit on January 20, 1998—Chancellor Manor's taking is still ongoing, and Oak Grove's and Gateway's ended on March 1, 1997. *See infra,* at 482-83. Accordingly, their claims were timely filed.

*2. Accord and satisfaction.*

The government next argues that the signing of Use Agreements by four of the plaintiffs—Cienega Gardens, Del Amo Gardens, Las Lomas Gardens, and Chancellor Manor—constituted an accord and satisfaction and thus, a release from their claims. *See Chancellor Manor* Def.'s Post-Trial Br. at 30-33; *Cienega* Def.'s Post-Trial Br. at 25-27. Courts discharge claims based on accord and satisfaction when "some performance different from that which was claimed as due is rendered and such substituted performance is *accepted by the claimant as full satisfaction of his claim.*" *O'Connor v. United States,* 308 F.3d 1233, 1240 (Fed.Cir. 2002) (emphasis added) (internal quotations and citations omitted). Accord and satisfaction has four elements: (1) proper subject matter; (2) competent parties; (3) a meeting of the minds; and (4) consideration. *Id.* When interpreting a purported release, courts must first look at the language of the document and apply its meaning, but if the language is ambiguous, courts may examine extrinsic evidence to determine the parties' intent. *Dureiko v. United States,* 209 F.3d 1345, 1356-57 (Fed.Cir.2000).

The principal controversy on this issue is whether the Use Agreements constituted a meeting of the minds such that the plaintiffs agreed to accept substitute performance as full satisfaction of their claim. The Use Agreements do not include any language releasing claims. JX-CG 52 (Use Agreement for Cienega Gardens); JX-CG 137 (Use Agreement for Del Amo Gardens); JX-CG 220 (Use Agreement for Las Lomas Gardens); DX 721 (Use Agreement for Chancellor Manor). In support of its position, the government cites two passages of the Use Agreement, one that recites the consideration involved, and one that explains

35. Independence Park, one of the model plaintiffs addressed in *Cienega VI,* had applied for a Title VI Use Agreement, but such an Agreement was not funded, and it eventually prepaid under HOPE and not Section 4114. *See Independence Park,* 61 Fed.Cl. at 697, 700; *Cienega VI,* 265 F.3d at 1243. *Cienega VI* held that Independence Park's takings claim was ripe. 265 F.3d at 1248. *See also supra,* at 460 n. 32 (addressing HUD's Preservation Letter No. 6, advising that HOPE's enactment superseded LIHPHRA's provision permitting prepayment if approved plans of action seeking incentives remained unfunded for fifteen months).

the restrictions on plaintiffs' property. *See, e.g.*, JX–CG 52, at 1 ("[T]he Owner has requested, and HUD has agreed to provide certain incentives ... in exchange for the Owner's agreement to continue low-income affordability restrictions...."); *id.* ¶ 2 ("The project shall be used solely as rental housing for Very Low, Lower, and Moderate Income Families"). *See also* JX–CG 137; JX–CG 220; DX 721.

The lack of a release in these two provisions of the Use Agreements is evident when the language of the provisions is juxtaposed against the contract in the principal case cited by the government, *Aktieselskabet Dampskibsselskabet Svendborg v. United States,* 131 Ct.Cl. 399, 130 F.Supp. 363, 365 (1955), which provided that the sums paid to the property owner under the contract constituted "the just compensation to which the Owner is entitled by law ... and in full and complete accord and satisfaction of any and all claims of whatsoever nature for just compensation." *Id.* at 365. By contrast, here the Use Agreements themselves offer no support for the government's argument that they constituted a release.

Assuming *arguendo* that the Use Agreements were ambiguous, the evidence at trial indicates that the parties did not intend to relinquish their claims when signing the agreements. Testimonial evidence from Carole Glodney, the president of G & K Management, was explicit that the *Cienega Gardens*-related owners did not intend to waive their takings claims by signing Use Agreements. Tr.2007:22 to 2008:7. The government offered no testimony to rebut this evidence and to supply a release notwithstanding the absence of any such indication in the Use Agreements. Instead, the government relies on efforts by G & K Management to include a reservation-of-claims clause in the Use Agreements, which efforts were rejected by HUD. DX 129, at 10 (Plan of Action for Del Amo Gardens Revision No. 1 (Dec. 9, 1993)); JX–CG168, at 10 (Plan of Action for Del Amo Gardens Revision No. 2 (Feb. 24, 1994)); Tr. 1793:6 to 1797:7 (Test. of Glodney). According to the government's argument, the rejections by HUD and subsequent signings of the Use Agreements indicate that the plaintiffs knew they were releasing their claims. Plaintiffs' requests, however, are indicative of their care and cautious thoroughness more than any waiver of claims. Moreover, G & K Management informed HUD that its withdrawal of the proposed language did not indicate a waiver of its takings claims. PCG 1155 (Letter from C. Glodney to K. Axtell, HUD (Apr. 4, 1994)).

Importantly, the *Cienega Gardens*-related plaintiffs had filed the present suit prior to signing the Use Agreements. No notice was presented to the court that the Use Agreements should be treated as settlements, and the issue of an accord and satisfaction or release was not raised at any point in the years of litigation connected with the prior eight decisions in the case. The issue first arose in connection with the trial of this case, the decision which will undoubtedly become known as *"Cienega IX."* The continued pursuit of a claim after entry of an alleged release can serve as evidence of an intent that parties never construed the Use Agreements as an accord and satisfaction. *England v. Sherman R. Smoot Corp.,* 388 F.3d 844, 849–50 (Fed.Cir.2004) ("[C]ourts may refuse to bar a claim based upon the defense of accord and satisfaction where the parties continue to consider the claim after execution of a release. Such conduct manifests an intent that the parties never construed the release as an abandonment of plaintiff's earlier claim.") (quoting *Community Heating & Plumbing Co. v. Kelso,* 987 F.2d 1575 (Fed. Cir.1993)).[36]

36. Counsel for the *Cienega Gardens*-related plaintiffs has argued that the government was foreclosed from making this argument because it was not disclosed during discovery. Tr. 1021:20 to 1025:22. *Cienega* Pls.' Post-Trial Br. at 43 n.9. Rule 8(c) of the Rules of the United States Court of Federal Claims ("RCFC") requires the government to plead accord and satisfaction as an affirmative defense. In its amended answer, filed on May 30, 1996, the government pled as an affirmative defense that "[p]laintiff's claims are barred by subsequent agreements that superseded the alleged agreements with HUD." Am. Answer ¶ 50. Although parties should be forthcoming during discovery to minimize prejudice at trial, this statement placed plaintiffs on notice that the government might argue that the Use Agreements constituted an accord and satisfaction. Accordingly, plaintiffs' request to bar the

Regarding Chancellor Manor, the government cites an amendment to the regulatory agreement signed on the same day as the Use Agreement, which stated the extended obligation of Chancellor Manor to provide low-income housing in exchange for "valuable consideration, the sufficiency of which is hereby acknowledged." DX 722 (Amendment to Regulatory Agreement for Chancellor Manor (Feb. 14, 1993)). This language is inadequate to show that the parties intended to waive their claims by signing a Use Agreement. In fact, the testimonial evidence at trial was that the owners of Chancellor Manor felt that LIHPHRA left them no choice but to mitigate their damages. Tr. 163:24 to 164:11 (Test. of A. Bernardi). Similar to the *Cienega Gardens*-related plaintiffs, the present claim further suggests that Chancellor Manor did not intend to waive its claims when it signed the Use Agreement. *See England,* 388 F.3d at 850.

In short, the Use Agreements constituted attempts to mitigate the damages resulting from LIHPHRA rather than as accords and satisfaction. The government has not satisfied its burden to prove that a meeting of the minds agreeing to waive or release the claims took place.

*3. Assignment of Claims Act.*

The government also argues that the claims of Blossom Hill Apartments and Skyline View Gardens are barred by the Anti-Assignment Act (also called the "Assignment of Claims Act"), 31 U.S.C. § 3727. *See Cienega* Def.'s Post-Trial Br. at 22–25. That provision generally prohibits assignments of claims against the United States, defining "assignment" as "(1) a transfer or assignment of any part of a claim against the United States Government or of an interest in the claim; or (2) the authorization to receive payment for any part of the claim." 31 U.S.C. § 3727(a). Among the claims that may not be transferred are takings claims for just compensation. *United States v. Dow,* 357 U.S. 17, 20, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958). The government argues that because partnership interests in the Blossom Hill Apartments and Skyline View Gardens partnerships have been sold and transferred, the partnership entities themselves may not sue under the Anti-Assignment Act.

The plaintiffs in these cases are not the partners but the partnerships. Under California law, a partnership is viewed as an entity, not as an aggregation of individuals, regarding its ownership of property. *See Everest Investors 8 v. McNeil Partners,* 114 Cal.App.4th 411, 424, 8 Cal.Rptr.3d 31, 40 (2003).[37] The entities who entered into the Regulatory Agreements with HUD were Blossom Hill Apartments, a limited partnership, and Skyline View Gardens, a limited partnership. JX-CG 5 (Regulatory Agreement for Blossom Hill); JX-CG 293 (Regulatory Agreement for Skyline View). Those are the same entities that have filed the present suit. Accordingly, because no transfer of a claim took place, Blossom Hill and Skyline View did not violate the Anti-Assignment Act.[38]

government from asserting accord and satisfaction as an affirmative defense is denied.

37. The decisions cited by the government for the contrary proposition, *Naylor v. United States,* 102 F.Supp. 309 (S.D.Cal.1952), and *Broffman v. Newman,* 213 Cal.App.3d 252, 262–64, 261 Cal. Rptr. 532, 540 (1989), are readily distinguishable. Neither concerned real property or an interest in real property. *Naylor* addressed a suit to recover cabaret taxes paid by a partnership that had dissolved upon the withdrawal of one of the partners. The attempted assignment of the withdrawing partner's interest in the partnership claim was held to be invalid under the Anti-Assignment Act. *Broffman* is even more inapposite. There, two equal partners disagreed over the management of a building, and the court held that the disagreement voided an earlier pre-dispute agreement that one of the partners should manage the building in return for compensation for that service. On that and other issues respecting which the partners were equally divided, the court held that it was "appropriate to view the partnership as an aggregate rather than as an entity." *Broffman,* 213 Cal.App.3d at 263, 261 Cal.Rptr. at 540.

38. An exception to the Anti-Assignment Act permits a successor to bring suit when the transfer took place by operation of law, such as by way of a consolidation or merger with the successor of a claimant corporation. *See Seaboard Air Line Ry. v. United States,* 256 U.S. 655, 657, 41 S.Ct. 611, 65 L.Ed. 1149 (1921); *Tuftco Corp. v. United States,* 222 Ct.Cl. 277, 614 F.2d 740, 745 (1980). Because the partnerships owned the properties for the entire period in question, and are appro-

This treatment of partnerships is consistent with the purposes of the Anti-Assignment Act. These purposes include preventing the purchase by persons of influence of claims against the government, preventing multiple payments of claims, and preserving any affirmative defenses and counterclaims the government may have. *United States v. Shannon,* 342 U.S. 288, 291–92, 72 S.Ct. 281, 96 L.Ed. 321 (1952). Treating partnerships as entities does not create a market for suits—those who purchase partnership interests invest in the entirety of the partnerships' operations. The government is also capable of preserving its claims against partnership entities. Furthermore, there is no fear of multiple claimants here; just as the court would not allow the former limited partners of Blossom Hill Apartments and Skyline View Gardens to bring a takings suit in this court, it will allow the partnerships to litigate their claims.[39]

Finally, each of the partnerships named as a plaintiff in this case has the capacity to sue or be sued as an entity in this court to enforce a right arising under the Constitution or laws of the United States. RCFC 17(b) so provides. That rule, after addressing the capacity of individuals and corporations to sue or be sued, provides that

> [i]n all other cases capacity to sue or be sued shall be determined by the law of the applicable state, except (1) that a partnership or other unincorporated association, which has no capacity by the law of its state, may sue or be sued in its common name for the purpose of enforcing for or against it a substantive right existing under the Constitution or laws of the United States ....

RCFC 17(b) (third sentence). Of course, in this case it is not necessary to invoke the exception in Rule 17(b) for partnerships to sue in their own name to redress a federal constitutional or statutory right because partnerships that own real property have the capacity to sue and be sued regarding that property under relevant state law, as indicated above.

### B. *TAKINGS ANALYSIS*

All eight plaintiffs allege that they possessed property rights to prepayment that ELIHPA and LIHPHRA, as applied, temporarily took from them. The Court of Appeals addressed the property rights at issue in *Cienega VIII* and *Chancellor Manor.* In *Cienega VIII,* the Court of Appeals held that plaintiffs had both property and contractual rights to prepayment after twenty years, with the property rights being derived from the owners' fee interest and the contractual rights vesting upon the signing of the con-

priately viewed as entities under California law respecting their ownership of property and claims arising with that property, no such transfer took place. Nonetheless, if one conceived of partnerships as different entities depending on the identity of the partners, transfer of claims from a partnership to its successor arguably would be analogous to corporate successorship.

39. Plaintiffs' counsel has also contended that the government is foreclosed from making this claim because it was not disclosed during discovery. Tr. 1021:20 to 1025:22; *Cienega* Pls.' Post-Trial Br. at 45 n.12. The government did not list assignment of claims as an affirmative defense in its original answer, filed on June 19, 1995, nor in its amended answer, filed on May 30, 1996, nor did it move to amend its answer upon learning of the changes in partners during discovery. Although RCFC 8(c) does not explicitly require that the government assert alleged violations of the Anti-Assignment Act as an affirmative defense in its answer, it does require that the government aver or give notice of "any other matter constituting an avoidance or affirmative defense." Thus, the answer would be an appropriate point to notify plaintiffs of an affirmative defense. The government argues that "the positions of the parties change over time as they, themselves, do discovery and learn more about the case." Tr. 1027:21–24. While this statement is true, counsel also have the obligation to identify claims and defenses that will be presented to avoid prejudice to opposing counsel. Apparently, the government did not provide notice to plaintiffs that it would be pursuing this argument until after supplemental discovery had closed despite an interrogatory seemingly on point. When the government at trial orally responded to plaintiffs' contention, it requested permission to brief the issue before the court ruled. Tr. 1032:20 to 1034:4. The government used several pages of its opening 80-page post-trial brief to address the merits of this issue but did not deal with the foreclosure point. *See Cienega* Def.'s Post-Trial Br. at 22–25. In all events, chiefly because the *Cienega Gardens* case has evolved so markedly through years of intensive litigation, the court has addressed the issue on the merits and will not foreclose the government from asserting that plaintiffs' claims are barred by the Anti-Assignment Act.

tracts. 331 F.3d at 1328–30. In *Chancellor Manor,* the Court of Appeals held that the owners did "not allege a contractual right separate and distinct from the real property right" but that the plaintiffs possessed real property rights that provided a viable foundation for their claims. 331 F.3d at 902–03.

The appropriate test for analyzing plaintiffs' claims is that for regulatory takings, *see Cienega VI,* 265 F.3d at 1248–49, based upon the three factors or guideposts identified in *Penn Central,* 438 U.S. at 124, 98 S.Ct. 2646. *See supra,* at 458 n. 28. None of the individual factors are decisive by themselves but rather each must be weighed in a balance that takes into account all of the circumstances. *See Palazzolo,* 533 U.S. at 635–36, 121 S.Ct. 2448 (O'Connor, J., concurring) (quoted *supra,* at 458 n. 28). Analyzing regulatory takings claims involves "essentially ad hoc, factual inquiries, designed to allow careful examination and weighing of all the relevant circumstances." *Tahoe–Sierra,* 535 U.S. at 322, 122 S.Ct. 1465 (internal citations and quotations omitted). Accordingly, in the analysis that follows, each element of the *Penn Central* test is addressed individually and then pieced together to complete a composite takings finding, after which the duration of temporary takings is determined.

*1. Character of governmental action.*

Assessing the character of the governmental action requires an analysis both of the purpose of the statute and of the actions taken by the government to serve that purpose. *See Maritrans Inc. v. United States,* 342 F.3d 1344, 1356 (Fed.Cir.2003) (quoting *Creppel,* 41 F.3d at 631). This inquiry concerns not only the societal benefit sought to be achieved by the governmental action but also whether the burdens imposed by the action were spread broadly over a large portion of the population or placed particularly on a relatively few property owners. *See Cienega VIII,* 331 F.3d at 1338–40. *See also Lingle v. Chevron U.S.A., Inc.,* ––– U.S. ––––, ––––, 125 S.Ct. 2074, 2084, 161 L.Ed.2d 876 (2005) (contrasting the due process test focusing on a "substantially advances" legitimate-state-interests inquiry with the three-pronged takings analysis explicated in *Penn Central*). As the Supreme Court explained in *Lingle,*

> [i]n stark contrast to the three regulatory takings tests discussed above [referring to *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (installation of cable facilities in an apartment building effected a physical taking); *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (regulatory action that deprived owner of all economic use constituted a *per se* taking); and *Penn Central*], the "substantially advances" inquiry reveals nothing about the *magnitude* or *character of the burden* a particular regulation imposes upon private property rights. Nor does it provide any information about how any regulatory burden is *distributed* among property owners.

*Lingle,* ––– U.S. at ––––, 125 S.Ct. at 2084 (emphasis in original). Here, in this takings case, the court must be concerned with the purpose of the statute, the nature of the benefits to be derived from it, and the magnitude, character, and distribution of the burdens attendant to it.

a. *The basis and purpose of ELIHPA and LIHPHRA.*

ELIHPA and LIHPHRA were designed to extend the availability of low-income housing. *Cienega VIII,* 331 F.3d at 1338. *Chancellor Manor,* 331 F.3d at 905–06. Prior to 1983 or 1984, the supply of low-income housing had been increased by, among other things, the new-construction program under Section 8, which provided housing subsidies for the construction of new units. Tr. 2961:11 to 2962:7, 2965:13–21 (Test. of T. Vitek). During the early 1980s, however, Congress and the administration decided "that the Section 8 new construction program was expensive, that it was a burden to the budget," and terminated its funding. Tr. 2965:13 to 2966:9 (Test. of Vitek). This decision meant that a fresh supply of low-income housing was not being built to add to or to replace that housing that would reach its twentieth anniversary and become eligible for prepayment and an exit from the low-income housing program. Tr. 2966:11 to 2968:18 (Test. of Vitek). As owners who had entered the Section 221(d)(3)

and Section 236 programs in the late 1960s prepared to prepay, Congress passed ELIHPA, determining that keeping existing low-income housing providers in the program was a more "cost-effective strategy" than other options, such as funding new Section 8 construction. *See* S.Rep. No. 101–316, at 107 (1990) (quoted *supra,* at 442).[40] Congress's decision to enact the preservation statutes targeting specific property owners of low-income housing who had rights to prepay and exit the program, and not all owners of rental properties or all taxpayers, raises a concern under the Takings Clause, which "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960). *Cf. Pennell v. San Jose,* 485 U.S. 1, 22, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988) (Scalia, J., concurring in part and dissenting in part) ("The politically attractive feature of regulation is not that it permits wealth transfers to be achieved that could not be achieved otherwise; but rather that it permits them to be achieved 'off-budget,' with relative invisibility and thus relative immunity from normal democratic processes.").

The statutes themselves provide ample evidence of their thrust and purpose. In theory, both ELIHPA and LIHPHRA provided for four options that could operate in lieu of the contractual prepayment right. The first, approval by HUD for prepayment, was not an option for any of the plaintiffs in this case because as to them HUD could not make the factual findings that were a necessary predicate for prepayment approval. *See supra,* at 461. Second, owners could sign Use Agreements, which in exchange for certain benefits, required property owners either to continue providing housing for the duration of the Regulatory Agreement (ELIPHA, Title II) or for the remaining useful life of the property (LIHPHRA, Title VI). *See supra,* at 443. Third, property owners could sell the property to a HUD-approved purchaser who would continue to provide affordable housing. The owners' fourth option, not explicitly addressed in the statutes but nonetheless recognized by HUD and affected property owners, was to maintain the status quo, and provide low-income housing for the duration of their Regulatory Agreements, *i.e.,* until the mortgage was paid off in the ordinary course after forty years. Tr. 2887:20 to 2888:3; 2916:25 to 2917:7 (Test. of Vitek). Thus, none of the options available to the plaintiffs permitted them to exercise their preexisting, vested property right to exit the program and exclude low-income tenants, by prepaying after twenty years.

The Court of Appeals in *Cienega VIII* drew an analogy between this situation and a government holdover tenancy, which would constitute a compensable taking by way of a "physical invasion." *Cienega VIII,* 331 F.3d at 1338 (citing *United States v. General Motors Corp.,* 323 U.S. 373, 380, 65 S.Ct. 357, 89 L.Ed. 311 (1945)). As the Court of Appeals posited in *Cienega VIII,* the facts of these cases were "akin" to such a tenancy, and the Supreme Court found that a compensable temporary taking had occurred in *General Motors. Cienega VIII,* 331 F.3d at 1338. HUD effectively rented the plaintiffs' property beyond the agreed term for the benefit of its designated low-income tenants. *Id. See also id.* at 1330 (citing *United States v. Petty Motor Co.,* 327 U.S. 372, 381, 66 S.Ct. 596, 90 L.Ed. 729 (1946) (holding that plaintiff was entitled to just compensation for government's taking of option to renew a lease)).

None of the options available to plaintiffs permitted them to exercise their right to transfer their property to a purchaser of their choice. Tr. 3222:23 to 3223:2 (Test. of R. Mandel) (testifying that transfer of all HUD-assisted property requires HUD approval). Under LIHPHRA, purchasers were required to agree to maintain the property as low-income housing, and could not pay more than the value determined by the statutory process. *See supra,* at 443–44. This restriction severely limited plaintiffs' property

40. Another option may have been a larger version of another program instituted around 1987 in which a tax credit was provided in exchange for building new properties. Tr. 2962:17 to 2963:20 (Test. of Vitek). This program has provided a significant amount of new housing. Tr. 2963:13–20 (Test. of Vitek).

rights to transfer. *See Cienega VIII,* 331 F.3d at 1338. *Cf. Hodel v. Irving,* 481 U.S. 704, 716, 107 S.Ct. 2076, 95 L.Ed.2d 668 (1987) (treating a statute that virtually abrogated the right to devise a portion of one's land as an "extraordinary" government action amounting to a taking).

b. *HUD's application of the statutes.*

Illuminating also is HUD's application of the preservation statutes because it reflects HUD's objective of keeping existing providers in the HUD programs as long as possible. For example, prior to signing Use Agreements, owners underwent a lengthy process of submitting notices of intent, preparing plans of action, and obtaining approval of those plans. Tr. 1441:1 to 1455:6 (Test. of Glodney); PCG 1021 (Letter from C. Glodney to J. Lagerbauer (Feb. 10, 1993)) (requesting that the divisions of HUD process a property's plan of action simultaneously, rather than wait for a prior division to complete its analysis before passing the plan of action along to another division). G & K Management's inquiries and suggestions were met with representations that those who complained would be placed in the back of the queue for processing. Tr. 1441:7 to 1442:7 (Test. of Glodney). One government witness testified that every HUD office with which he worked "took a very long time to process in the program." Tr. 2957:5 to 2958:2 (Test. of Vitek). A witness who was a HUD official familiar with the process under ELIHPA and LIHPHRA, and who was familiar with HUD's actions respecting the *Cienega Gardens*-related properties, was critical of G & K Management, as compared to other managers and owners, because G & K was "among a group of several owners that would, at times, raise objections or question the deficiencies that had been noted by HUD." Tr. 2949:2–22 (Test. of Vitek). In addition, plans of action seeking sale of properties generally required two years for processing, and in the case of properties dealing with HUD's Los Angeles office, longer. Tr. 3237:20 to 3238:4 (Test. of R. Mandel). Appraisal values under LIHPHRA did not reflect any increase in value for the two-year processing requirement between the appraisals and the sale. Tr. 3239:4–14 (Test. of Mandel). Furthermore, during the time taken up by processing requests, owners remained bound by the Regulatory Agreements, including rent limitations and the dividend limitation of six percent of the owners' initial equity investment. Tr. 3240:22 to 3241:6 (Test. of Mandel). Finally, if an owner chose the "no action" alternative, or maintaining the status quo, that owner faced twenty years of waiting before prepayment could occur.

Even after HOPE was enacted, HUD continued to impose limitations on property owners. Less than two weeks after HOPE's enactment, G & K Management submitted to HUD notices of intent to prepay Blossom Hill and Skyline View. Tr. 1513:3 to 1514:14 (Test. of Glodney). The regional HUD office responded that it had "not yet received instructions from [its] Headquarters on how to proceed with the prepayments." DX 244 (Letter from K. Axtell to J. Goldrich (Apr. 18, 1996)). In due course, HUD issued a series of preservation letters in which it sought to keep alive requirements under ELIHPA and LIHPHRA, notwithstanding the HOPE statute. For example, Preservation Letter No. 2 provided that owners "will not be permitted to opt out of an existing [HAP] Contract." PCG 1163, at DOJ 28540. HUD also postponed a decision on the status of tenants in low-vacancy areas and whether to require a three-year moratorium on rents plus payment of relocation expenses. *Id.;* Tr. 1520:7 to 1521:17 (Test. of Glodney). Preservation Letter No. 4 added that property owners in low-vacancy areas would be prohibited from raising rents for three years after prepayment and must pay 50% of the moving expenses of each relocated family. DX 266, at DOJ 0033.[41] Preservation Letter No. 6 stated that ELIHPA's one-year notice rule was still in effect. PCG 1169, at DOJ 16117. At or around December 10, 1996,

41. Preservation Letter No. 6 modified this requirement by stating that the moving expenses must be "actual, reasonable" expenses and that "[t]he owner is only required to pay for moving expenses to a unit in the area where the project from which the displaced family is located." PCG 1169, at DOJ 16123.

after an appropriations act for fiscal year 1997 reiterated HOPE's terms, *see supra,* at 445, HUD changed its position on the three-year rent moratorium and determined that owners in low-vacancy areas could increase rents, although owners still would be responsible for certain relocation expenses and still would be required to accept vouchers from those tenants who qualified. DX 253, at CGII–12518 (Mem. from HUD to Blossom Hill (Dec. 10, 1996)). These administrative practices reflected a continuation of ELIHPA and LIHPHRA's burden on property owners despite Congress's enactment of HOPE. Thus, the statutes and the record in this case establish a character consistent with that of a taking. *See, e.g., Kaiser Aetna v. United States,* 444 U.S. 164, 176, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979) (right to exclude is "one of the most essential sticks in the bundle of rights that are commonly characterized as property"); *see also Cienega VIII,* 331 F.3d at 1336 & n. 30.

c. *The governmental interest.*

The government makes several arguments to avoid and ameliorate the thrust of the statutes and HUD's implementation of them.[42] Most of these arguments were rejected in *Cienega VIII.* First, the government argues that providing low-income housing is an important governmental interest. And, indeed, Congress presumably aimed to benefit the public welfare by ensuring such housing was provided. However, the manner in which the benefit was achieved shapes the character of the action. *See Cienega VIII,* 331 F.3d at 1340 ("Congress' *purpose* in enacting the statutes may have been entirely legitimate but the government has not shown that the *actions* Congress took—the enactment of ELIHPA and LIHPHRA—were within its powers to exercise without also granting just compensation.") (emphasis in original). *Cf. Lingle,* — U.S. at —, 125 S.Ct. at 2084 (contrasting the due process test of whether a law substantially advances legitimate state interests to the focus in regulatory takings jurisprudence on the magnitude and character of the burden placed on property owners, as well as the distribution of that burden among property owners).

d. *Inapposite permitting analogy.*

Second, the government argues that the preservation statutes in effect established a permitting process as an overlay on the low-income housing program and that Congress's and HUD's actions ought to be evaluated in the takings context as if the court were dealing with a quotidian, garden-variety permitting situation. *Cienega* Def.'s Post–Trial Br. at 36–38. This argument lacks any basis. As addressed *supra,* at 441–42, ELIHPA and LIHPHRA were targeted pieces of legislation aimed at preventing prepayment of mortgages and exits from the low-income housing program. They were not statutes that regulated rental housing generally. Moreover, the government implicitly suggests that HUD had considerable discretion whether to proceed regarding the properties' prepayment. No such discretion existed in the circumstances of these plaintiffs, as the ripeness discussion, *supra,* at 459–62, shows. In LIHPHRA, Congress enacted a permanent statute which, as applied to the plaintiffs, took away their property rights. Once the property right was taken, no action by Congress could forestall the constitutional obligation to pay the property owners' compensation for the period the right was taken. *See First English Evangelical Lutheran Church of Glendale v. Los Angeles,* 482 U.S. 304, 321, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) ("[W]here the government's activities have already worked a taking of all use of property, no subsequent action by the gov-

42. The Court of Appeals's decision in *Chancellor Manor* explicitly provided the government with an opportunity on remand to attempt to prove at trial that the property owners somehow created or contributed to the potential future shortage of low-income housing that ELIHPA and LIHPHRA addressed. *Chancellor Manor,* 331 F.3d at 905. The government did not adduce any such evidence.

Similarly, the Court of Appeals' decision in *Cienega VIII* provided the government with an opportunity to rebut that court's analysis of the character of the governmental action, made in connection with the four model plaintiffs, by demonstrating "affirmative errors through reference to additional evidence and flaws in the arguments." 331 F.3d at 1337 n. 31. Here too, the government did not provide any evidence to this effect beyond explaining the options available under LIHPHRA, which are codified at 12 U.S.C. §§ 4110 and 4111, and were available to the Court of Appeals.

ernment can relieve it of the duty to provide compensation for the period during which the taking was effective.").

e. *Value of extrinsic statutory options.*

Finally, the government argues that the statutes do not have the character of a taking because options were provided—property owners could opt to receive some benefits offered under the statutes as partial recompense for the taking of their prepayment right. *Cienega* Def.'s Post–Trial Br. at 34–36, 39–43. This argument is overreaching; "[a]n offer to pay would make no sense if nothing were taken." *Whitney Benefits,* 926 F.2d at 1176. *See also id.* ("[a] compensated taking is still a taking."). Congress may not establish through an option that it will provide value equal to forty, or fifty, or sixty cents on the dollar for a taking, and thereby evade paying the constitutionally-required just compensation. *United States v. 564.54 Acres of Land,* 441 U.S. 506, 510, 99 S.Ct. 1854, 60 L.Ed.2d 435 (1979) (just compensation should place the owner "in as good a position pecuniarily as if his property had not been taken.") (internal quotation omitted); *Monongahela Navigation Co. v. United States,* 148 U.S. 312, 326, 13 S.Ct. 622, 37 L.Ed. 463 (1893) (holding that there is "no doubt that the compensation must be a full and perfect equivalent for the property taken."); *Narramore v. United States,* 960 F.2d 1048, 1051 (Fed.Cir.1992) ("The Fifth Amendment guarantees a property owner the right to seek damages for the full extent of a taking."). In effect, the government's argument translates into the question of whether the value of any options plaintiffs were offered under LIHPHRA should change the character of the governmental action or the way that the *Penn Central* takings analysis is applied. The short answer to that question is "no." Instead, any value derived from statutory options should not affect the takings analysis but should be addressed in the determination of just compensation.

The government's argument, if accepted, which it is not, would enable the government to take property with impunity, so long as it offered a modicum of recompense by statutory action. As a practical matter, courts have tended to view 75% as a notional rule of thumb or tipping point for the requisite proportion of value taken before a governmental action would be deemed a taking. *See, e.g., Yancey v. United States,* 915 F.2d 1534 (Fed. Cir.1990). Under the government's approach, carried to its logical endpoint, to avoid a taking, the government would only have to provide roughly 30% in recompense by way of statutory options.

Thus, the court concludes that value provided by extrinsic means, as, for example, by statutory options that previously did not inhere in and with the property, should not be part of the takings analysis but rather should be part of the just-compensation calculus. Any such extrinsically-generated, options-related value should be contrasted with any residual value of the property itself, which would be considered during the economic-impact portion of the takings analysis. Thus, the value of any extrinsically provided options should be taken into account in computing just compensation, because that value, if and as actually realized by the owner whose property was taken, would form part of the just compensation determined by a court to be due.[43]

A closely divided Supreme Court recently emphasized that the authority to exercise the powers of eminent domain to effect a taking of property for public use rests with the legislative and executive branches of government. *See Kelo v. City of New London,* ––– U.S. –––, 125 S.Ct. 2655, 2668, 162 L.Ed.2d 439 (2005). *See also Berman v. Parker,* 348 U.S. 26, 35–36, 75 S.Ct. 98, 99 L.Ed. 27 (1954). A federal court has no power "to enlarge or contract the scope of the taking," as long as it is for a public use. *Narramore,* 960 F.2d at 1050 (citing *Berman,* 348 U.S. at 32, 75 S.Ct. 98). *Cf. Kelo,* ––– U.S. at –––, 125 S.Ct. at 2669 (Kennedy, J., concurring) (applying rational-basis review with teeth to

43. A fact not critical to this result but nonetheless instructive is that the *Cienega Gardens*-related plaintiffs that signed Use Agreements did so *after* the *Cienega Gardens* suit was filed. *See supra,* at 463. They filed suit on January 3, 1994, while LIHPHRA was fully in force and several years before HOPE was enacted.

evaluate a taking under the Public Use Clause). However, once a taking has been made by the legislative and executive branches, it is "the judicial branch [which] fixes the amount of just compensation—'the price of the taking.'" *Narramore,* 960 F.2d at 1050 (quoting *Berman,* 348 U.S. at 36, 75 S.Ct. 98). The Fifth Amendment guarantees a property owner the right to come to court to seek damages for the full extent of a taking. *United States v. Clarke,* 445 U.S. 253, 256–57, 100 S.Ct. 1127, 63 L.Ed.2d 373 (1980). The legislative and executive branches may affect the judiciary's actions within that province, but they cannot constitutionally dispossess the judiciary from it. Tellingly, it is not at all apparent from the circumstances of this case that Congress has sought to hinder the judiciary in any way from performing its function pursuant to the Takings Clause. Congress said nothing about a mandate to consider the options provided under ELIHPA and LIHPHRA as the equivalent of full and just compensation in the constitutional sense, displacing a judicial remedy. Rather, that construct appears only as an argument of counsel in this case. In all events, the options available under ELIHPA and LIHPHRA do not change the taking character of these statutes. Instead, the value of the options is brought to bear during the judicially determined just-compensation phase.

### 2. *Reasonable investment-backed expectations of the property owners.*

One of the *Penn Central* factors inquires whether the statutes interfered with the property owners' distinct, reasonable investment-backed expectations. *Penn Central,* 438 U.S. at 124, 98 S.Ct. 2646. This factor contemplates that owners will, to a greater or lesser degree, "demonstrate that 'they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime.'" *Cienega VIII,* 331 F.3d at 1346 (quoting *Loveladies Harbor, Inc. v. United States,* 28 F.3d 1171, 1177 (Fed.Cir.1994)).[44] "The critical question is whether a reasonable developer confronted with the particular circumstances facing the Owners would have expected the government to nullify the twentieth-year prepayment right in the mortgage contract and in the regulations." *Id.* at 1346; *Chancellor Manor,* 331 F.3d at 904 ("The critical question is what a reasonable owner in the Appellants' position should have anticipated.") (citing *Commonwealth Edison Co. v. United States,* 271 F.3d 1327, 1348 (Fed.Cir.2001) (en banc)). This inquiry is "objective, but fact-specific." *Cienega VIII,* 331 F.3d at 1346. The analysis begins with the plaintiffs' actual expectations and then delves into whether they were objectively reasonable. *Compare Cienega VIII,* 331 F.3d at 1346 ("we start with an analysis of the Model Plaintiffs' actual expectation ... as a threshold matter" and "incorporat[e] an objective test" whether that expectation is "reasonable"), *with Chancellor Manor,* 331 F.3d at 904 ("The subjective expectations of the Appellants are irrelevant."). In this aspect, even the opinion of the Court of Appeals in *Chancellor Manor* recognized that it was the *expectations of the owners* that were pertinent. *See Chancellor Manor,* 331 F.3d at 907 (calling on this court to "conduct a searching factual inquiry using an objective analysis to determine the reasonable investment-backed expectations *of the Owners.*") (emphasis added).[45]

The *Cienega Gardens*-related plaintiffs expected to prepay when they invested in their properties. The partnerships built well-constructed properties with high square footage

44. However, under this factor, the court should not accept any and all pre-acquisition governmental restrictions on use of property, "no matter how extreme or unreasonable." *Palazzolo,* 533 U.S. at 627, 121 S.Ct. 2448. An acquiror of title has the "right to challenge unreasonable [pre-acquisition] limitations on the use and value of land [or other property]." *Id.*

45. The relevant time period for measuring expectations is that "at which the complaining party entered into the activity that triggered the obligation, specifically when the Appellants entered the programs." *Chancellor Manor,* 331 F.3d at 904 (internal citations omitted). The complaining parties in these cases are the partnerships who have owned the properties at all relevant times. Tr. 3140:19–24 (Test. of W. Breslow) (*Cienega Gardens*-related partnerships have stayed intact), 4510:23–24 (Test. of Weinberger) (*Chancellor Manor*-related partnerships have owned properties "since day one.").

in middle-class neighborhoods, where potential for enhanced value after prepayment was highest. Tr. 1070:8 to 1071:7 (Test. of Goldrich). They hired G & K Management to maintain a high standard of maintenance and aesthetic quality, sustaining properties that would be attractive to tenants and that could be converted to conventional or market-rate rentals at minimal or no cost. Tr. 1074:20 to 1076:17 (Test. of Goldrich), 1244:17 to 1245:3 (Test. of Glodney). The site visits to the five Cienega Gardens properties confirmed the testimonial evidence concerning the quality of construction, the advantageous location of the properties, and the high standard of maintenance. The owners' stated goals for the properties were to prepay, Tr. 1069:9–14, 1093:18 to 1094:9 (Test. of Goldrich), and the general partners' practices support these assertions. The general partners systematically employed a "buy and hold" approach to real estate, whereby they purchased property and held it for long-term appreciation in value. 1074:11–18, 1142:5–11 (Test. of Goldrich). They also consistently maintained a substantial fund, at the time of trial approximately $50 million, providing them resources to close payments for properties, improvements, and escrows on an expedited basis and "not wait until the bank gives us a loan." Tr. 1163:13–14 (Test. of Goldrich). *See also* Tr. 1160:24 to 1164:5 (Test. of Goldrich). In addition, they are reluctant to sell unless a purchaser is willing to overpay for a property. Tr. 1141:5–24 (Test. of Goldrich). All of these factors indicate that the partnerships intended to prepay the five properties after the 20–year period expired and to maintain them thereafter as conventional rental properties.

The *Chancellor Manor*-related plaintiffs' investment was also backed by an expectation to prepay. Their properties also were constructed to a high standard in excellent locations with significant prospects for long-term appreciation. *See supra,* at 452–57. *See also* Tr. 864:16 to 878:19 (Test. of E. Herman), 4494:3–6, 4495:4–11 (Test. of Weinberger). The construction and maintenance of the properties was exemplary, as the court witnessed in the site visits. The owners' other actions demonstrate that they planned on and for prepayment. The partnerships brought in Landtech as a general partner to manage the property and ensure the properties' long-term viability. Tr. 4510:17 to 4511:13 (Test. of Weinberger). Correlatively, Landtech purchased general-partnership interests in the three partnerships in reliance on the 20–year prepayment right. Tr. 476:8–20 (Test. of Weinberger). This testimony is consistent with Landtech's "buy and hold" strategy, which the partnerships have employed since their inception. Tr. 4495:25 to 4496:6 (Test. of Weinberger). *See also* Tr. 4490:3–19 (Test. of Weinberger). The *Chancellor Manor*-partnerships applied a very conservative approach to funding their ownership interests, electing to employ equity funding to the extent possible rather than relying on highly leveraged debt financing. *See supra,* at 455, 457. As the testimony at trial indicated, the properties were intended to serve as a prudent, long-lasting investment for the Bernardi family's grandchildren. Tr. 4490:17–19 (Test. of Weinberger). In short, the plaintiffs' intention "was always to prepay." Tr. 4492:3–4 (Test. of Weinberger).[46]

The plans of both sets of partnership owners were reasonable.[47] The factors relied

46. After plaintiffs' case, the government moved for judgment as a matter of law under RCFC 52(c) respecting the *Chancellor Manor*-plaintiffs on the ground that those plaintiffs had not established the expectations of the plaintiffs at the time they entered the agreements because the only witnesses offered were from Landtech. Tr. 2502:5 to 2515:7. That motion was deferred and now is denied. The evidence described above proves that the *Chancellor Manor*-plaintiffs intended to prepay when they entered the HUD program. Although the government emphasizes that Landtech only became partners in Chancellor Manor and Oak Grove after HUD endorsed the deed of trust note, the fact that the partnerships brought in Landtech so early in the process is indicative of the partnerships' intent to invest for the long term.

47. There is not one magical, reasonable set of expectations that a business could have; hundreds of business plans could be deemed reasonable. For example, the Blossom Hill and Skyline View partnerships chose to syndicate limited partnership interests, while other partnerships whose properties were managed by G & K Management did not. PCG 1186. Similarly, although both the *Cienega Gardens* and *Chancellor Manor* sets of plaintiffs implemented a strong

upon by the Court of Appeals in *Cienega VIII* respecting the four model plaintiffs are all present here. The deed of trust notes signed by all eight plaintiffs included a rider that explicitly granted plaintiffs the contractual right to prepay after twenty years. *See, e.g.*, JX–CG 132A, at CGII–000003 (Deed of Trust Note for Del Amo Gardens). This right matched the then-existing regulations. *See* 24 C.F.R. § 236.30 (1970) (allowing prepayment without HUD's consent where "the prepayment occurs after the expiration of 20 years from the date of final insurance endorsement of the mortgage"); *id.* § 221.524(a)(ii). Because, as one government appraiser acknowledged, "real estate investment is a long-term investment," Tr. 3342:4–5 (Test. of D. Mueller), prudent investors should have both good reasons to enter a program and an exit strategy if the benefits of the program are no longer realized. *See Cienega VIII,* 331 F.3d at 1349 ("[B]y fixing an exit date from participation in the programs, the prepayment right would be a significant factor in the calculation of the total profit that could be expected over the lifetime of the investment in the property."). Accordingly, industry experts considered this prepayment right to be important. Tr. 1203:15 to 1204:6 (Test. of W. Dockser) ("[A] reason why people would invest in the programs ... was the ability to discuss an exit strategy in 20 years."). *Cienega VIII* determined "that a prepayment term would be presumptively material for any housing program participant with similar documents." 331 F.3d at 1348–49. The government offered no evidence that rebuts this testimony or this presumption.

Instead, the government offered evidence that investors participated in the programs for tax purposes. An expert for the government pointed to the availability under generally applicable federal tax law of accelerated depreciation for the buildings and improvements. DX 419 (Expert Report of Kenneth Malek (Aug. 26, 2004)). Such treatment generated paper losses for owners during their early years of ownership, offset by paper gains during later years when "phantom income," or income without cash flow, would be created, which would have negative tax implications. Tr. 2702:9–21, 2789:24 to 2790:12 (Test. of Malek). This tax benefit was removed in 1986 with the enactment of changes both to permissible schedules of depreciation for buildings and improvements and to tax treatment of passive losses. It bears emphasis that, contrary to the implication in the government's argument, the pre–1986 tax benefits attributable to accelerated depreciation and the ability to use passive losses to offset ordinary income were applicable not only to owners of low-income properties but applied generally to owners of all buildings and improvements, including those constructed for conventional rental. Tr. 2774:1–7 (Test. of K. Malek). And, where pre–1986 accelerated depreciation was elected, the prepayment right would become even more important because after about 19 years phantom income would be triggered. Tr. 2789:24 to 2790:12 (Test. of Malek). In sum, this evidence regarding taxation does not undermine the reasonableness of plaintiffs' expectations to prepay, and the pre–1986 tax regime provided no specific incentive to sign a HUD Regulatory Agreement.

The government also points to a prospectus for Skyline View Gardens designed to entice limited partners to invest in that partnership via a syndication. DX 93 (Skyline View Prospectus (Nov. 22, 1972)). This document assumed that the partnership would sell the property for $1 at the end of the twenty-first calendar year after HUD's endorsement. *Id.* at CGII 003473. The government argues that this prospectus reveals two flaws in plaintiffs' case: the failure to present the motivations of the limited partners and the diminished importance of the

"buy and hold" strategy, the *Cienega Gardens*-related set planned to borrow more heavily against the properties, Tr. 1103:5–19 (Test. of Goldrich), while the *Chancellor Manor* set planned to refinance with very small, seven to ten-year, fully-amortizing mortgages in the interests of having "as little debt as possible." Tr. 427:23 to 429:12 (Test. of Weinberger). In fact, by the time of trial, Oak Grove had already paid its conventional mortgage and was operating as a conventional property on a debt-free basis. Tr. 429:9–11 (Test. of Weinberger). Because such a wide range of business expectations and plans could be deemed reasonable, it is important to determine what plaintiffs expected and then determine whether that baseline was reasonable.

residual property value for the plaintiffs. *Cienega* Def.'s Post–Trial Br. at 56–59. Because Blossom Hill underwent a similar syndication, the court will assume that a similar argument pertains to that partnership as well as to Skyline View.

This argument is, however, unavailing. The partnerships are the relevant entities, *see supra*, at 464–65 & nn. 37–38, not the limited partners in the partnerships. Moreover, the Skyline View prospectus does not traduce the strong evidence of plaintiffs' intention to prepay. The syndicator, Boston Financial, prepared the prospectus, not Skyline View's representatives. Tr. 3056:9–11, 3060:12–23 (Test. of Breslow). In addition, the statement in the prospectus does not make a projection about value of the properties after twenty years but rather sets out an assumption that focused potential limited-partnership investors on a twenty-year horizon for their investment. DX 93 at CGII 003473. Notably in this regard, the general partners retained control of the partnership, subject to the rights of the limited-partnership investors, and the general partners kept a 35% residual (post 20–year) ownership right. *See supra*, at 450, 451. In light of all the evidence before the court supporting the Blossom Hill and Skyline View plaintiffs' intent to prepay, the Skyline View syndication prospectus is not persuasive to the contrary.[48]

The evidence shows that both the *Cienega Gardens*-related and the *Chancellor Manor*-related sets of plaintiffs invested in the properties with the expectation of prepaying the mortgage without HUD approval after twenty years.[49] This expectation was reasonable given the deed of trust notes, the existing regulations, the type of properties involved, the location of the properties, and the importance of an exit strategy in entering such a program. The statutory abrogation of their prepayment rights constituted a significant interference with their reasonable investment-backed expectations.

*3. Economic impact.*

The third prong of the *Penn Central* test measures the severity of the economic impact on the claimants. This factor determines whether a plaintiff suffered a "serious financial loss from the regulatory imposition." *Loveladies Harbor*, 28 F.3d at 1177. There is no *per se* numerical limitation below which compensation is impermissible; courts must weigh the economic impact with the other *Penn Central* factors to determine whether justice and fairness require that a claimant be compensated. *Tahoe–Sierra*, 535 U.S. at 336, 122 S.Ct. 1465 (quoting *Palazzolo*, 533 U.S. at 633, 121 S.Ct. 2448) (O'Connor, J., concurring); *Yancey*, 915 F.2d at 1541. Three optional means of addressing economic impact are recognized by precedents. One is to measure the claimant's return on equity against the return on equity the claimant would have received but for the taking. *See Penn Central*, 438 U.S. at 129,

48. The government argues that the investments were low-risk because they only required about 10% equity financing, and that the owners could receive substantial cash flows. *Cienega* Def.'s Post–Trial Br. at 50–51, 53–55; *Chancellor Manor* Def.'s Post–Trial Br. at 59–61. These arguments are not persuasive. The low level of required equity financing may have provided some incremental additional incentive to construct the properties, but little evidence was provided at trial that this incentive was important to investors. The cash flows were limited to six percent of the owners' initial equity investment plus any management fees, the total of which was much lower than conventional cash flows would have been. *See infra*, at 476–78 (addressing economic impact). The direct link between the allowed cash flows and the level of equity financing also meant that the low level of required equity financing also produced a low level of permissible return.

Furthermore, even HUD recognized that private investments in low-income housing were relatively risky undertakings compared to conventional rental housing projects. A study by HUD completed in 1973 projected that Section 221(d)(3) and Section 236 would suffer failure rates of 20 to 30% in the first ten years and concluded that "[t]he high failure rates reflect the riskiness of the undertaking." HUD, Housing in the Seventies: A Report of the National Housing Policy Review 118, 122–23 (1974).

49. The government affirmatively argues that the *Cienega Gardens*-related plaintiffs should reasonably have expected delays in working with HUD. *Cienega* Def.'s Post–Trial Br. at 55. The evidence cited by the government supports the notion that the owners expected delays when constructing the properties. Tr. 1108:25 to 11:09:8 (Test. of Goldrich). This evidence reinforces the value of plaintiffs' contractual right to prepay without HUD approval.

98 S.Ct. 2646 ("capable of earning a reasonable return"); *Kimball Laundry Co. v. United States,* 338 U.S. 1, 7, 16, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949) (referring to "the record of its past earnings" and holding that the "proper measure of compensation [for a temporary taking] is the rental that probably could have been obtained"); *Rose Acre Farms, Inc. v. United States,* 373 F.3d 1177, 1188–89 (Fed. Cir.2004); *Cienega VIII,* 331 F.3d at 1342–43; *Chancellor Manor,* 331 F.3d at 905. Another method of measuring economic impact concerns the claimant's recoupment of its capital. *See Florida Rock Indus., Inc. v. United States,* 18 F.3d 1560, 1567 (Fed.Cir. 1994) (looking to "the owner's opportunity to recoup its investment or better" in "determining the severity of economic impact"). *See also Walcek v. United States,* 303 F.3d 1349, 1357 (Fed.Cir.2002). *Cf. Penn Central,* 438 U.S. at 129, 98 S.Ct. 2646. The third method is a comparison of the value taken from the property with the value remaining in the property. *See Keystone Bituminous Coal Assoc. v. DeBenedictis,* 480 U.S. 470, 497, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987). A trial court must determine the best measure of the economic impact caused by the restrictions at issue. *Rose Acre,* 373 F.3d at 1190.

In *Cienega VIII,* the Court of Appeals applied a return-on-equity approach. 331 F.3d at 1342–43. There, the court compared the annual return on the owners' real equity in their properties to a conservative market return on Fannie Mae bonds. *Id.*[50] This approach is well-grounded; in the present case, the return-on-equity approach best measures the impact of ELIHPA and LIHPHRA on the plaintiffs. Measuring an owner's return on equity better demonstrates the economic impact on the owner of temporary takings of income-generating property than a measurement of the change in fair market value. *See Kimball Laundry,* 338 U.S. at 7, 69 S.Ct. 1434 ("[I]f the [change in value] were taken to be the measure, there might frequently be situations in which the owner would receive no compensation whatever because the market value of the property had not decreased during the period of the taker's occupancy."). For example, a temporary taking of a bar of gold is different than that of an income-generating beach house—the owner of the gold is returned the same property at the end of the taking, but the revenue stream from the beach house for the duration of the taking is gone forever. *Independence Park,* 61 Fed.Cl. at 707 n. 12. Accordingly, the appropriate measure of just compensation for the temporary taking of a bar of gold might well be interest on the value of the bar for the pertinent period, while that for the beach house is its owner's lost rents. *Id. See also Chancellor Manor,* 331 F.3d at 905 (specifically instructing the court on remand to "calculate the *rate of return* on invested capital under the new statutes as implemented by HUD *and the reasonableness of that return*") (emphasis added).

The government criticizes the return-on-equity approach for not adequately taking into account the duration of the taking. Nonetheless, the period of the alleged temporary taking is the relevant time for assessing the economic impact to the property. *See Seiber v. United States,* 364 F.3d 1356, 1371 (Fed.Cir.2004) ("the period of the alleged temporary taking ... is the relevant period for purposes of assessing the economic impact"). Recoupment and change in value both fail to measure the effect of a taking except over the long-term, extending well beyond "the period of the alleged temporary taking," especially for an income-generating property. *See Rose Acre,* 373 F.3d at 1188–89 ("[I]t appears that the [change-in-value approach] is less appropriate where, as here, the issue concerns the economic impact, albeit temporary, of government regulations on a going business concern.").

**50.** The government attempts to limit *Cienega VIII* by referring to a footnote addressing the government's failure to argue error in the trial court's rejection of the government expert's data in that case. *See Cienega* Def.'s Post–Trial Br. at 46 (addressing *Cienega VIII,* 331 F.3d at 1343 n. 40). This statement does not limit use of a returns-based approach to those situations where the government fails to object. Rather, the Court of Appeals was supporting its decision to hold the government liable under the *Penn Central* test rather than remand the case for further analysis. *See Cienega VIII,* 331 F.3d at 1337.

The government nonetheless urges that the court put aside the return-on-equity approach and focus upon a change in value. However, under the government's change-in-value approach, the government could take 100% of an owner's $10 million annual income on a $100 million property for four and one half years, and the property would only suffer a 45% diminution in expected returns. Tr. 4251:3 to 4256:8 (Test. of W. Hamm). The government thus would use the duration of the taking as a means to allow the capture of all value or return from a property for a period of a few years. Thus, the best option for measuring plaintiffs' economic impact is their return on equity.

Each of the five *Cienega Gardens*-related plaintiffs specifically addressed the economic impact they incurred as a result of ELIHPA and LIHPHRA. The plaintiffs offered Dr. Richard Peiser, Michael D. Spear Professor of Real Estate Development at Harvard University, the same expert who appeared for plaintiffs in *Cienega III* and *Cienega VIII,* who used the same model to calculate economic impact. *Cienega VIII,* 331 F.3d at 1341. As a starting point, this model uses the appraisal value determined by the Title II process, then subtracts the amount owed on the mortgage on the prepayment eligibility date and the costs to convert the apartments to market rate. The resulting number represents the property's equity on the prepayment eligibility date. Tr. 2201:5 to 2203:9 (Test. of Peiser). Dr. Peiser then calculates the return on equity that plaintiffs received without prepayment and compares that value to the owners' potential return on equity with a prudent benchmark rate of 8.5%, the same rate approved by *Cienega VIII.* Tr. 2203:10 to 2204:15 (Test. of Peiser); *Cienega VIII,* 331 F.3d at 1342–43. This calculation reveals the comparative financial detriment suffered by plaintiffs, as shown in the following table:

| Property | (A) Appraisal Value | (B) Outstanding Mortgage + Projected Conversion Costs[51] | (C) Preservation Equity (A - B) | (D) Annual Limited Dividend | (E) Return without Prepayment (D/C) | (F) Economic Impact (1-E/.085) |
|---|---|---|---|---|---|---|
| Cienega Gardens | $8,360,000 | $2,801,392 | $5,558,608 | $18,258 | 0.33% | 96.1% |
| Del Amo Gardens | $11,710,000 | $2,550,632 | $9,159,368 | $18,288 | 0.20% | 97.7% |
| Las Lomas Gardens | $6,848,726 | $1,955,733 | $4,892,993 | $12,113 | 0.25% | 97.1% |
| Blossom Hill | N/A[52] | N/A | $7,924,881 | $26,196 | 0.33% | 96.1% |
| Skyline View | N/A | N/A | $9,490,707 | $20,388 | 0.21% | 97.5% |

PCG 1203. The court finds that Dr. Peiser's calculations were made using a reasonable

51. For Cienega Gardens, the mortgage balance was $2,609,880 and the projected conversion costs were $191,512. For Del Amo Gardens, the mortgage balance was $2,320,814 and the projected conversion costs were $229,818. For Las Lomas Gardens, the outstanding mortgage was $1,814,481 and the projected conversion costs

methodology and are accurate. Accordingly, the court finds the *Cienega Gardens*-related properties suffered the following economic impacts: Cienega Gardens, 96.1%; Del Amo Gardens, 97.7%; Las Lomas Gardens, 97.1%; Blossom Hill, 96.1%; and Skyline View, 97.5%. Such an economic impact of 96% or 97% is manifestly significant. *Cienega VIII,* 331 F.3d at 1343. Accordingly, ELIHPA and LIHPHRA caused all five California plaintiffs to suffer a serious financial loss.

The *Chancellor Manor*-related plaintiffs offered Dr. William Wade to testify regarding the diminution in their return on equity. Dr. Wade's approach largely corresponds to the model approved by *Cienega VIII.* The major difference is that Dr. Wade used a 14% return on equity as a benchmark for comparison rather than the 8.5% figure used by Dr. Peiser and in *Cienega VIII.* PCM 469, at 10 (Amended Expert Report for Dr. William Wade (Nov. 15, 2004)). The 14% rate is linked to Korpacz data, and reflects what property owners were earning in various geographic markets over time. Tr. 2364:6 to 2365:8 (Test. of Wade).[53] Dr. Wade opined that the 14% rate better approximates how the plaintiffs would have invested but for LIHPRA, especially when compared with Fannie Mae bonds. Tr. 2366:19 to 2376:3 (Test. of Wade). To avoid introducing a point of divergence into comparative measures, the court will continue to use the Fannie Mae bond rate as the benchmark. In addition, Dr. Wade used the outstanding mortgage balance from October 1997, the date the HAP contracts expired, for Oak Grove and Rivergate, and the mortgage balance from November 2004, the start of trial, for Chancellor Manor. PCM 469, at 14. A more consistent measure is the outstanding mortgage balance on the initial prepayment eligibility date because it does not require making any assumptions about refinancing. Accordingly, the court has made its own calculations about the *Chancellor Manor*-related plaintiffs' rates of return, based on data in Dr. Wade's report and information contained in the report of Dr. George Karvel, the plaintiffs' damages expert:

| Property | (A) Appraisal Value[54] | (B) Outstanding Mortgage + Projected Conversion Costs[55] | (C) Preservation Equity (A - B) | (D) Annual Limited Dividend | (E) Return without Prepayment (D/C) | (F) Economic Impact (1-E/.085) |
|---|---|---|---|---|---|---|
| Chan. Manor | $7,000,000 | $3,320,521 | $3,679,479 | $29,879 | 0.81% | 90.5% |
| Oak Grove | $7,300,000 | $3,368,967 | $3,931,033 | $29,123 | 0.74% | 91.3% |
| Rivergate | $9,470,000 | $3,617,259 | $5,852,741 | $28,415 | 0.49% | 94.2% |

were $141,252. PCG 1203 (Economic Impact Analysis by R. Peiser (undated)).

52. For Title VI properties, Dr. Peiser uses the preservation-equity calculations listed in letters from HUD after reviewing the Title VI appraisals but prior to the submission of plans of action. Tr. 2203:5–9 (Test. of Peiser); PCG 1000 (Back-up Materials to Economic Impact Analysis of R. Peiser (undated)), at 1000.26 (Letter from K. Ragan to J. Goldrich regarding Blossom Hill (Jan. 4, 1995)), and 1000.51 (Letter from K. Ragan to J. Goldrich regarding Skyline View (Oct. 31, 1994)).

53. The Korpacz report is a compilation of information from institutional investors, real estate investment trusts and life insurance companies regarding discount rates, capitalization rates, mortgage rates, and investment demand information. Tr. 569:24 to 570:8 (Test. of Karvel).

54. The appraisal values were determined by the Title VI process—the competing appraisals were

PCM 469, at 13, 14.[56] Based upon the court's own calculations from these data, the court finds that Chancellor Manor has suffered a detrimental economic impact of 90.5%, Oak Grove an impact of 91.3%, and Rivergate, 94.2%. These losses support a finding of a temporary taking.[57]

Apart from arguing for use of a change-in-value approach to evaluating economic impact, the government's arguments fall into two categories. The first is that the plaintiffs' models of economic impact do not include the incentives available under Title II or Title VI. *Cienega* Def.'s Post–Trial Br. at 38–49; *Chancellor Manor* Def.'s Post–Trial Br. at 42–56. As the court has already explained, extrinsic benefits like those present here must be addressed in the just-compensation analysis and not in the takings analysis. *See supra,* at 470–71. Otherwise, the government could circumvent owners' constitutional rights by crafting legislation that only "compensates" thirty or more cents on the dollar. Second, the government argues that the plaintiffs could have received fair and adequate value for their property had they sold it pursuant to Title II or Title VI. This option also was available only as an extrinsic benefit, and none of the plaintiffs in this case sought that option. Notably, the government itself argues that "[e]ach plaintiff was free to choose among the options available under the preservation statutes," and four of the eight plaintiffs "chose to seek and to sign Use Agreements because those represented the greatest financial return for the plaintiffs." *Cienega* Def.'s Post–Trial Br. at 10. The government offered no proof, however, concerning the rate of return actually available under use agreements, *see supra,* at n. 57, nor did it offer a financial comparison with the preservation-sale possibility.[58] In addition, the preservation-sale process was uncertain, and the court is dubious that any of these plaintiffs could have received fair market value even if they had wanted to choose the option. A sale would take two years or more to complete, Tr. 3237:20 to 3238:4 (Test. of R. Mandel), the appraisal value under LIHPHRA was not adjusted to reflect any increase in value for the two-year processing interval between the

$6,435,000 and $7,000,000 for Chancellor Manor, $6,390,000 and $7,300,000 for Oak Grove, and $9,470,000 and $10,000,000 for Rivergate. *Chancellor Manor* Stip. ¶¶ 57, 66. Each of HUD's appraisals was within 10% of the owner's appraisal. *See* Tr. 1728:15 to 1732:20 (Test. of Glodney) (explaining the procedure for reconciling appraisals under Title VI).

**55.** For Chancellor Manor, the outstanding loan balance was $2,890,542, and the projected cost of upgrades was $429,979. PCM 435, at 23 (Amended Expert Report of G. Karvel (Nov. 4, 2004)); PCM 469, at 14. *See also* Tr. 686:4 to 687:10 (Test. of Karvel). For Oak Grove, the outstanding loan balance was $3,010,677, and the projected cost of upgrades was $358,290. PCM 435, at 55; PCM 469, at 14. *See also* Tr. 691:20 to 692:8 (Test. of Karvel). For Rivergate, the outstanding loan balance was $3,263,622, and the projected cost of upgrades was $353,637. PCM 435, at 83; PCM 469, at 14. *See also* Tr. 692:17 to 693:17 (Test. of Karvel).

**56.** Dr. Wade's report contained a typographical error for Rivergate's appraisal value. *See Chancellor Manor* Stip. ¶ 66; Tr. 2360:4–21 (Test. of W. Wade) That error is corrected in the court's calculations.

**57.** The Court of Appeals stated that this court "should also calculate the rate of return on invested capital under the new statutes as implemented by HUD and the reasonableness of that return. Determination of net investment may, in turn, require consideration of the government tax benefits afforded to property owners." *Chancellor Manor,* 331 F.3d at 905. The government did not provide the information necessary to do so. The government's expert provided only two models and both relied on the change-in-value approach—neither model calculated the return on equity under ELIHPA or LIHPHRA. Tr. 4261:22 to 4263:4 (Test. of W. Hamm). In addition, the government did not provide information regarding the tax treatment of these properties. Its primary tax expert was unaware of the tax treatment of these plaintiffs. Tr. 2840:2 to 2847:2 (Test. of K. Malek).

**58.** The only proof at trial about a preservation sale concerned the sale of the Cienega Gardens property in 2002. That property was sold on October 10, 2002, roughly six years after the key dates in the case; that sale was made to a HUD-approved purchaser for $14,000,000. Tr.2017:20 to 2018:2 (Test. of Glodney); PCG 1010, Tab 6, Schedule B(10) (Second Amended Report of R. Peiser (Nov. 3, 2004)) The Cienega Gardens property sold for $3,219,593 less than it could have without HUD restrictions, PCG 1010, Tab 6, Schedule B(10) apparently because of the applicable use agreement.

appraisals and a sale, Tr. 3239:4–14 (Test. of Mandel), owners could only receive six percent of their initial equity investment during that time, Tr. 3240:22 to 3241:6 (Test. of Mandel), an owner was not permitted to sell a property for more than the preservation valuation, 12 U.S.C. § 4110(b)(1), and a sale could be made only to a limited category of entities rather than on the open market. *See supra,* at 443–44, 440–41. This hypothetical, unrealized option does not alter the takings calculus in any case, and, in the circumstances at hand it also does not affect the just-compensation determination.

*4. Takings synopsis.*

The *Penn Central* test is "designed to allow 'careful examination and weighing of all the relevant circumstances.'" *Tahoe–Sierra,* 535 U.S. at 322, 122 S.Ct. 1465 (quoting *Palazzolo,* 533 U.S. at 636, 121 S.Ct. 2448 (O'Connor, J., concurring)). As the foregoing analysis indicates, for the eight plaintiffs, the three factors all indicate that a temporary taking has occurred. ELIHPA and LIHPHRA disproportionately burdened existing owners of low-income housing by requiring them to continue to use their properties for such service beyond the agreed term. *See supra,* at 440–44. The owners' reasonable, investment-backed expectations were frustrated when the government abrogated their prepayment right, an incentive recognized and established at the time of the owners' investments, and upon which the plaintiffs legitimately could rely in locating and constructing properties that would serve as low-income housing for twenty years and could thereafter be positioned to succeed in the conventional rental housing market. *See supra,* at 471–74. The owners suffered a significant financial loss as a result of the preservation statutes, losing a high percentage of the returns they would have been able to receive in the conventional market. *See supra,* at 476–77. Thus, each of the relevant factors for each plaintiff indicates that ELIHPA and LIHPHRA constituted an as-applied, temporary regulatory taking.

*5. Duration of the temporary takings.*

The "'essential element'" of a temporary taking is "'a finite start and end to the taking.'" *Seiber,* 364 F.3d at 1364 (quoting *Wyatt v. United States,* 271 F.3d 1090, 1097 n. 6 (Fed.Cir.2001)). The as-applied takings under ELIHPA and LIHPHRA began on the properties' initial prepayment eligibility dates. *See Independence Park,* 61 Fed.Cl. at 700. When the takings period ended for each plaintiff is a more complicated fact-intensive matter. In *Independence Park,* this court held that the takings periods for the model plaintiffs ended upon their signing of Use Agreements or sixty days after the enactment of HOPE. *Id.* at 699–702. There, this court was bound by the mandate of the Court of Appeals in *Cienega VIII* to reinstate the award entered by the trial court in *Cienega III,* subject to limited adjustments. *See Independence Park,* 61 Fed.Cl. at 702 ("Because this court is limited on remand as to the relief it may provide ... the court will not redefine the scope of the taking that plaintiffs have suffered.").

The court is not similarly bound in the present case. Indeed, the mandates from *Cienega VIII* and *Chancellor Manor* explicitly called for a searching, comprehensive trial on liability, and if necessary, just compensation, rather than for reinstatement of a prior judgment. *Cienega VIII,* 331 F.3d at 1354 (remanding "to allow the parties to develop an appropriate record to rule on liability, and if liability is found, also on damages"). *See also Chancellor Manor,* 331 F.3d at 906 (remanding the case "for a more searching factual inquiry"). The parties built an extensive record through the lengthy trial and that record, not the one derived from *Cienega III* and the more limited trial on adjustments in *Independence Park,* informs the court's judgment here. Extensive evidence was introduced at trial about the practical effects of ELIHPA and LIHPHRA. Those preservation statutes essentially offered plaintiffs three options: (1) sell the property at a preservation valuation, *see supra,* at 441, 443–44, (2) stand pat by keeping the property and accepting no statutory benefits, or (3) keep the property and accept some benefits. *See supra,* at 460 (rejecting the government's argument that LIHPHRA was a permitting statute). First, those owners which sold their properties under ELIHPA or LIHPHRA prior to bringing suit in effect lost

their ability to pursue a takings remedy because they gave up their property interest. For obvious reasons, none of the plaintiffs in this case fall into this first category. Second, those which kept their property and did not accept any statutory benefits in essence merely stood pat after enactment of ELIHPA and LIHPHRA and before the adoption of HOPE. The chief question as to those plaintiffs is when HUD would have allowed prepayment under HOPE. The record in this case is markedly more robust on that issue than it was for the model plaintiffs in *Cienega VIII* and *Independence Park*, as explained below. Third, an even more significant divergence between this trial record and that for the *Independence Park* model plaintiffs concerns the four plaintiffs in this case that entered Use Agreements, namely Del Amo Gardens, Las Lomas Gardens, Cienega Gardens, and Chancellor Manor. Those plaintiffs entered into Use Agreements during the period after enactment of ELIHPA and LIHPHRA and before the adoption of HOPE. In other words, those plaintiffs accepted an option provided either under ELIHPA or LIHPHRA. Because of the terms of those agreements, they will be unable to regain their right to exclude until the agreement expires.

For those plaintiffs who stood pat after the enactment of ELIHPA and LIHPRA and did not accept any of the statutory options, the evidence is compelling that the temporary takings period extends beyond the date of enactment of HOPE plus sixty days. HUD exerted strenuous efforts to extend ELIHPA and LIHPHRA through preservation letters despite the passage of HOPE. Also in this connection, even after HOPE's enactment, mortgage lenders refused to accept prepayment without HUD approval. Tr. 1602:6–13 (Test. of Glodney); DX 245 (Letter from C. Glodney to S. Dogan, GMAC (May 28, 1996)) (referring to lender's refusal to permit prepayment without HUD approval). Correlatively, in its initial preservation letters, HUD required that owners receive HUD approval prior to prepayment. PCG 1163, at DOJ 28542 (Preservation Letter No. 2) ("Must owner request HUD approval prior to prepayment or termination? ... Yes. HUD needs to be assured that very low-income and low-income tenants are protected."); Tr. 1522:10–21, 1524:18 to 1525:2 (Test. of Glodney). By Preservation Letter No. 4, HUD had changed its position, but still required notification. *See* DX 266, at DOJ 0035 ("Must an owner request HUD approval prior to prepayment of termination? ... No. However, restoration of an owner's right to prepay does not eliminate the need for HUD notification of the owner's intent or the need for HUD review."). HUD also attempted to impose a three-year moratorium on rent increases on tenants in low-vacancy areas. PCG 1169, at DOJ 16119 (Preservation Letter No. 6). Only after the 1997 Appropriations Act for HUD reiterated HOPE's provisions did HUD change its policy to no longer require a waiting period. DX 253, at CGII 12518 (Mem. from HUD to Blossom Hill (Dec. 10, 1996)). In short, HUD's efforts posed substantial barriers to prepayment, particularly in low-vacancy areas, extending the takings period beyond the enactment of HOPE.

HUD's efforts rendered Blossom Hill and Skyline View unable to prepay immediately after HOPE. The properties' initial prepayment eligibility dates were October 31, 1994 for Blossom Hill and March 15, 1994 for Skyline View. *See supra*, at 450, 451. Less than two weeks after HOPE's enactment, G & K Management submitted notices of intent to prepay to HUD. Tr. 1513:3 to 1514:14 (Test. of Glodney). HUD initially responded that it had "not yet received instructions from [its] Headquarters on how to proceed with the prepayments." DX 244 (Letter from K. Axtell to J. Goldrich (Apr. 18, 1996)). Then, HUD issued the preservation letters, after which HUD claimed that G & K Management's notices of intent were defective because they failed to comply with Preservation Letter No. 4. DX 243 (Letter from K. Loman to J. Goldrich (May 20, 1996)); Tr. 1535:18 to 1537:12 (Test. of Glodney). In addition, the three-year moratorium on rent increases was of great concern to the *Cienega Gardens*-related plaintiffs. PCG 1037 (Letter from C. Glodney to K. Mulholland (Aug. 22, 1996)) (posing several questions about this requirement); Tr. 1606:8 to 1609:24 (Test. of Glodney). In mid-Decem-

ber 1996, G & K Management learned for the first time that the three-year restriction was no longer HUD's policy. Tr. 1609:11–24 (Test. of Glodney). After learning this information, Blossom Hill and Skyline View prepaid on December 19, 1996. The court is satisfied that Blossom Hill and Skyline View prepaid as expeditiously as possible.[59] Because HOPE required the plaintiffs to maintain and not increase rents for sixty days after prepayment, the court finds that the takings period as to Blossom Hill and Skyline View ended sixty days after December 19, 1996, specifically on February 17, 1997.[60]

Oak Grove and Gateway (owner of Rivergate) waited to prepay until just before their HAP contracts expired. The initial prepayment eligibility dates for Oak Grove and Rivergate were January 31, 1994, and June 6, 1995, respectively. Like Blossom Hill and Skyline View, they had HAP contracts extending into the autumn of 1997; Oak Grove had one contract extending through September 1997 and another through October 1997, while both of Rivergate's contracts ended on September 30, 1997. *See supra,* at 455, 456.[61] Unlike Blossom Hill and Skyline View, however, the Minnesota partnerships waited to prepay until July 30, 1997, approximately sixty days before their September 1997 HAP contracts expired. Tr. 414:25 to 416:2, 417:12–21 (Test. of Weinberger). Oak Grove and Rivergate urge the court to find that their temporary takings did not conclude until their HAP contracts expired and they were permitted to raise rents on all the units. *Chancellor Manor* Pls.' Post–Trial Br. at 67–68. In short, the manner in which Oak Grove and Rivergate structured their HAP contracts and provided notice to tenants was partly the result of the preservation statutes and HUD's preservation letters and partly the result of their own decisions. The court, consequently, must determine an appropriate end date upon which the owners could reasonably have regained their taken rights. Given the expeditious prepayment by the *Cienega Gardens*-related properties and the evidence of the timing of HUD's policy changes as expressed in HUD's preservation letters, the court finds that an owner could have reasonably completed all the requirements for prepayment and prepaid by December 31, 1996. Accordingly, the takings period ended for Oak Grove and Rivergate sixty days after December 31, 1996, *i.e.,* on March 1, 1997.

For the third category of plaintiffs, those which accepted a statutory option, the circumstances are even more convoluted. Three *Cienega Gardens*-related plaintiffs entered Use Agreements. Del Amo Gardens's initial prepayment eligibility date was March 27, 1992. *See supra,* at 448. Although it wished to prepay, PCG 1179 (Letter from C. Glodney to M. Findley (Feb. 8, 1990)); Tr. 1347:23–25 (Test. of Glodney), when the right to do so statutorily disappeared, the Del Amo partnership entered into a Use Agreement under Title II on May 26, 1995. JX–CG 137. This agreement maintains low-income housing restrictions on the property through February 1, 2012. *Id.* ¶ 2. Las Lomas Gardens is materially similar to Del Amo Gardens.[62] Its initial prepayment eligibility date was July 15, 1991. *See supra,* at 448. Las Lomas also wished to prepay, PCG 1123 (Letter from C. Glodney to S. Adame (Dec. 27, 1990)); Tr. 1349:17–23 (Test. of Glodney), but when the right to do so was statutorily elid-

59. The government argues that because another property run by G & K Management, Beck Park, prepaid in July 1996, Blossom Hill and Skyline View also could have prepaid at an earlier date. *Cienega* Def.'s Post–Trial Br. at 77. The evidence showed that this property slipped through the preservation regime employed by HUD, and the lenders accepted prepayment, not-withstanding the preservation letters. Tr. 3785:24 to 3787:22 (Test. of Glodney). HUD nonetheless required the property to give one-year notice to tenants of the prepayment, meaning that the property owner could not raise rents on the Section 8 units for one year. Tr. 3787:5–18 (Test. of Glodney).

60. Blossom Hill and Skyline View were able to prepay because they had not entered into Use Agreements, and they had not entered into such agreements because HUD was not able to fund them. *See supra,* at 451–52.

61. Blossom Hill also had a HAP contract involving 20 units that expired on June 30, 1998. DX 251.

62. The fact that Del Amo Gardens initially entered the Section 221(d)(3) program and Las Lomas Gardens initially entered the Section 236 program is not material to this case.

ed, the Las Lomas partnership entered into a Use Agreement under Title II on May 16, 1995, continuing the low-income housing restrictions though December 1, 2011. JX–CG 220, ¶ 2. Cienega Gardens's initial prepayment eligibility date was December 8, 1991. *See supra,* at 448. Despite wishing to prepay, PCG 1079 (Letter from C. Glodney to M. Findley (Dec. 26, 1990)); Tr. 1346:25 to 1347:3 (Test. of Glodney), after its right to prepay was statutorily removed, the Cienega Gardens partnership entered into a Use Agreement under Title II on May 26, 1995. JX–CG 52. This agreement required the partnership to maintain the low-income rental restrictions until February 1, 2012. *Id.* ¶ 2. Cienega Gardens sold the property on October 10, 2002. Tr.1909:24 to 1910:4 (Test. of Glodney); 2166:17–22 (Test of Peiser). All three of these plaintiffs signed their Use Agreements prior to the enactment of HOPE and before the Congressional consideration of the bill that became HOPE could have reasonably been anticipated to pass and to be signed into law by the President. Tr. 1502:10 to 1504:18 (Test. of Glodney).[63] Because these three partnerships were following the statutory scheme as it existed after passage of ELIHPA and LIHPHRA had removed their ability to prepay, they in effect were realizing Congress's goal expressed in the preservation statutes of keeping their properties in the program. This "choice" was not a free or unfettered one, as it would have been had they extended the term of participation in the low-income housing program after HOPE was enacted (or after it became evident that Congress would pass HOPE and that the President would sign it into law). As a consequence, the temporary takings period for these plaintiffs was extended through the term of the Use Agreements, which in accord with Title II (ELIHPA) was coextensive with the pay off date of their original mortgage. Thus, the end dates for these three plaintiffs are February 1, 2012 for Del Amo Gardens, December 1, 2011 for Las Lomas Gardens, and October 10, 2002 for Cienega Gardens.[64]

Chancellor Manor also entered a Use Agreement. Its initial prepayment eligibility date was August 14, 1993. *See supra,* at 453. It entered into its Use Agreement under Title VI (LIHPHRA) on February 14, 1995. DX 721. When it signed its Use Agreement, the Chancellor Manor partnership had no knowledge that HOPE would ultimately be enacted and permit prepayment. Tr. 233:17 to 236:3 (Test. of S. Bernardi). This agreement, unlike those under Title II, bound the property for "the remaining useful life of the project." DX 721, ¶ 2. The first day on which Chancellor Manor can petition HUD to find that its property has no remaining useful life is December 13, 2044. *Id.* (allowing such petition "not less than fifty years from the date of approval of the Plan of Action for the Project"); *Chancellor Manor* Stip. ¶ 58 (stating the date of the plan of action's approval as December 13, 1994). Accordingly, for Chancellor Manor, the court finds that December 13, 2044 is the temporary taking end date.

That some plaintiffs chose to receive the statutory benefits after the prepayment right was taken does not change the fact that the government was still taking that right. *Cf. Whitney Benefits,* 926 F.2d at 1176 ("To hold that mere presence of an exchange provision precludes a court from finding a taking on enactment in cases like this one would eviscerate the constitutional just compensation guarantee."). Of course, this analysis only applies to property owners who entered Use Agreements before HOPE restored that right; other owners may have entered into such agreements when they were not statutorily constrained.[65] Accordingly, for those plaintiffs who entered Use Agreements prior

63. One HUD official, Thomas Vitek, was unsure in October 1995 that legislation would be passed that might restore the right to prepay. Tr. 2992:22 to 2993:11.

64. As previously addressed, these plaintiffs received certain benefits under the Use Agreements and those benefits must be taken into account in the just-compensation calculus. *See supra,* at 469–71.

65. Property owners who entered Use Agreements prior to HOPE's enactment were not permitted to withdraw from the agreements. Tr. 372:3 to 373:17 (Test. of Weinberger), 1504:19 to 1505:20 (Test. of Glodney) (explaining plaintiffs' own unsuccessful efforts to withdraw).

to the enactment of HOPE, the takings period ends at the conclusion of such agreement.

In sum, the court finds that the government took the plaintiffs' vested rights for the following periods:

| Property | Temporary Takings Period |
|---|---|
| Cienega Gardens | December 8, 1991—October 10, 2002 |
| Del Amo Gardens | March 27, 1992—February 1, 2012 |
| Las Lomas Gardens | July 15, 1991—December 1, 2011 |
| Blossom Hill Apartments | October 31, 1994—February 17, 1997 |
| Skyline View Apartments | March 15, 1994—February 17, 1997 |
| Chancellor Manor | August 14, 1993—December 13, 2044 |
| Oak Grove | January 31, 1994—March 1, 1997 |
| Rivergate | June 6, 1995—March 1, 1997 |

### C. *JUST COMPENSATION*

Just compensation under the Fifth Amendment is the amount of money that places the owner "in as good [a] position pecuniarily as he would have occupied if his property had not been taken." *United States v. Miller,* 317 U.S. 369, 373, 63 S.Ct. 276, 87 L.Ed. 336 (1943). When the property taken is a going business concern, "the proper measure of compensation is the rental that probably could have been obtained [but for the taking]." *Kimball Laundry,* 338 U.S. at 7, 69 S.Ct. 1434. *See also Petty Motor,* 327 U.S. at 381, 66 S.Ct. 596 (holding that the measure of compensation is "the difference between the value of the use and occupancy of the leasehold for the remainder of the tenant's term, plus the value of the right to renew ... less the agreed rent which the tenant would pay for such use and occupancy."); *General Motors,* 323 U.S. at 382, 65 S.Ct. 357 (basing compensation on "what would be the market rental value of such a building on a lease by the long-term tenant to the temporary occupier.").

This section addresses the appropriate amount of compensation plaintiffs are due. First, it focuses on assessing the value of a temporarily-taken, income-producing going concern as the foundation for measuring compensation due in a temporary taking and it evaluates plaintiffs' and defendant's conceptual models in that context. Second, the appropriate discount rate is determined for present-value calculations. Third, an appropriate measure for interest is developed from the evidence. Fourth, and lastly, the question whether simple or compound interest is appropriate is resolved.

#### 1. *Net rental value*

Both sets of plaintiffs have proffered a conceptual model based on net value for measuring just compensation. This model calls for determination of the rental value the properties would have received had they been permitted to prepay ("market scenario" or "but-for world") and subtraction of the value they actually received ("HUD-restricted scenario" or "actual world") to result in net rents for each year in the temporary takings period. PCG 1010 (Second Amended Report of R. Peiser (Nov. 3, 2004)); PCM 435 (Amended Report of G. Karvel (Nov. 4, 2004)). Plaintiffs were unable to charge market rents for their properties during the course of the taking, and this measure of compensation most closely approximates "the rental [the plaintiffs] could have obtained." *Kimball Laundry,* 338 U.S. at 7, 69 S.Ct. 1434. *See also Independence Park,* 61 Fed.Cl. at 706–08.

The government counters with a model that calculates damages based on a delay in obtaining the prepayment right. DX 421, ¶ 142 (Revised Expert Report of W. Hamm (Oct. 5, 2004)); Tr. 4234:11–18 (Test. of W. Hamm). *See also Cienega* Def.'s Post-Trial Reply Br. at 27 ("Plaintiffs further argue that Dr. Hamm's model 'merely compensates Plaintiffs for the delay in receiving cash flows.' ... This, however, is proper for the plaintiffs' alleged temporary taking.").[66] The

66. The government first argues that to the extent plaintiffs are entitled to compensation, they should only be awarded nominal damages because, given the choice, plaintiffs would have chosen to sign Use Agreements instead of prepayment. *Cienega* Def.'s Post-Trial Br. at 61–62; *Chancellor Manor* Def.'s Post-Trial Br. at 61–62. This argument ignores the large body of evidence introduced in this case that plaintiffs consistently sought prepayment whenever that right was or might be available, and even sought to withdraw from the Use Agreements some of them did sign such that they could prepay. *See, e.g.,* PCG 1123 (Letter from C. Glodney to S. Adame (Dec. 27, 1990)); Tr. 1349:17–23 (Test. of Glodney) (stating Las Lomas's intention to prepay), Tr. 372:3 to

government's model ignores the lost rental income plaintiffs would have received but for the taking. Instead, it measures interest on a derived value for the prepayment right. Such a method might be appropriate when the government temporarily takes property that is not susceptible of producing current income, such as a bar of gold, whereby the owner receives the same property at the end of the takings period as it lost at the beginning. *See Yuba Natural Res., Inc. v. United States,* 904 F.2d 1577, 1583 (Fed.Cir.1990). However, when the property temporarily taken is an income-generating property, the value of the going concern must be taken into account. *General Motors,* 323 U.S. at 382, 65 S.Ct. 357 ("market rental value" of a property on a temporary basis); *Kimball Laundry,* 338 U.S. at 16, 69 S.Ct. 1434 ("[S]ince the Government for the period of its occupancy of petitioner's plant has for all practical purposes preempted the trade routes, it must pay compensation for whatever transferable value their temporary use may have had."); *Independence Park,* 61 Fed.Cl. at 706–08.

Consequently, the court finds that plaintiff's model is conceptually sound as a basis for measuring compensation and that the government's proffered interest-only model fails to provide just compensation to the plaintiffs for the rental value they would have received had they prepaid.

a. Net rents for *Cienega Gardens*-related plaintiffs.

Dr. Peiser's model for the *Cienega Gardens*-related plaintiffs calculates, in both nominal and present value terms, the net cash flows plaintiffs would have received had they prepaid and subtracts the cash flows they actually received. In doing so, Dr. Peiser relied on several assumptions. First, to determine the rents in the market scenario, he began with the rents derived from the Use Agreements for those properties that signed them. Tr.2087:15 to 24 (Test. of Peiser). *See, e.g.,* PCG 1010, Tab 5, Supplemental Description (listing permissible Use Agreement rent for Del Amo Gardens); *id.,* Schedule A(2) (using the same rent for average market rent in 1995). Those rents passed muster with HUD as being appropriate for the pertinent properties. For the years prior to the signing of Use Agreements, Dr. Peiser applied HUD's annual adjustment factors in a weighted form to reduce the rent. Tr.2088:5–23 (Test. of Peiser). *See, e.g.,* PCG 1010, Tab 5, Notes to Schedules A(1)-(3), n.1. For subsequent years through 2003, Dr. Peiser's calculations were based on zip-code specific data from RealFacts, a service that provides information on the housing market. Tr.2087:25 to 2088:5, 2088:24 to 2089:9 (Test. of Peiser). For the years after 2003, he used the geometric mean increase of RealFacts rents between 1995 and 2003. Tr.2090:11–19 (Test. of Peiser). For the two *Cienega Gardens*-related properties that did not have Use Agreements, Blossom Hill and Skyline View, Dr. Peiser used a similar model for 1995 and earlier, basing the rents for 1995 on the rents determined through the Title VI process. PCG 1010, Tab 8, Supplemental Description (listing 1995 rents for Skyline View Apartments). For 1997, he used the "contract rent" (as contrasted to the rents paid by tenants) determined by the plaintiffs' HAP contracts and reflected on the rent rolls. Tr. 2185:25 to 2187:8 (Test. of Peiser). For 1996, Dr. Peiser used data based on RealFacts but capped the rents at the contract rents for 1997. PCG 1010, Tab 8, Supplemental Description. Between 1994 and 2003, Dr. Peiser used RealFacts vacancy data for the properties' areas, and in prior and subsequent years, he used the average vacancy rate from 1994–2003. *See, e.g.,* Tab 5, Notes to Schedules A(1)-(3), n.2. The court finds that Dr. Peiser's methodology in calculating market rents is reliable and provides an objectively confirmable predicate for determining net rental income.[67]

373:17 (Test. of Weinberger), 1504:19 to 1505:20 (Test. of Glodney) (describing plaintiffs' efforts to withdraw from the Use Agreements).

67. One indication of the reliability of Dr. Peiser's methodology is that the government appraiser's average market rent per unit at prepayment for the Title II properties was higher than Dr. Peiser's estimate. *Compare* DX 420, at 45 (Supplemental Expert Report of Ron Hendricks (Sept. 20, 2004)) (listing Las Lomas Gardens's average market rent per unit at prepayment date as $738), *with* PCG 1010, Tab 4, Schedule A(1)

Second, and importantly, Dr. Peiser accounts for the benefits received by those plaintiffs who entered Use Agreements. First, the rents in the HUD-restricted scenario are the increased rents permitted by the Use Agreements. For example, upon the signing of the Use Agreements, the average rent in the HUD-restricted scenario for Las Lomas increased from $414 to $759. *Compare* PCG 1010, Tab 4, Schedule B(1), *with id.,* Schedule B(2). Second, Dr. Peiser calculates the difference between the equity loans received by the Title II properties and a comparable loan available in the market. *Compare* PCG 1010, Tab 4, Schedule B(9)a, *with id.,* Schedule B(9)b (Equity Loan Analysis for Las Lomas Gardens). *See also* Tr. 2148:2 to 2149:15 (Test. of Peiser). Third, when the Use Agreement removed the cap on the annual limited dividend the partnerships could receive, Dr. Peiser's calculations of the cash flows in the HUD-restricted scenario reflected the new distributions when they were paid. *See* PCG 1010, Tab 5, Schedule B(2) (Total Distribution Paid per year to Del Amo Gardens). *See also id.,* Notes to Schedule B(1)-(3), n.19 ("The limited dividend for Del Amo until the prepayment eligibility date is $18,288. Subsequent to the Use Agreement Date, distributions are not limited.").

The government specifically objects to four aspects of Dr. Peiser's calculations. First, it argues that Dr. Peiser does not adequately account for the plaintiffs' existing HAP contracts in the market scenario. At the time of prepayment, the standard HAP contract lasted for five-year terms. Dr. Peiser assumes that plaintiffs would have negotiated customized HAP contracts to arrange for prepayment to coincide with the expiration of such contracts. Tr. 2258:17 to 2260:23 (Test. of Peiser). This assumption corresponds to the plaintiffs' stated intent. Tr. 1510:23 to 1513:1 (Test. of Glodney). The plaintiffs also point to the supporting testimony of Michael Winiarksi, a HUD official, that the duration of a HAP contract "[d]epends on the circumstances of a particular property and the conditions under which the property is operating." Tr. 2286:2–10. The government did not provide countervailing testimony from any HUD official that only a five-year contract was available and no shorter contract would be allowed. It relies instead on Ms. Glodney's testimony that she had never negotiated a contract for a term shorter than five years prior to 1996. Tr. 1675:23 to 1676:16 (Test. of Glodney). Her failure to have done so does not logically indicate what would have happened if ELIHPA or LIHPHRA had not been enacted, nor does it shed light on whether HUD would permit contracts shorter than five years in duration. Importantly, the only testimony from HUD on this point is from Mr. Winiarski and that testimony favors plaintiffs' position. Accordingly, the court finds Dr. Peiser's assumption reasonable.

Similarly, the government criticizes Dr. Peiser's model for failing to phase in new rents. Dr. Peiser did make an adjustment for the transition of the properties to the conventional market, and the court will consider the government's critique as a contention that his adjustment was inadequate. The plaintiffs' actual experience is informative in assessing transition costs. When Blossom Hill prepaid, 119 out of 201 units, or approximately 60% of the units, were covered by Section 8 contracts. DX 251 (Letter from K. Loman to C. Glodney (Jan. 29, 1997)). The remaining units were either (1) vacant and prepared to charge market rents, Tr.2020:6–10 (Test. of Glodney), (2) housing tenants who objected under San Jose's local law, whose rents were phased in for six to 24 months, Tr.1963:9 to 1964:8 (Test. of Glodney), (3) housing non-objecting tenants whose rents were phased in for three to 24 months, Tr.1965:15 to 1966:2 (Test. of Glodney), or (4) housing non-Section 8 tenants who received housing vouchers that covered a portion of their rent. Tr.2020:11–12 (Test. of Glodney). The number of tenants who were phased-in was less than 25%. Tr.2019:23 to 2020:3 (Test. of Glodney). Skyline View's experience was similar to Blossom Hill's. Tr.1966:3–19, 2020:4–5 (Test. of Glodney).

Dr. Peiser's adjustment was more generous to the government than would be re-

(listing average market rent for Las Lomas Gardens for 1991 as $714).

quired by the plaintiffs' actual experiences. Dr. Peiser's model assumed that 50% of the tenants would immediately begin paying market rents and that 50% of the units will become vacant. *See, e.g.,* PCG 1010, at Tab 5, Schedule B(8)(a) (Conversion Costs for Del Amo Gardens). He assumed that it would take six months for the property to re-lease fully those vacant units. *Id.* Dr. Peiser believed, and the court concurs, that this assumption adequately accounts for the likely phase-in of rents, and is more generous to the government than what actually happened. Tr. 4381:24 to 4383:3 (Test. of Peiser). This conclusion is especially justified in light of the proven ability of tenants who needed assistance in covering their rents to obtain vouchers that provided such assistance and the ability of the properties also to attract market-rate tenants immediately. Tr.2021:9 to 2022:19 (Test. of Glodney).

Next, the government criticizes Dr. Peiser for excluding "catch-up" distributions from the income the Del Amo Gardens and Skyline View partnerships actually received. In 1993, Del Amo Gardens apparently paid a distribution of $97,278 to the partners, but all but $12,392 had accrued prior to the initial prepayment eligibility date. PCG 1010, Tab 5, Schedule B(1). Similarly, in the years ending in June 1995 and December 1996, Skyline View paid a distribution that included accrued but unpaid dividends from years before its prepayment eligibility date. PCG 1010, Tab 8, Schedule B(1). Dr. Peiser excluded these dividends from his calculation because they accrued in a previous year, and would overstate the available cash flows in the actual world by artificially treating it as new revenue in a later year. Tr. 2227:4 to 2228:3, 4379:11 to 4380:16 (Test. of Peiser). The court finds Dr. Peiser's treatment of "catch-up" distributions to be reasonable because such dividends were payable in previous years, and were accumulated for HUD purposes as being payable, but the partnerships had not paid them in the face of uncertainty due to the preservation statutes. For all practical and legal purposes, the "catch up" dividends were attributable to operations prior to the prepayment dates, and Dr. Peiser properly excluded them from his calculations.

As a final point, the government challenges Dr. Peiser's assumption for Blossom Hill and Skyline View that plaintiffs would have been able to obtain permanent financing had they prepaid in the market scenario. When Blossom Hill and Skyline View prepaid, they used bridge financing to do so. Tr. 3133:1–11 (Test. of W. Breslow). One of the general partners testified that the plaintiffs always took out bridge loans prior to obtaining permanent financing. Tr. 3133:9 to 3134:25 (Test. of Breslow). A bridge loan would result in additional closing costs. The conservative interest rate adopted by Dr. Peiser, however, was higher than the interest rate that plaintiffs paid on their bridge loans. Tr. 4383:20 to 4384:23 (Test. of Peiser). The criticism by the government is undercut by the testimony of one of their own experts, Dr. Hamm, who in his supplemental report stated that Dr. Peiser's assumption of permanent financing does not create "a material bias in his estimate of the plaintiffs' damages." DX 516, at 4 n.2 (Supplemental Expert Report of W. Hamm (Nov. 26, 2004)). There is no doubt that plaintiffs could have obtained permanent financing immediately, *see supra,* at 472 (noting the general partners' multi-million dollar reserve fund to assure the availability of resources to pay obligations promptly), and that the bridge-financing route they chose was employed to reduce their net financing costs.

In sum, the court finds Dr. Peiser's model to be conceptually appropriate and sound in its application.[68] The court finds that the five *Cienega Gardens*-related plaintiffs have suffered the following net lost rents, not adjusted for present value: Las Lomas Gardens has suffered $9,278,045, Del Amo Gardens, $2,867,896, Cienega Gardens,

68. The calculation for the Cienega Gardens partnership includes $3,219,593 in nominal terms as diminution in value of the property on the date of the sale. *Compare* PCG 1010, Tab 6, Summary Market Scenario, *with id.,* Summary HUD–Restricted Scenario. *See also id.,* Schedule B(10). The government did not specifically object to this figure, nor did either party brief the appropriateness of including this amount in the compensation award. Without a specific government objection, the court will not alter Dr. Peiser's award in this respect.

$5,930,072, Blossom Hill, $2,669,284, and Skyline View, $1,960,177. PCG 1010, Tabs 4–8.

b. Net rents for *Chancellor Manor*-related plaintiffs.

The *Chancellor Manor*-related plaintiffs proffered the model of Dr. George Karvel to measure their compensation. Dr. Karvel's model, like Dr. Peiser's, calculates the net cash flows that the plaintiffs would have received had they prepaid, and then subtracts the net cash flows the plaintiffs actually received. PCM 435, ¶ 2. In many respects, the assumptions employed by Dr. Karvel are quite conservative. For example, in the market scenario, he assumes zero cash flows for the first year after prepayment. Tr. 579:18 to 580:15 (Test. of Karvel); PCM 435, ¶ 49. This assumption is meant to account for any necessary phase-in of rents, extra vacancies, advertising costs, and other transition costs the properties might face. Tr. 779:3 to 780:17 (Test. of Karvel).

Dr. Karvel's calculation of rents in the market scenario begins by determining the market rents of each type of unit in the year of the property's prepayment eligibility date. Tr. 581:12 to 582:3 (Test. of Karvel); PCM 435, ¶ 12. To do so, he examined a number of appraisals and market data and used the rents he deemed most reasonable. Tr. 697:2 to 700:2 (Test. of Karvel). The court concurs that the rents selected by Dr. Karvel are reasonable. His estimated rents for each unit type at Chancellor Manor in 1993 were lower than those recommended by the plaintiffs' appraiser and the government's appraiser. *Compare* PCM 435, at 19 (Rental income for Chancellor Manor) ($450 for a one-bedroom apartment), *with* PCM 384, at 5 (Retrospective and Current Rent Comparability Study by Ellen B. Herman (Sept. 14, 2004)) (calculating rent for a small one-bedroom apartment at Chancellor Manor on August 17, 1993 as $535), *and* DX 1192, at 53 (Appraisal of Chancellor Manor by Dan Mueller (Sept. 9, 2004)) (calculating rent for a non-corner, one-bedroom apartment at Chancellor Manor on August 14, 1993 as $500). Dr. Karvel's initial rents are consistently less than or equal to those of the plaintiffs' appraiser, Ellen Herman. *Compare* PCM 435, at 19, 49, and 76, *with* PCM 384, at 5. After determining the rent for the base year, Dr. Karvel increases those rents based on data gathered from Apartment Search, a rental services company in the Twin Cities area that maintains a database containing information about apartments in the area. Tr. 587:22 to 591:7, 700:24 to 702:6 (Test. of Karvel). Based on these actual market trends, Dr. Karvel projected that Chancellor Manor's rents would increase by 3.5% per year between 1993 and 2004, and 4% per year through 2004 for Oak Grove and Rivergate. PCM 435, at 19, 49, 76; Tr. 582:4 to 583:16, 676:8–22, 679:4–17 (Test. of Karvel). For projecting rent increases beyond 2004, Dr. Karvel uses a more conservative figure of 2.5%. Tr. 583:16 to 584:7 (Test. of Karvel). To determine the vacancy rates, Dr. Karvel again uses location-specific data from Apartment Search. Tr. 584:8–17 (Test. of Karvel). Using this data, he estimated Chancellor Manor's market-vacancy percentage at 3%, and the vacancy rate of Oak Grove and Rivergate at 4% through 2004. Tr. 584:8–19 (Test. of Karvel); PCM 435, at 19, 49, 76. Beyond 2004, Dr. Karvel uses a more conservative 5% vacancy rate. Tr. 584:19 to 585:8 (Test. of Karvel); PCM 435, at 19, 49, 76. Given Dr. Karvel's cautious assumptions, the court finds his method of determining market rents to be reliable, and, if anything, to provide a modest bias in the government's favor.

Dr. Karvel's calculations of net cash flow for each of the three plaintiffs must nonetheless be altered. First, he fails to account for the equity loan that Chancellor Manor received under the Use Agreement. Under the agreement, the partnership obtained a second mortgage loan of $3,618,100, of which $2,119,430 was distributed to the partners. DX 649E, at 9 (Chancellor Manor Audited Financial Statements Years Ended December 31, 1995 and 1994 (Feb. 28, 1996)). Rather than calculate the difference between the value of this loan and that of a loan available in the market scenario, Dr. Karvel did not conduct any analysis of equity loans. Tr. 750:24 to 751:10 (Test. of Karvel). As the court explained above, *see supra,* at 469–71, the just compensation analysis must offset the benefits the properties received under the Use Agreements, and an equity loan

obtained for Chancellor Manor was one of those benefits.

Based on the data in evidence, the court will conduct its own calculation of the value of the equity loan, using Dr. Peiser's methodology. Dr. Peiser assumed that the properties would receive a loan in the market scenario at 80% of the property's value, while the equity loan provided by the Use Agreements could be as high as 90% of the HUD-determined value. Tr. 2148:2 to 2149:15 (Test. of Peiser). Dr. Peiser's model determines the market value of the equity loan by taking 80% of the appraised value of the property, and subtracting the amount of outstanding debt and refinancing costs of 1.5%. PCG 1010, Tab 4, Schedule B(9)a. The appraised value of Chancellor Manor was $7.0 million, *Chancellor Manor* Stip. ¶ 57, and 80% of that value is $5.6 million. In Dr. Karvel's market scenario, Chancellor Manor's outstanding mortgage would be $3,263,405.42 in February 1995, the month of the Use Agreement. PCM 435, at 23. The refinancing costs, 1.5% of $5.6 million, would be $84,000. Also, when Chancellor Manor took out its equity loan in the HUD-restricted scenario, it placed $664,521 in a second replacement reserve fund. DX 649E, at 10. This second replacement reserve fund was not required by HUD regulations but rather was established voluntarily by the Chancellor Manor partnership. To avoid compensating the partnership for this money, $664,521 should also be deducted from the equity loan in the market scenario.[69] Based on these calculations (*i.e.,* $5,600,000 minus $3,263,405.42, minus $84,000, minus $664,521), the value of an equity loan in the market scenario is $1,588,073.58. The proceeds actually received by plaintiffs in the HUD-restricted scenario were $2,119,430.00. Accordingly, a figure of $531,356.42 (*i.e.,* the HUD-restricted value of $2,119,430.00 minus the market value of $1,588,073.58) should be deducted from Chancellor Manor's award in February 1995.

Second, Dr. Karvel also incorrectly compensates Oak Grove and Rivergate for the settlement of tenant litigation. Facing litigation from tenants, Oak Grove and Rivergate agreed to accept vouchers from qualified tenants. *See supra,* at 455, 457. As a result of this settlement, the owners were unable to increase the rents to market rate. Tr. 646:13 to 648:19 (Test. of Karvel). Dr. Karvel's model extends into 2006 to account for this delay. PCM 435, at 51–52; Tr. 670:15 to 671:19 (Test. of Karvel). Nothing in the preservation statutes or their accompanying regulations required plaintiffs to provide tenants with these benefits. Although the settlement may have been a rational business decision, *see* Tr. 479:21 to 480:11 (Test. of Weinberger) (explaining the reasoning behind plaintiffs' decision to maintain suppressed rents), it was not directly attributable to governmental action, and thus not compensable. *See Hartwig v. United States,* 202 Ct.Cl. 801, 485 F.2d 615, 619–20 (1973). Accordingly, Dr. Karvel's calculations beyond 1997 should be removed from both the market and HUD-restricted scenarios.[70]

The government also criticizes two other portions of Dr. Karvel's compensation model. First, Dr. Karvel assumed that plaintiffs

69. Chancellor Manor also spent $342,702 in a fund "for more immediate, HUD-required repairs." DX 649E, at 10. In the market scenario, Dr. Karvel already accounts for $414,851 of conversion costs that would be paid from the proceeds of a 1993 loan used to prepay the mortgage. PCM 435, at 19. Tr. 686:15 to 688:20 (Test. of Karvel). Accordingly, the $342,702 should not be deducted a second time from the value of the equity loan in the market scenario.

70. Plaintiffs offered extensive testimony that they entered their HAP contracts because of the preservation statutes. Both Oak Grove and Rivergate had HAP contracts that they extended in 1992 because of LIHPHRA, and second HAP contracts they extended in 1996 to comply with ELIHPA's one-year notice requirement. Tr. 4535:22 to 4542:17 (Test. of Weinberger). These plaintiffs could have prepaid prior to the expiration of their HAP contracts and have begun to charge market rates in those units not covered by Section 8. The court thus has made its own findings as to a reasonable prepayment date. *See supra,* at 481. Using the reasonable prepayment date that reflects all of the evidence, recovery of the net rental value lost because of the preservation statutes is necessary to place the owners "in as good [a] position pecuniarily as [they] would have occupied if [their properties] had not been taken." *Miller,* 317 U.S. at 373, 63 S.Ct. 276.

would not be hampered by a HAP contract in the market scenario. Tr. 774:25 to 775:14 (Test. of Karvel). As with the *Cienega Gardens*-related plaintiffs, the government argues that Oak Grove and Rivergate would have entered five-year HAP contracts in the early 1990s and would not have prepaid until their expiration. *Chancellor Manor* Def.'s Post–Trial Br. at 68–69. The evidence on this issue is a reprise of that with the *Cienega Gardens*-related plaintiffs. The only evidence about the permissibility of customizing HAP contracts, *i.e.*, developing such contracts for terms of one year to five years, rather than only five years, is from Michael Winiarksi, who testified that it "[d]epends on the circumstances of a particular property and the conditions under which the property is operating." Tr. 2286:2–10. The government did not provide testimony from any HUD official that a five-year contract would be required. Accordingly, Dr. Karvel's assumption that no HAP contracts would restrict the plaintiffs in the market scenario is appropriate.

Second, the government argues that costs for installing more parking at Rivergate should be deducted from its compensation. *Chancellor Manor* Def.'s Post–Trial Br. at 74; Tr. 3394:13 to 3395:6 (Test. of Mueller). In 2001, Rivergate built a parking garage which accommodates 270 parkers, 121 of whom were tenants of Rivergate. Tr. 817:14–22 (Test. of Weinberger). Prior to the newly built parking ramp, Rivergate featured 64 surface stalls for the 269 units. DX 1190, at 37 (Expert Report of D. Mueller). Ellen Herman, the plaintiffs' appraiser, testified that no parking ramp would be necessary to attract market-rate tenants because many tenants had no need for an automobile. Tr. 926:11 to 927:25 (Test. of Herman). This circumstance derives from the demographics of residents of this complex, who typically are young professionals who can walk to work through the skyway, elderly people who do not need a car, and others who work in the city and park their car elsewhere during the week. Tr. 865:19 to 866:2, 922:22 to 924:23, 926:11 to 927:25 (Test. of Herman). Mr. Weinberger also testified that the garage ramp is viewed as a separate revenue-generating activity designed to take advantage of the general lack of parking in the downtown area. Tr. 453:6 to 454:9. Furthermore, Dr. Karvel believed that the property had space available for thirty additional parking spots, and given that 121 tenants parked in the garage, and the thirty additional spaces would give the complex 99 parking spaces, it would be economically irrational for a business to build a $3 million parking garage for approximately 20 parking spaces. Tr. 679:22 to 681:10, 767:18 to 770:21 (Test. of Karvel). The court accordingly finds that no deduction from the market scenario need be made to account for parking at Rivergate.

With the exceptions noted above, the court follows Dr. Karvel's model for determining compensation. After deducting the value of the equity loan, *see supra*, at 488, and the cash flows to the partners in the HUD-restricted scenario, PCM 435, at 21, from the property's cash flow before tax in the market-rent scenario, *id.* at 20, the compensation owed Chancellor Manor, without any present-value adjustment, is $61,349,267.58.[71] Similarly, for Oak Grove, after deducting the value of the "restricted rents" for 1995–1997, *id.* at 53,[72] and the nominal value of an additional benefit Oak Grove received because of the taking, *id.* at 64, from the market cash flow before tax between 1995 and 1997, *id.* at 51, the compensation owed Oak Grove without any present-value adjustment

71. Dr. Karvel proffers two different models for measuring the compensation owed Chancellor Manor: one deducting the dividend in the HUD-restricted scenario each year it is accrued and the other deducting the money actually received by plaintiffs. Tr. 637:12 to 641:18 (Test. of Karvel). The court finds, as it did with the "catch-up" distributions excluded from Dr. Peiser's model, *see supra*, at 486, that measuring the accrued values better avoids overstating the available cash flows in the actual world. PCM 435, Tab 1A.

72. Dr. Karvel's report does not designate market cash flows and HUD-restricted cash flows by month. The calculation above includes the entire calendar year of 1997 rather than information through the expiration of the HAP contract on October 31, 1997. Dr. Karvel conservatively assumed that *Chancellor Manor*-related plaintiffs would receive zero cash flows in the properties' first year after prepayment. *See supra*, at 487.

is $1,451,631.[73] Using the same model as for Oak Grove, the compensation owed Gateway, based on 1996 and 1997, is $1,501,296 without any present-value adjustment.[74] *Id.* at 78, 80–81. These figures must be discounted to obtain a present value. *See infra.*

c. Discounting.

Measuring just compensation requires the court to apply a discount rate to the stream of net rents to determine its present value at the time of the taking. *See Whitney Benefits, Inc. v. United States,* 18 Cl.Ct. 394, 412–13 (1989), *aff'd,* 926 F.2d at 1178. The valuation date for temporary takings is the end of the temporary takings period. *Independence Park,* 61 Fed.Cl. at 709. This valuation date is appropriate because the end of the temporary taking sets a boundary for just compensation and, apart from duration, events that transpired during the temporary takings period "have to be taken into account in setting a valuation." *Id. See also Creppel,* 41 F.3d at 632.[75] The facts of these consolidated cases also illustrate that property owners may file temporary takings claims when a taking known to be temporary has not yet ceased. *Bass Enters.,* 133 F.3d at 896 (1998) (citing *Hendler v. United States,* 952 F.2d 1364, 1375 (Fed. Cir.1991), and *Skip Kirchdorfer, Inc. v. United States,* 6 F.3d 1573, 1583 (Fed.Cir.1993)). Compensation in such a situation should be discounted to the date of judgment. *Independence Park,* 61 Fed.Cl. at 710. *Cf. Energy Capital Corp. v. United States,* 302 F.3d 1314, 1330 (Fed.Cir.2002) (discounting to date of judgment to measure lost profits in a breach of contract case).

The discount rate used reflects returns required to attract investment capital. The issue regarding the discount rate turns on the incorporation of a risk premium in the discount rate to account for the potential investor's uncertainty about future events. Tr. 2242:24 to 2243:16 (Test. of Peiser). One of the chief difficulties regarding a risk premium is avoidance of subjectivity in selecting such a premium. One route to that end would be to employ a sensitivity analysis which, through mathematical regressions, addresses the potential significance of the major risks an investor would face. *See Whitney Benefits,* 18 Cl.Ct. at 412–13. The parties in this case were not so rigorous in their analysis. Rather, they looked to the factors that might be employed to set parameters for mathematical analysis, but limited their consideration largely to subjective evaluations of those factors.

One of the factors in evaluating investments in real property is whether the properties are "institutional grade," with non-institutional grade properties being a riskier investment than institutional-grade properties. Tr. 4062:15 to 4063:12 (Test. of Hamm). Whether a property is considered institutional grade depends upon the character of the properties more than the investors who purchase the property. Tr. 4055:11 to 4056:2 (Test. of Hamm), 4836:10 to 4837:24 (Test. of Peiser). Among the characteristics of institutional-grade properties are location in a major market, impressive appearance, large size, high-quality construction, above-average

73. The cash flow listed for Oak Grove in 1997 is $319,047. PCM 435, at 53. This figure includes $280,000 of reserve accounts that would have accrued in previous years. Tr. 652:3 to 654:16 (Test. of Karvel). Accordingly, the court has calculated Oak Grove's cash flow before tax in the HUD-restricted scenario in 1997 to be $39,047.

74. At trial, the government moved for judgment as a matter of law under RCFC 52(c) that Gateway had suffered no damages resulting from the preservation statutes. Tr. 2515:8 to 2519:2. This argument was based on the assumption that the taking ended sixty days after HOPE, an assumption this court has rejected. *See supra,* at 479–83. Accordingly, the government's motion for judgment as a matter of law is denied.

75. The government argues that the court should not use *ex post* information in determining the appropriate compensation. *Cienega* Def.'s Post–Trial Br. at 66–67; *Chancellor Manor* Def.'s Post–Trial Br. at 66. The court rejects this argument because "the events during the temporary takings period are relevant not just to delineate the period itself but also to provide an objective, non-speculative basis for assessing value." *Independence Park,* 61 Fed.Cl. at 709, n. 16. In short, events during the temporary takings period are not in any rational sense *ex post* at all. Rather events after the temporary taking has ended might legitimately be deemed *ex post.*

design, good amenities, and excellent condition. DX 421, at 53 (Revised Expert Report of W. Hamm). The court finds that the properties in this case possessed these characteristics of institutional-grade properties. Nonetheless, institutional-grade properties are usually less than ten years old, *id.,* and although these properties do not look their age, they do not satisfy that element of institutional grade property. Tr. 724:23 to 725:1 (Test. of Karvel), 2084:4–15 (Test. of Peiser). Because of the valuable characteristics the properties do possess, including their location, construction, and condition, the court concludes that a moderate-risk adjustment to a discount rate appropriately takes account of the stability of these properties. Given the properties' characteristics, an appropriate discount rate for all purposes is 10%. *See Independence Park,* 61 Fed.Cl. at 710–11; Tr.2081:11 to 2082:1 (Test. of Peiser) (acknowledging that a discount rate of 10% would adequately compensate plaintiffs), 4052:3–10 (Test. of Hamm) (stating that 10% would be adequate in the HUD-restricted scenario).[76]

The government argues that the discount rate in the market scenario should be higher than the discount rate in the HUD-restricted scenario because of allegedly increased risks in the former. The properties at issue in this case, however, do not suffer from substantial market risks because they are of high quality, in excellent locations, and should have no difficulty attracting tenants. *See, e.g., supra,* at 446 (explaining the positive attributes of Cienega Gardens), 27 (describing the advantageous location of Rivergate, as well as its high-quality construction). Moreover, the government significantly overstates the stability of the HUD-restricted scenarios. A HUD report issued in 1974 reported that 20% of Section 236 projects and 30% of all Section 221(d)(3) market-rate projects would fail within the first ten years, and concluded that "[t]he high failure rates reflect the riskiness of the undertaking." Housing in the Seventies, *supra* note 50–51 n. 48, at 118, 122–23.[77] The court concurs with Dr. Peiser that the stability of the two scenarios is at the very least comparable. Tr.2082:20 to 2083:11 (Test. of Peiser).[78] Indeed, the court concludes that the operation of properties in the HUD-restricted scenario probably is more uncertain and riskier than in a conventional rental scenario. In all events, the discount rate of 10% shall be applied in both scenarios.

Because the court has made factual findings that differ from those proffered by the parties in certain respects critical to determining the present value of net rents for each of the properties during the several temporary takings periods, the court is faced with the options either of itself using the discount rate derived above to calculate a present value of net rents for each property or of asking the plaintiffs to perform these calculations and asking defendant to provide a cross-check of them. The court opts for the prudent course of asking the parties to perform and check calculations of present value of net rents for each property, using the parameters determined by the court for each property as set out in the prior sections of this opinion. Thus, prior to entering judgment in favor of the plaintiffs, the court requests supplemental calculations from plaintiffs applying the discount rate determined above to the current-dollar net rental streams pertinent to each property. *See supra,* at 487, 489. For those plaintiffs whose

76. Dr. Wade testified that certain industry data reported in Korpacz indicated that a higher discount rate might be appropriate for the housing industry generally. Tr. 2364:6 to 2376:3. Nonetheless, the evidence in the record supports finding that a cautious rate of 10% would adequately compensate the plaintiffs.

77. The *Cienega Gardens*-related plaintiffs cite to an interim edition of this report that was published in October 1973. *Cienega* Pls.' Post-Trial Reply Brief at 32. At closing argument, the government moved to strike that portion of their brief because it was not presented at trial. Tr. 4947:12–25. The court reviewed the final version of this report, which was readily obtainable, and determined that it meets the criteria for the public-record exception to the hearsay rule. Fed.R.Evid. 803(8). Accordingly, the government's motion to strike is denied.

78. Although Dr. Karvel used different rates in the two scenarios, he noted that "the market rent property is significantly less risky than a restricted rent property" and that equal discount rates for the two scenarios would be "very generous" to the government. Tr. 605:25 to 606:17.

taking has ceased—Cienega Gardens, Blossom Hill, Skyline View, Oak Grove, and Gateway—the parties should discount the net rental streams by year to the end date of the taking of that property. For those plaintiffs whose taking has not yet ceased—Del Amo Gardens, Las Lomas Gardens, and Chancellor Manor—the parties should discount the net rental streams by year to September 30, 2005. Each set of plaintiffs shall file a supplemental submission transmitting these calculations on or before September 15, 2005. The government shall file a responsive brief on or before September 26, 2005, providing a review and commentary regarding the calculations submitted by plaintiffs. Copies of each of these submissions should also be delivered to the court's chambers by facsimile or by hand on the same day they are filed with the clerk's office.

By the court's rough reckoning, the present value of the net rents for each property should be approximately as follows (rounded to the nearest million dollars):

| Property | Rough Estimate |
|---|---|
| Cienega Gardens | $ 9 million |
| Del Amo Gardens | $ 5 million |
| Las Lomas Gardens | $12 million |
| Blossom Hill | $ 3 million |
| Skyline View | $ 2 million |
| Chancellor Manor | $13 million |
| Oak Grove | $ 2 million |
| Rivergate | $ 2 million |

*2. Interest.*

The parties dispute whether an award of interest is appropriate. "If the Government pays the owner before or at the time the property is taken, no interest is due on the award ... [b]ut if disbursement of the award is delayed, the owner is entitled to interest thereon." *Kirby Forest Indus., Inc. v. United States,* 467 U.S. 1, 10, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984) (internal citation omitted). If payment is delayed, satisfaction of the constitutional requirement of just compensation includes a payment of interest. *Library of Congress v. Shaw,* 478 U.S. 310, 317 n. 5, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986). *See also Seaboard Air Line Ry. v. United States,* 261 U.S. 299, 306, 43 S.Ct. 354, 67 L.Ed. 664 (1923) ("[T]he owner is ... entitled to such addition [to the value of the property at the time of the taking] as will produce the full equivalent of that value paid contemporaneously with the taking. Interest at a proper rate is a good measure by which to ascertain the amount so to be added."). Because the government failed to compensate the plaintiffs at the time their property rights were taken, the plaintiffs are entitled to interest.

The government argues that the plaintiffs' model pays the value of the taking, and that an award of interest would lead to double recovery. *Cienega* Def.'s Post–Trial Br. at 77–78; *Chancellor Manor* Def.'s Post–Trial Br. at 78. The court rejected a similar argument in *Independence Park,* 61 Fed.Cl. at 716. The government's argument wrongly assumes that plaintiffs' model fully compensates the plaintiffs without an award of interest. Because the court discounts the plaintiffs' calculations of net rents to the end of the taking (for those plaintiffs as to which the temporary taking has ended prior to the date of judgment) or the date of judgment (for those plaintiffs as to which the temporary taking will extend beyond the date of judgment), an award of interest until payment is necessary to place the plaintiffs "in as good a position pecuniarily" as they would have been without the taking. *Kirby Forest,* 467 U.S. at 10, 104 S.Ct. 2187. Accordingly, plaintiffs are awarded interest.

*a. Interest rate.*

In determining an appropriate interest rate, courts rely on the "prudent investor rule," which measures "how 'a reasonably prudent person' would have invested the funds to 'produce a reasonable return while maintaining safety of principal.'" *Tulare Lake Basin Water Storage Dist. v. United States,* 61 Fed.Cl. 624, 627 (2004) (quoting *United States v. 429.59 Acres of Land,* 612 F.2d 459, 464–65 (9th Cir.1980)). In *Independence Park,* the court applied the prudent-investor rule to award interest using annual averages of the daily yields of ten-year Treasury STRIPS. 61 Fed.Cl. at 716–17.[79] Treasury STRIPS are low-risk invest-

79. STRIPS is an acronym for "Separate Trading of Registered Interest and Principal of Securi-

ments because of the high likelihood that the Treasury Department will make payment when the STRIPS mature. The rates for Treasury STRIPS vary depending on the instruments' terms to maturity. Tr. 4156:5–10 (Test. of Hamm). The appropriate rate in this case is for a security that corresponds to the lengthy period between the takings and the judgment.

The parties prefer different interest rates. The government seeks to apply a one-year Treasury STRIPS rate, but concedes that if the court decides to award compound interest, a ten-year Treasury STRIPS rate is appropriate. *Cienega* Def.'s Post–Trial Br. at 79–80; *Chancellor Manor* Def.'s Post–Trial Br. at 80. *See also* Tr. 4157:6–15 (Test. of Hamm). The plaintiffs seek an interest rate that would approximate their opportunity cost of capital. *Cienega* Pls.' Post–Trial Br. at 77; *Chancellor Manor* Pls.' Post–Trial Br. at 79–80. This court has a strong judicial policy favoring uniform interest rates for similarly situated plaintiffs. *See Georgia–Pacific Corp. v. United States,* 226 Ct.Cl. 95, 640 F.2d 328, 365–66 (1980); *Miller v. United States,* 223 Ct.Cl. 352, 620 F.2d 812, 838 (1980); *Tulare Lake,* 61 Fed.Cl. at 627. Given the lack of evidence in the record to deviate from the court's decision in *Independence Park* on this point, the court finds that the annual averages of the daily yields of ten-year Treasury STRIPS provide an appropriate rate of interest.

*b. Compounding.*

The parties dispute whether simple or compound interest is appropriate. In effect, the disputed question is whether compound interest is necessary to put plaintiffs in "as good a position pecuniarily as [they] would have occupied if the payment had coincided with the appropriation." *Kirby Forest,* 467 U.S. at 10, 104 S.Ct. 2187. Compound interest may be necessary " 'to accomplish complete justice' " under the Constitution. *Dynamics Corp. of Am. v. United States,* 766 F.2d 518, 520 (Fed.Cir.1985) (quoting *Waite v. United States,* 282 U.S. 508, 509, 51 S.Ct. 227, 75 L.Ed. 494 (1931)).

Plaintiffs in this case must be awarded compound interest to satisfy the constitutional requirements of just compensation. They would have reinvested the money in some manner had the government paid them at the end of the taking. Compounding is "a routine means by which a reasonable person would protect [himself or herself], over an extended period of time, from erosion of [his or her] investment." *Vaizburd v. United States,* 67 Fed.Cl. 499, 504, 2005 WL 2100904 (2005). *See also Whitney Benefits v. United States,* 30 Fed.Cl. 411, 415–16 (1994) ("Income-producing property would generate an income stream that would be available for continual investment, at compound rates. Just compensation requires the payment of compound interest to replace the investment opportunities plaintiffs lost when the government took their property."). Given the use to which plaintiffs could have put the award, and that some of the takings ended over eight years ago, compound interest is appropriate.

## CONCLUSION

For the reasons stated above, the court finds that all eight plaintiffs have suffered a temporary taking and that an award of just compensation is appropriate. The court has made factual findings and determinations of mixed fact and law that set the parameters for an appropriate judgment of just compensation for each plaintiff. To determine the precise amount of a judgment, the court requests that plaintiffs prepare calculations that use the discount rate with the current-dollar amount of net rents on a year-by-year basis to the end of the temporary takings period for those properties whose taking has ceased, and to September 30, 2005 for those properties whose taking is still ongoing. Both sets of plaintiffs shall submit their calculations of the pertinent amounts on or before September 15, 2005. The government shall submit the results of its review of plaintiffs' calculations and its accompanying commentary on or before September 26, 2005. Interest shall accrue on the present-value compensation award until payment based on the annual average of the daily yield rate on

ties." *See* U.S. Dep't of the Treasury, *Treasury STRIPS,* at http://www.publicdebt.treas.gov/of/ofstrips.htm (Last modified Nov. 3, 2004).

ten-year Treasury STRIPS and shall be compounded annually.

In each of these eight consolidated cases, the court contemplates that it will issue its final judgments on or near September 30, 2005, and that the judgments will be issued under RCFC 54(b). The court will issue final judgments under this Rule because it will also award costs to plaintiffs, including an award of attorneys' fees and expenses under Section 304(c) of the Uniform Relocation Assistance and Real Property Acquisition Policies Act, 42 U.S.C. § 4654(c), and an appeal or cross-appeals from those judgments is virtually certain. In the interest of efficiency for the parties and the court, proceedings on award of attorneys' fees and costs should be deferred until after the appellate process has been concluded.

It is so ORDERED.